IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| NOLEF TURNS, INC., | ) | |
| GREGORY WILLIAMS, ANTONIO | ) | |
| MORRIS, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | Civil No. 3:23-cv-232-JAG |
| v. | ) | |
| | ) | |
| GLENN YOUNGKIN, in his official | ) | |
| capacity as Governor of Virginia, | ) | |
| KAY COLES JAMES, in her official | ) | |
| capacity as Secretary of the | ) | |
| Commonwealth of Virginia, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Nolef Turns, Inc. ("Nolef Turns"), Gregory Williams ("Mr. Williams"), and Antonio Morris ("Mr. Morris") (collectively, "Plaintiffs") seek declaratory and injunctive relief and allege as follows:

**NATURE OF ACTION**

1.      This case is about the exercise of the First Amendment-protected right at the heart of America's democratic system of self-government and the exercise of arbitrary control over that right. For nearly a decade, three successive Virginia Governors—Bob McDonnell, Terry McAuliffe, and Ralph Northam—restored voting rights to people with felony convictions based on specific, objective, and neutral criteria such as sentence completion or release from incarceration. In this way, they used their authority under the Virginia Constitution to remove arbitrary decision-making from the process and create a uniformly administered, non-discretionary restoration system.

2.      Defendant Governor of Virginia Glenn Youngkin ("Governor Youngkin") and Defendant Secretary of the Commonwealth of Virginia Kay Coles James ("Secretary James") (collectively, "Defendants") have terminated this policy and resurrected Virginia's purely discretionary and arbitrary voting rights restoration system. Virginians with felony convictions are once again subject to an arbitrary restoration scheme, under which the Governor grants or denies applications for voting rights restoration in his unfettered discretion, without objective rules or criteria or any reasonable definite time limits on rendering a decision.

3.      An unbroken, well-settled line of U.S. Supreme Court precedent dating back eighty-five years prohibits the arbitrary licensing of First Amendment-protected expression or expressive conduct. This is because the risk of viewpoint discrimination is highest when a government official's discretion to authorize or prohibit First Amendment-protected activity is entirely unconstrained by law, rules, or criteria. Officials with absolute authority to selectively enfranchise U.S. citizens with felony convictions may grant or deny voting rights restoration applications for pretextual reasons or no stated reason, while secretly basing their decision on information—or informed speculation—on the applicant's political affiliations or viewpoints. Defendants are able to review the prior expression of a restoration applicants—from donations to voter registration to online publications and social media postings—and nothing in Virginia law prevents Defendant Governor Youngkin from bestowing or withholding a license to vote based on that prior and ongoing expression. This is why conditioning the right to vote on the exercise of unfettered official discretion and arbitrary decision-making violates the First Amendment.

4.     Virginia is now the only state in the Union that consigns the voting rights of *all* residents with felony convictions to the unfettered discretion of public officials.[1] Under the Virginia Constitution, VA. CONST. art. II, § 1, art. 5, § 12, and the rescission of his predecessors' restoration system, Governor Youngkin has sole and limitless power to grant or deny applications for restoration of voting rights.[2] There are no laws, rules, or criteria governing Defendant Governor Youngkin's decisions to grant or deny voting rights restoration applications. Such unfettered discretion in considering restoration applications is apparent from Defendants' vague characterizations of the new process and their references to highly subjective, vague concepts. The Governor has recently stated that "[e]very individual is looked at carefully – they deserve that."[3] Further, in a March 22, 2023 letter to State Senator Lionel Spruill, Defendant Secretary James described the new process as follows:

> Virginians trust the Governor and his Administration to consider each person individually and take into consideration the unique elements of each situation, practicing grace for those who need it and ensuring public safety for our community and families.[4]

---

[1] VA. CONST. art. II, § 1 ("No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority."); Secretary of the Commonwealth of Virginia's Website, Restoration of Rights Process, *available at* https://www.restore.virginia.gov/restoration-of-rights-process (last visited June 30, 2023); Christopher Uggen, Ryan Larson, Sarah Shannon, and Robert Stewart, LOCKED OUT 2022: ESTIMATES OF PEOPLE DENIED VOTING RIGHTS, The Sentencing Project (Oct. 25, 2022) ("SENTENCING PROJECT REPORT"), at Table 1, *available at* https://www.sentencingproject.org/reports/locked-out-2022-estimates-of-people-denied-voting-rights/ (last visited June 30, 2023).

[2] Secretary of the Commonwealth of Virginia's Website, Restoration of Rights Process, *available at* https://www.restore.virginia.gov/restoration-of-rights-process/ (last visited June 30, 2023) ("The Constitution of Virginia gives the Governor the sole discretion to restore civil rights . . . .").

[3] David Ress, *Youngkin defends his approach to restoring former convicts' rights,* RICHMOND TIMES-DISPATCH, Apr. 1, 2023, https://richmond.com/news/local/govt-and-politics/glenn-youngex-con-convictions-prison-inmates/article_44e8975a-d003-11ed-ac3e-77584d14a537.html.

[4] Letter from Secretary Kay Coles James to Senator Lionel Spruill (Mar. 22, 2023), *available at* https://www.virginiamercury.com/wp-content/uploads/2023/03/032323.Letter-to-Spruill-on-ROR-2-1.pdf.

This is the archetypal arbitrary licensing scheme that the Supreme Court has found runs afoul of the First Amendment unfettered discretion doctrine. *See, e.g.*, *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150–53 (1969) (invalidating permit scheme for marches or demonstrations that lacked "narrow, objective, and definite standards" and was "guided only by [Commissioners'] own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience'").

5.    This action challenges Virginia's selective and arbitrary voting rights restoration scheme for people with felony convictions. It does ***not*** challenge Virginia's authority to disenfranchise individuals upon their conviction for a felony. Nor does it challenge Virginia's system for restoring any other right beyond the right to vote.

6.    Additionally, Virginia law does not set any reasonable, definite time limits by which the Governor must make a decision on an application for voting rights restoration. This additional legal void constitutes a separate violation of the First Amendment.

7.    The disenfranchised population in Virginia remains one of the largest nationwide. As of October 2022, the Sentencing Project's most recent updated estimates of the disenfranchised population in each state reflect that Virginia has an estimated 211,344 people with felony convictions who remain disenfranchised even after completing their full sentences including parole and probation.[5] This constitutes 5.04 percent of the state's voting-age population—the sixth highest rate in the nation.[6]

8.    Plaintiffs bring this action under 42 U.S.C. § 1983 against Defendants' unlawful deprivation of Plaintiffs' rights under the First Amendment to the United States Constitution.

---

[5] SENTENCING PROJECT REPORT, *supra* n.1, at Table 3.
[6] *Id.*

9.      Plaintiffs Gregory Williams and Antonio Morris are disenfranchised by reason of felony convictions. Mr. Williams and Mr. Morris have both applied for restoration of their voting rights, and their applications are currently pending before Defendants. Mr. Williams and Mr. Morris are seeking restoration of their voting rights so they can register and vote in future primary and general elections in Virginia for candidates of their choice and ballot initiatives, and to support and associate with candidates and political parties in order to advance their goals.

10.     Plaintiff Nolef Turns, Inc. will be forced to divert substantial paid staff time and resources in response to this change from a non-discretionary voting rights restoration system to a purely discretionary and arbitrary restoration system.

## JURSIDICTION AND VENUE

11.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343 because this case arises under the United States Constitution and seeks equitable and other relief for the deprivation of constitutional rights under color of state law.

12.     This Court has jurisdiction to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

13.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202.

14.     This Court has personal jurisdiction over Defendant Glenn Youngkin, the Governor of Virginia, and Defendant Kay Coles James, the Secretary of the Commonwealth of Virginia, who are sued in their official capacities. Defendant Governor Youngkin is an elected state government official who works in Richmond, Virginia. Defendant Secretary of the Commonwealth Kay Coles James is an appointed state government official who works in Richmond, Virginia.

5

15.     Venue is appropriate in the Eastern District of Virginia, under 28 U.S.C. § 1391(b)(1), because Defendants are state officials working in Richmond, Virginia. Additionally, a substantial part of the events giving rise to these claims have occurred and will continue to occur in this district, as Plaintiffs have their residences in Richmond and Chesapeake, making venue also proper under 28 U.S.C. § 1391(b)(2).

## PARTIES

16.     Plaintiff Nolef Turns, Inc. is a 501(c)(3) non-profit organization based in Richmond, Virginia. Nolef Turns was founded in 2016 as an all-volunteer group to advocate for people with felony convictions throughout Virginia. It was established to build a network of resources to help individuals live self-sufficient lives after they have completed their sentences. Nolef Turns, Inc. now has four paid staff members who work with those affected by the criminal justice system to maintain a stable support system and to facilitate such individuals' reintegration into society by assisting with employment and financial literacy, restoration of voting rights, voter registration after restoration, and more. Some of Nolef Turns, Inc.'s programs include the following: Back To Work Program; Food Pantry; Annual Holiday Help Program; Voter Registration Drives; Right to Vote Campaign; Restoration of Rights; Pardon and Expungement Resource Workshops; Parenting Promises Campaign; Beyond Home Program; Healthcare Initiatives; First Thursdays Community Feeding; Drug and Alcohol Treatment Referrals; Mental Health Referrals; Character Building Program; Notary Services; Financial Literacy Program; and Finding Forgiveness Campaign.

17.     Plaintiff Gregory Williams, a resident of Richmond, Virginia, was convicted of a felony in Virginia state court and lost his right to vote under Virginia law. After nineteen years in prison, Mr. Williams was released from incarceration in 2007. He was on parole until 2010. Mr.

Williams wants to register and vote in future primary and general elections in the Commonwealth of Virginia for candidates of his choice and state constitutional amendments, to express his political preferences, and to support and associate with political parties in order to advance their goals. His restoration application is pending with the Governor's office and subject to an arbitrary restoration process.

18.    Plaintiff Antonio Morris, a resident of Chesapeake, Virginia, was convicted of a felony in federal court in 2002 and lost his right to vote under Virginia law. He was released from incarceration in 2009, and his probation ended on June 29, 2012. Mr. Morris was convicted of a state felony in April 2015. He was released from state prison in 2018 and subsequently finished probation. After completing his sentences, including probation, Mr. Morris applied for voting rights restoration in June or July 2022. In November 2022, the Office of the Secretary of the Commonwealth's rights restoration staff informed Mr. Morris that there was an error with his application, specifically that he had failed to attach documentation of his release from federal probation. The rights restoration application does not give any notice that such documentation is required. After Mr. Morris submitted this documentation by email, the Office of the Secretary of the Commonwealth emailed him to say that his application had been "finalized and submitted for review" on November 15, 2022, and that it was now in "review status." Mr. Morris's restoration application remains pending nearly a full year after its initial submission and seven months after he submitted the additional requested documentation. Mr. Morris wants to register and vote in future primary and general elections in the Commonwealth of Virginia for candidates of his choice and state constitutional amendments, to express his political preferences, and to support and associate with political parties in order to advance their goals. His restoration application is pending with the Governor's office and subject to an arbitrary restoration process.

19.     Defendant Glenn Youngkin is the Governor of Virginia and is sued in his official capacity. The Virginia Constitution vests the Governor with the exclusive authority to restore voting rights. VA. CONST. art. II, § 1, art. 5, § 12.

20.     Defendant Kay Coles James is the Secretary of the Commonwealth of Virginia and is sued in her official capacity. The Secretary of the Commonwealth is appointed by the Governor, Va. Code Ann. § 2.2-400, and is responsible for assisting the Governor in a number of different capacities, including restoration of rights.[7]

## BACKGROUND

### A.  Felony Disenfranchisement and Re-enfranchisement in Virginia Law

21.     The Virginia Constitution sets forth the rules for voting eligibility and also includes a felony disenfranchisement provision: "No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." VA. CONST. art. II, § 1. Article 5, Section 12 of the Virginia Constitution also states that "[t]he Governor shall have power . . . to remove political disabilities consequent upon conviction for offenses committed prior or subsequent to the adoption of this Constitution . . ." VA. CONST. art. 5, § 12. People with felony convictions may not register to vote prior to the restoration of their voting rights by the Governor. If an individual with a felony conviction willfully registers to vote without restoration, they commit a Class 5 felony. Va. Code Ann. § 24.2-1016.

22.     Felony disenfranchisement and re-enfranchisement are also incorporated within Virginia's election code. Just after the enumerated eligibility criteria in the definition of a "qualified voter," Virginia law states that: "No person who has been convicted of a felony shall be

---

[7] Secretary of the Commonwealth of Virginia, *What We Do*, https://www.commonwealth.virginia.gov/ (last visited June 30, 2023).

a qualified voter unless his civil rights have been restored by the Governor or other appropriate authority." Va. Code Ann. § 24.2-101; *see also* Va. Code Ann. § 24.2-427(D.) (requiring cancellation of "registration of any registered voter shown to have been convicted of a felony who has not provided evidence that his right to vote has been restored").

23.     Virginia law fails to establish any rules or criteria governing the Governor's decision-making on voting rights restoration applications. The Supreme Court of Virginia has noted that the Governor's powers of restoration are exclusive and unfettered: "[T]he power to remove the felon's political disabilities remains vested solely in the Governor, who may grant or deny any request *without explanation*, and there is no right of appeal from the Governor's decision." *In re Phillips*, 265 Va. 81, 87–88 (2003) (emphasis added).

24.     The Director of the Department of Corrections is required to notify anyone convicted of a felony of the loss of their voting rights and of the procedures for applying for restoration. Va. Code Ann. § 53.1-231.1. "The notice shall be given at the time the person has completed service of his sentence, period of probation or parole, or suspension of sentence." *Id*. The Director of the Department of Corrections is required to assist the Secretary of the Commonwealth in administering the restoration application review process. *Id*. The Secretary of the Commonwealth is instructed by statute to "maintain a record of the applications for restoration of rights received, the dates such applications are received, and the dates they are either granted or denied by the Governor" and to "notify each applicant who has filed a complete application that the complete application has been received and the date the complete application was forwarded by the Secretary to the Governor." *Id*. Virginia law requires that complete applications be forwarded to the Governor within ninety days of receipt. *Id*.

25.     Those disenfranchised by reason of their felony convictions who seek to regain their voting rights in Virginia must submit an application to the Secretary of the Commonwealth's office through the website restore.virginia.gov. The website can walk the applicant through the rights restoration application form or, alternatively, the applicant can print a copy and fill it out by hand.[8] An individual with a felony conviction "is eligible to apply to have his/her rights restored by the Governor if he/she has been convicted of a felony and is no longer incarcerated."[9]

26.     The application asks for personally identifying information, contact information, the court in which the applicant was convicted, and whether the applicant is a U.S. citizen.[10] One of the new questions that Defendants have added to the rights restoration application asks whether the applicant was convicted of a violent crime.[11] If the applicant answers "Yes," then they must list the specific crime and the date of conviction.[12] Ostensibly, applicants convicted of non-violent offenses need *not* list the offense or date of conviction.

27.     Next, the application form asks all applicants, regardless of the type of offense, to answer three questions: "HAVE YOU COMPLETED SERVING ALL TERMS OF INCARCERATION? ARE YOU CURRENTLY ON PROBATION, PAROLE OR OTHER STATE SUPERVISION? IF YES, WHEN IS YOUR EXPECTED END DATE?"[13]

---

[8]   Office of the Secretary of the Commonwealth, Restoration of Rights Form, https://www.restore.virginia.gov/media/governorvirginiagov/restoration-of-rights/pdf/ror_form.pdf (last visited June 30, 2023).

[9] Secretary of the Commonwealth of Virginia's Website, *Restoration of Rights Process*, https://www.restore.virginia.gov/restoration-of-rights-process/ (last visited June 30, 2023).

[10]   Office of the Secretary of the Commonwealth, Restoration of Rights Form, https://www.restore.virginia.gov/media/governorvirginiagov/restoration-of-rights/pdf/ror_form.pdf (last visited June 30, 2023).

[11] No definition of that term is provided; nor does the form enumerate which offenses constitute violent offenses.

[12] *Id*.

[13] *Id*.

28.     The revised restoration application form also includes two new checkboxes related to the payment of any legal financial obligations arising out of the felony conviction. An applicant who has paid off "all fines, fees and restitution" will check the first box; an applicant who is "currently paying [their] fines, fees and restitution" will check the second.[14] The second checkbox includes the parenthetical "(receipt or payment plan from court attached)", suggesting that the applicants needs to attach documentation of completed or ongoing payment.[15]

29.     Finally, the rights restoration form informs the applicant that "the restoration of rights does not restore the right to possess a firearm" and they "must petition the appropriate circuit court pursuant to Virginia Code § 18.2-308.2."[16] The application form also emphasizes that restoration of rights "is not a pardon nor does it expunge a criminal conviction."[17]

30.     Defendant Secretary James and her office staff "thoroughly review[ ]" restoration applications and conduct investigations, "including checking [an applicant's] records with various state agencies to ensure the individual meets the Governor's standards for restoration of rights."[18] During the investigation, the Secretary's office "works with other various state agencies to consider individuals who may be eligible to have their rights restored."[19] According to Defendant Secretary James, these state agencies at least include: the Virginia Department of Corrections, Virginia State Police, Virginia Department of Elections, Virginia Department of Behavioral and Developmental Services, and Compensation Board.

---

[14] *Id*.

[15] *Id*.

[16] *Id*.

[17] *Id*.

[18] Secretary of the Commonwealth of Virginia's Website, *Restoration of Rights Process*, https://www.restore.virginia.gov/restoration-of-rights-process/ (last visited June 30, 2023).

[19] Secretary of the Commonwealth of Virginia's Website, *Restoration of Rights*, https://www.restore.virginia.gov (last visited June 30, 2023).

31.     Defendants send "personalized restoration orders" to applicants when their applications are granted.[20] These documents are available to restored applicants online and are also sent by mail if there is a current mailing address on file for the restored applicant. However, prior to restoration, there is no publicly available timeline for decision-making.

32.     Defendant Governor Youngkin's decision whether to grant or deny a restoration application rests with his unfettered discretion. Applicants may be granted or denied for a pretextual reason or no stated reason. The absence of objective, transparent rules or criteria for restoration opens the door to viewpoint and political discrimination based on the applicant's prior and ongoing expression, including public statements, online writings and recordings, and social media posts, as well as informed speculation as to the applicant's viewpoints and politics based on their name, address, previous voter registration information, race, ethnicity, religion, income, occupation, donation history, partisan primary voting history prior to disenfranchisement, affiliations, and memberships. All of this information can be readily learned or ascertained from easily accessed sources, a Google search, or government databases.

33.     A March 22, 2023 letter sent to State Senator Lionel Spruill by Defendant Secretary of the Commonwealth Kay Coles James constitutes the only description of this opaque and arbitrary restoration process:

> The Constitution places the responsibility to consider Virginians for restoration in the hands of the Governor and to the Secretary as delegated. After Inauguration, the Governor charged me and our team with ensuring our application and deliberation were legal and fair – that every applicant be considered individually as required by the Constitution and underscored by the Supreme Court of Virginia in 2016.

---

[20] Secretary of the Commonwealth of Virginia's Website, *Restoration of Rights Process*, https://www.restore.virginia.gov/restoration-of-rights-process/ (last visited June 30, 2023); Secretary of the Commonwealth of Virginia's Website, *FAQ—Will I receive proof after my rights are restored?*, https://www.restore.virginia.gov/frequently-asked-questions/ (last visited June 30, 2023).

Every applicant is different and we utilize our partners at the Virginia Department of Corrections, Virginia State Police, Virginia Department of Elections, Virginia Department of Behavioral and Developmental Services, and the Compensation Board to research each application and provide further information to be used in the consideration process.

As we updated this process to ensure Constitutionality, we worked with the Secretary of Public Safety and the Department of Corrections to ensure that every discharged felon be provided with an application for restoration and explained its significance. Each inmate signs to attest to receiving this application. The Department of Corrections has indicated that roughly 12,000 people are released each year which includes individuals found guilty of misdemeanors and felonies.

Our website was updated to include that applications are considered individually and not granted on an automatic basis. As noted earlier, individuals are informed upon release the recommendation of applying and given a paper application. Applicants use this same website to apply and to check the status of their application and advocates use this website to help individuals apply or to share the PDF paper application to be submitted by mail. We have scheduled a roundtable for advocates in April to discuss the process.

Virginians trust the Governor and his Administration to consider each person individually and take into consideration the unique elements of each situation, practicing grace for those who need it and ensuring public safety for our community and families.

*See supra* note 4. This letter makes plain that Governor Youngkin's administration is fully exploiting the unfettered discretion the Virginia Constitution and state court cases confer upon him to restore or deny voting rights to people with felony convictions. Since the original Complaint in this lawsuit was filed on April 6, 2023, Defendants have not stated that the restoration process is governed by any rules or criteria whatsoever—a strong indication that it is a purely arbitrary restoration process.[21]

---

[21] In a reported email to State Sen. Scott Surovell, Defendant Secretary James wrote: "We consider each application that we receive on the merits of each individual case, but we get information from state agency partners [Department of Behavioral Health and Developmental Services, Virginia State Police, Department of Elections, and the Compensation Board] from applicants to appropriately consider each candidate." Charlotte Rene Woods, *Surovell, Spruill ask if Youngkin has changed rights restoration process*, RICHMOND TIMES-DISPATCH (Mar. 17, 2023),

**B.  The Rise and Fall of Non-Arbitrary Voting Rights Restoration in Virginia**

34.    Almost a decade ago, in May 2013, Governor Bob McDonnell took the first steps towards giving Virginia a non-discretionary, non-arbitrary voting rights restoration system. *See* Office of the Governor, Executive Order No. 65 (July 15, 2013), Sharing of Criminal History Record Information for Determining Eligibility for Automatic Restoration of Rights Process. Governor McDonnell's restoration system "create[d] a procedure for automatic, individualized restoration of civil rights to non-violent felons who meet the following specific conditions: 1) completion of their sentence, probation or parole; 2) payment of all court costs, fines, restitution, and completion of court-ordered conditions, and 3) have no pending felony charges." *Id*. Ultimately, Governor McDonnell restored voting rights to over 8,000 individuals with felony convictions.[22]

35.    Governor Terry McAuliffe streamlined the process for non-discretionary, non-arbitrary restoration, expanded coverage to all felony convictions, and eliminated the prerequisite to pay off all fines, fees, and restitution. The Supreme Court of Virginia ruled in *Howell v. McAuliffe* that, pursuant to the Virginia Constitution, the Governor must restore people with felony convictions on an individualized basis. 292 Va. 320, 350–51 (2016). Following that decision, Governor McAuliffe used his power to individually restore the voting rights of over 173,000 people with felony convictions based on objective rules and criteria.[23]

_____

https://richmond.com/news/state-and-regional/govt-and-politics/surovell-spruill-ask-if-youngkin-has-changed-rights-restoration-process/article_dd1232ba-c4fb-11ed-8b57-3723c72fb438.html.

[22] *See generally*, Office of the Governor, SD2 Reports – List of Pardons, Commutations, Reprieves and Other Forms of Clemency, *available at* https://rga.lis.virginia.gov/search/?query=SD2; Graham Moomaw, *Youngkin administration now requires felons to apply to get their voting rights back*, VIRGINIA MERCURY (Mar. 23, 2023), https://www.virginiamercury.com/2023/03/23/youngkin-administration-now-requires-felons-to-apply-to-get-their-voting-rights-back/.

[23] *Id*.

36.     Governor Ralph Northam expanded this non-discretionary restoration system still further, issuing an executive order in March 2021 that authorized the restoration of parolees and probationers as well.[24] That new system effectively restored individuals upon release from incarceration. All told, Governor Northam used his power to restore the voting rights of over 126,000 people with felony convictions based on objective rules and criteria.[25]

37.     Defendants Governor Youngkin and Secretary of the Commonwealth Kay Coles James have ended their predecessors' system of non-discretionary restoration based on objective rules and criteria.

### C.  Effect of the Arbitrary Restoration of Voting Rights Process in Virginia

38.     Not only is Defendants' arbitrary voting rights restoration process prone to inconsistent and discriminatory treatment, but the Governor actually does make decisions in a wholly arbitrary manner.

39.     It remains unclear exactly when Defendants converted Virginia's non-discretionary restoration process into a purely discretionary, arbitrary restoration scheme. However, on information and belief, Defendants made this change at some time in 2022, as the effects on last year's total restorations are unmistakable. Restoration grants have declined steeply since Defendant Governor Youngkin assumed office in January 2022. In his first year in office, Governor Youngkin only granted restoration to approximately 4,300 people.[26]

40.     The number of voting rights restoration applications currently pending with Defendants' offices is unknown.

---

[24] Governor of Virginia's Website, *Governor Northam Restores Civil Rights to Over 69,000 Virginians, Reforms Restoration of Rights Process* (Mar. 16, 2021), https://www.governor.virginia.gov/newsroom/all-releases/2021/march/headline-893864-en.html.
[25] *See supra* note 22.
[26] *See supra* note 22.

41.     On information and belief, Governor Youngkin does not deny any applications for voting rights restoration. Instead, certain applications are indefinitely held in limbo by the Governor's office, without any final decision.

42.     The disenfranchised population in Virginia remains one of the largest nationwide. As of October 2022, the Sentencing Project's most recent updated estimates of the disenfranchised population in each state reflect that Virginia has an estimated 211,344 people with felony convictions who remain disenfranchised even after completing their full sentences including parole and probation.[27] This constitutes 5.04 percent of the state's voting-age population—the sixth highest rate in the nation.[28]

## INJURY TO PLAINTIFFS

43.     Voting rights restoration assistance is one of Plaintiff Nolef Turns, Inc.'s core programs, but paid staff members' time and organization resources are finite. Every hour and dollar spent on the rights restoration process is a dollar and an hour that cannot be spent fulfilling the other programs essential to fulfilling Plaintiff Nolef Turns, Inc.'s core mission of reintegrating their clients and reducing recidivism. Defendant Governor Youngkin's termination of his predecessors' non-discretionary voting rights restoration system and reversion to an arbitrary restoration system will have a significant impact on Nolef Turns, Inc.'s work. It will force the organization to divert substantial paid staff time, money, and other resources to guiding their clients through the process from beginning to end.

44.     First and foremost, Nolef Turns will need to divert paid staff time, money, and other resources to explaining and educating community members with felony convictions on the changes

---

[27] SENTENCING PROJECT REPORT, *supra* n.1, at Table 3.
[28] *Id.*

in Virginia's restoration system. Many people with felony convictions are not adequately informed by Virginia state government agencies about the restoration process, so Nolef Turns will need to fill that public education gap on this sea change in the state's restoration system.

45.     Second, given Defendants' arbitrary restoration process, now each restoration application will be unique and require specific documentation of the applicant's completed or ongoing payment of fines, fees, and restitution. Plaintiff Nolef Turns, Inc.'s four paid staff members will need to: (1) verify the specific offenses against the judgment; and (2) verify the completed or ongoing payment of legal financial obligations. The former may necessitate a background check, and the lack of clarity around what constitutes a "violent crime" means will entail even more research and communication. For the latter, Nolef Turns will need to help their clients obtain and submit the requisite paperwork documenting the completed payment of fines, fees, and restitution or the ongoing payment plan. All of this work collecting information and documentation is burdensome and challenging, as criminal court records and request processes vary from county to county. This, in turn, means that Nolef Turns as an organization will be spending more time and resources per applicant than it would have prior to the imposition of an arbitrary restoration process with undisclosed and/or vague requirements. Furthermore, Defendants have not clarified whether there is a risk of prosecution for any inaccuracies on the form. Given the arbitrary and secretive nature of Defendants' restoration process, Nolef Turns, Inc. has a legitimate fear that their clients may be prosecuted for inaccuracies on the restoration of rights application form. Accordingly, this risk of prosecution will force an even more substantial diversion of Nolef Turns, Inc.'s paid staff time, money, and other resources to ensure accuracy on rights restoration forms.

46.     Third, Defendant Secretary Kay Coles James has asserted that the new restoration process entails an investigation that will involve other Virginia state agencies providing information on applicants. This shift to a more expansive investigation into each restoration applicant will require Nolef Turns, Inc. to engage more deeply with each restoration applicant it assists, helping them to respond to Virginia state agencies' informational requests, as well as any requests for the submission of documents to Defendants' offices for consideration along with their application.

47.     Fourth, Defendants have also communicated that the preexisting waiting period of two to four weeks has been increased to one to three months. But on information and belief, many restoration applications languish with Defendants' offices for longer than three months. Accordingly, as a result of this new arbitrary voting rights restoration system with no reasonable, definite time limits for the Governor to make a decision, Plaintiff Nolef Turns, Inc.'s work with their clients will entail calling for status updates over far longer periods of time. Under the previous process, Nolef Turns, Inc. could assist people with the application and educate them on a simplified process that restored people by operation of neutral, objective criteria. Now, under this arbitrary and more complex process, Nolef Turns must help their clients navigate a process with subjective, vague criteria, open-ended investigations, and obscure procedures.

48.     Accordingly, Defendants' new arbitrary restoration process will force Nolef Turns to divert substantial time and resources from other core mission programs focused on reintegrating people with felony convictions into society and reducing recidivism. This diversion of effort and resources will increase both the per-applicant and aggregate costs and resources for its restoration of rights program.

49.     Plaintiffs Gregory Williams and Antonio Morris are per se injured by being subjected to an arbitrary voting rights restoration process with no reasonable, definite time limits. Virginia law's complete lack of rules or criteria governing the voting rights restoration process and Defendants' operation of an arbitrary restoration system without any such rules or criteria violate Mr. Williams's and Mr. Morris's First Amendment rights.

## CLAIMS

### COUNT ONE
### (All Plaintiffs)
### (Unfettered Discretion and Arbitrary Treatment of Voting Rights Restoration Applicants in Violation of the First Amendment and 42 U.S.C. § 1983)

50.     The factual allegations contained in the preceding paragraphs are incorporated into Count One, as though fully set forth herein.

51.     Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of the First Amendment to the U.S. Constitution.

52.     The First Amendment protects the right to vote because voting is political expression or expressive conduct, as well as political association. *Norman v. Reed*, 502 U.S. 279, 288-90 (1992) (recognizing "the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences"); *Anderson v. Celebrezze*, 460 U.S. 780, 787–89, 806 (1983) (evaluating burdens on "the voters' freedom of choice and freedom of association"); *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973) (recognizing "freedom to associate with others for the common advancement of political beliefs and ideas" is protected by First Amendment); *Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968) ("[T]he state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and

the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.").

53.     The First Amendment forbids vesting government officials with unfettered discretion to issue or deny licenses or permits to engage in any First Amendment-protected speech, expressive conduct, association or any other protected activity or conduct. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130–33 (1992) ("The First Amendment prohibits the vesting of such unbridled discretion in a government official."); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988) (noting "danger [of viewpoint discrimination] is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official"); *Shuttlesworth*, 394 U.S. at 150–53 (invalidating permit scheme for marches or demonstrations that lacked "narrow, objective, and definite standards" and was "guided only by [Commissioners'] own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience'"); *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (striking down licensing scheme that turned on "uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official"). Absent any laws, rules, or criteria regulating the granting or denying of restoration of voting rights applications, the process is highly susceptible to arbitrary, biased, and/or discriminatory decision-making.

54.     The Governor of the Commonwealth of Virginia is vested with the authority to grant or deny applications for voting rights restoration, and his discretion in issuing these licenses to vote is absolute. Voting rights restoration in Virginia is not governed by any laws, rules, or criteria of any kind. This scheme therefore constitutes an unconstitutional arbitrary licensing scheme regulating the exercise of the right to vote.

55.     The First Amendment unfettered discretion doctrine does not require plaintiffs to demonstrate actual evidence of discriminatory treatment. The absence of any legal constraint *preventing* viewpoint discrimination is grounds for a facial challenge under this doctrine. *Forsyth Cnty.*, 505 U.S. at 133 n.10; *City of Lakewood*, 486 U.S. at 757, 769–70.

56.     U.S. Supreme Court precedent prohibits the arbitrary licensing of First Amendment-protected expression or expressive conduct. This is because the risk of viewpoint discrimination is highest when a government official's discretion to authorize or prohibit First Amendment-protected activity is entirely unconstrained by law, rules, or criteria. *City of Lakewood*, 486 U.S. at 763–64 ("[W]ithout standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the . . . viewpoint of the speaker."). Officials with unfettered authority to selectively enfranchise people with felony convictions may grant or deny voting rights restoration applications on pretextual grounds while secretly basing their decisions on the applicants' political affiliations and viewpoints. The absence of objective, transparent rules or criteria for restoration opens the door to viewpoint discrimination based on the applicants' prior and ongoing expression, including public statements, online writings and recordings, and social media posts, as well as informed speculation as to the applicants' viewpoints and politics based on race, ethnicity, religion, income, occupation, address, previous voter registration information, donation history, partisan primary voting history prior to disenfranchisement, affiliations, and memberships. All of this information can be readily learned or ascertained from easily accessed sources, a Google search, or government databases. Governor Youngkin "can measure" a restoration applicant's "probable . . . viewpoint[s] by speech already uttered." *Id*. at 759. In this way, an arbitrary licensing system enables viewpoint discrimination against "disfavored" votes and "disliked" voters. *Id*.

21

57.     Va. Const. art. II, § 1, Va. Const. art. V, § 12, and Va. Code Ann. § 24.2-101 require a person with a felony conviction to obtain the Governor's permission in order to regain their right to vote, confer unfettered discretion on the Governor to grant or deny restoration, and therefore impose an unconstitutional arbitrary licensing scheme for First Amendment-protected voting. Virginia law contains no rules or criteria regulating the Governor's discretionary power to grant or deny applications for voting rights restoration, making the system prone to arbitrary, biased, and/or discriminatory treatment. As a licensing scheme of unfettered official discretion, it violates the First Amendment.

58.     At all relevant times, Defendants have acted under color of state law.

59.     Defendants have deprived and will continue to deprive Plaintiffs of their right not to be subjected to an unconstitutional arbitrary licensing scheme governing voting rights. This right is guaranteed by the First Amendment and enforced by 42 U.S.C. § 1983.

**COUNT TWO**
**(All Plaintiffs)**
**(Lack of Reasonable, Definite Time Limits for Decisions on Voting Rights Restoration**
**Applications in Violation of the First Amendment and 42 U.S.C. § 1983)**

60.     The factual allegations contained in the preceding paragraphs are incorporated into Count Two, as though fully set forth herein.

61.     Plaintiff asserts a claim pursuant to 42 U.S.C. § 1983 for violation of the First Amendment to the U.S. Constitution.

62.     The First Amendment protects the right to vote because voting is political expression or expressive conduct, as well as political association. *Norman v. Reed*, 502 U.S. 279, 288 (1992) (recognizing "the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences"); *Anderson v. Celebrezze*, 460 U.S. 780, 787–89, 806 (1983) (evaluating burdens on

"the voters' freedom of choice and freedom of association"); *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973) (recognizing "freedom to associate with others for the common advancement of political beliefs and ideas" is protected by First Amendment); *Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968) ("[T]he state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.").

63.    First Amendment doctrine clearly holds that an administrative licensing scheme "that fails to place limits on the time within which the decisionmaker must issue the license is impermissible." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990). "Where the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as great as the provision of unbridled discretion. A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." *Id*. at 227; *see also Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 802 (1988) ("[D]elay compels the speaker's silence. Under these circumstances, the licensing provision cannot stand."). Without reasonable, definite time limits, there is also a significant risk of arbitrary, biased, and/or discriminatory treatment of voting rights restoration applicants.

64.    The Governor is not bound by any reasonable, definite time limits in processing voting rights restoration applications and issuing final decisions. Virginia law is devoid of any such time limits for granting or denying restoration applications.

65.    Without binding time limits, the Governor's office may process individual restoration applications at any speed and may deliberately fast-track select applicants while delaying others.

23

66.     Since no provision in Virginia law requires the Governor's office to render a decision on a voting rights restoration application within a reasonable, definite time period, Va. Const. art. II, § 1, Va. Const. art. V, § 12, and Va. Code Ann. § 24.2-101 create the risk of arbitrary delays, biased treatment, and viewpoint discrimination, and therefore violate the First Amendment.

67.     Va. Const. art. II, § 1, Va. Const. art. V, § 12, and Va. Code Ann. § 24.2-101 contain no reasonable, definite time constraints on the Governor's processing of and decisions on voting rights restoration applications, making the system susceptible to arbitrary, biased, and/or discriminatory treatment. Accordingly, the lack of reasonable, definite time limits in Virginia's voting rights restoration process also violates the First Amendment.

68.     At all relevant times, Defendants have acted under color of state law.

69.     Defendants have deprived and will continue to deprive Plaintiffs of their right to a voting rights restoration scheme with reasonable, definite time limits on the Governor's decision-making, which is guaranteed to Plaintiffs by the First Amendment and enforced by 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

(a) Assume jurisdiction over this matter;

(b) Declare that Virginia's arbitrary voting rights restoration scheme for people with felony convictions created by Va. Const. art. II, § 1, Va. Const. art. V, § 12, and Va. Code Ann. § 24.2-101 violates the First Amendment to the United States Constitution;

(c) Preliminarily and permanently enjoin Defendants Governor Youngkin and Secretary of the Commonwealth Kay Coles James, as well as their respective agents, officers, employees, successors, and all persons acting in concert with them, from subjecting

Plaintiffs to the unconstitutional arbitrary voting rights restoration scheme created by Va. Const. art. II, § 1, Va. Const. art. V, § 12, and Va. Code Ann. § 24.2-101;

(d) Declare that the lack of reasonable, definite time limits in Virginia's voting rights restoration process created by Va. Const. art. II, § 1, Va. Const. art. V, § 12, and Va. Code Ann. § 24.2-101 violates the First Amendment;

(e) Preliminarily and permanently enjoin Defendants Governor Youngkin and Secretary of the Commonwealth Kay Coles James, as well as their respective agents, officers, employees, successors, and all persons acting in concert with them, from administering the voting rights restoration scheme created by Va. Const. art. II, § 1, Va. Const. art. V, § 12, and Va. Code Ann. § 24.2-101 without reasonable, definite time limits;

(f) Preliminarily and permanently order Defendants Governor Youngkin and Defendant Secretary James, their respective agents, officers, employees, successors, and all persons acting in concert with them, to replace the current arbitrary voting rights restoration scheme for people with felony convictions with a non-arbitrary voting rights restoration scheme which restores the right to vote based upon specific, neutral, objective, and uniform rules and/or criteria and within reasonable, definite time limits;

(g) Retain jurisdiction to enforce its order;

(h) Grant Plaintiffs their reasonable attorneys' fees and costs incurred in bringing this action pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and as otherwise permitted by law; and

(i) Grant such other relief as this Court deems just and proper.

DATED: June 30, 2023                    Respectfully submitted,

                                        */s/ Terry Frank*

25

Terry Frank
Virginia State Bar No. 74890
TERRY FRANK LAW
6722 Patterson Avenue, Suite B
Richmond, VA 23226
(804) 899-8090

Jon Sherman*
D.C. Bar No. 998271
Michelle Kanter Cohen*
D.C. Bar No. 989164
Beauregard Patterson*
Wisconsin Bar No. 1102842
FAIR ELECTIONS CENTER
1825 K St. NW, Suite 701
Washington, DC 20006
(202) 331-0114
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
bpatterson@fairelectionscenter.org

Charles H. Schmidt, Jr.
Virginia State Bar No. 84416
Attorney at Law
4310 Dorset Road
Richmond, VA 23234
(804) 402-0767
charlieschmidtrva@gmail.com

*Counsel for Plaintiffs*

*Admitted Pro Hac Vice*