# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | | |
|---|---|---|
| NOLEF TURNS, INC., and<br>GEORGE HAWKINS | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-00232 |
| | ) | |
| GLENN YOUNGKIN, in this official | ) | |
| capacity as Governor of Virginia, and | ) | |
| KAY COLES JAMES, in her official | ) | |
| capacity as Secretary of the Commonwealth | ) | |
| of Virginia | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM IN OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

I. INTRODUCTION ............................................................................................................. 1

II. NATURE OF PLAINTIFFS' ACTION ............................................................................ 1

III. ARGUMENT .................................................................................................................... 4

    A. Plaintiffs have standing to pursue their First Amendment claims against Defendants' arbitrary voting rights restoration scheme. ........................................................................ 4

        1. George Hawkins ................................................................................................ 4

        2. Nolef Turns, Inc. .............................................................................................. 7

    B. Plaintiffs have stated a claim for relief under longstanding First Amendment precedents. ........................................................................................................................ 10

        1. The Fourteenth Amendment and cases construing it do not preclude Plaintiffs' First Amendment challenges to arbitrary voting rights restoration ................................ 10

        2. The Fourteenth Amendment's guarantees do not displace First Amendment rules in the voting rights context ............................................................................................ 14

        3. Voting is politically expressive conduct protected by the First Amendment. ......... 16

        4. The First Amendment commands a functional analysis, and Virginia's voting rights restoration system functions as a licensing scheme. ................................................. 19

5. The First Amendment unfettered discretion doctrine does not require a showing of actual invidious discrimination—arbitrary licensing of protected expressive conduct is per se prohibited. .............................................................. 28

IV. CONCLUSION .............................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996) ............................................................................................... 11

*Allen v. Wright*,
    468 U.S. 737 (1984) ................................................................................................. 8

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) .......................................................................................... 17, 18

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58(1963) ................................................................................................ 20

*Beacham v. Braterman,*
    300 F. Supp. 182 (S.D. Fla. 1969) ....................................................................... 16

*Bell v. Hood*,
    327 U.S. 678 (1946) ............................................................................................... 6

*Bigelow v. Virginia*,
    421 U.S. 809 (1975) .............................................................................................. 20

*Bland v. Roberts*,
    730 F.3d 368 (4th Cir. 2013) ............................................................................... 17

*Blount v. Clarke*,
    291 Va. 198 (2016) .............................................................................................. 21

*Branti v. Finkel*,
    445 U.S. 507 (1980) .............................................................................................. 20

*Burson v. Freeman*,
    504 U.S. 191 (1992) .............................................................................................. 17

*Carter v. Cummins Inc.,*
    No. 2:10-CV-1408, 2010 WL 5139842 (D.S.C. Dec. 10, 2010) .......................... 24

*Citizens United v. Federal Election Commission*,
    558 U.S. 310 (2010) .............................................................................................. 17

*City of Ladue v. Gilleo,*
 512 U.S. 43 (1994) ......................................................................................... 17

*City of Lakewood v. Plain Dealer Publishing Co.,*
 486 U.S. 750 (1988) ................................................................. 1, 2, 3, 4, 5, 6, 12, 26

*City of Littleton v. Z.J. Gifts D-4, LLC,*
 541 U.S. 774 (2004) .......................................................................................... 2

*Colorado Republican Federal Campaign Commission v. Federal Election Commission,*
 518 U.S. 604 (1996) ........................................................................................ 17

*Connecticut Board of Pardons v. Dumschat,*
 452 U.S. 458 (1981) ...................................................................................... 3, 16

*DiCocco v. Garland,*
 52 F.4th 588 (4th Cir. 2022) ............................................................................ 6

*Doe v. Reed,*
 561 U.S. 186 (2010) ......................................................................................... 19

*Doe v. Virginia Department of State Police,*
 713 F.3d 745 (4th Cir. 2013) ........................................................................... 5

*Farrakhan v. Locke,*
 987 F. Supp. 1304 (E.D. Wash. 1997) ......................................................... 11, 13

*Forsyth County, Georgia v. Nationalist Movement,*
 505 U.S. 123 (1992) .............................................................................. 1, 2, 28, 29

*FW/PBS, Inc. v. City of Dallas,*
 493 U.S. 215 (1990) .......................................................................................... 2

*Garcetti v. Ceballos,*
 547 U.S. 410 (2006) ..................................................................................... 19, 20

*Hand v. DeSantis,*
 946 F.3d 1272 (11th Cir. 2020) ..................................................................... 14, 15

*Hand v. Scott,*
 888 F.3d 1206 (11th Cir. 2018) ..................................................................... 15, 16

*Harrison v. Spencer,*
 449 F. Supp. 3d 594 (E.D. Va. 2020) ......................................................... 8, 9,10

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ............................................................................................ 8

*Hayden v. Pataki*,
    No. 00 Civ. 8586, 2004 WL 1335921 (S.D.N.Y. June 14, 2004) ......................... 13

*Heffron v. International Society for Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981) ..................................................................................... 13, 14

*Hill v. Colorado*,
    530 U.S. 703 (2000) .......................................................................................... 20

*Howard v. Gilmore*,
    205 F.3d 1333 (4th Cir. 2000) ........................................................................... 13

*Howell v. McAuliffe*
    292 Va. 320 (2016) ............................................................................................. 21

*Hunter v. Underwood*,
    471 U.S. 222 (1985) ........................................................................................... 29

*Illinois State Bd. of Elections v. Socialist Workers Party*,
    440 U.S. 173 (1979) ........................................................................................... 18

*Irby v. Virginia State Board of Elections*
    889 F.2d 1352 (4th Cir. 1989) ........................................................................... 15

*Johnson v. Bush*,
    214 F. Supp. 2d 1333 (S.D. Fla. 2002) ............................................................. 13

*Johnson v. Governor of the State of Florida*,
    405 F.3d 1214 (11th Cir. 2005) ......................................................................... 13

*Kronlund v. Honstein*,
    327 F. Supp. 71 (N.D. Ga. 1971) ...................................................................... 13

*Lebron v. National Railroad Passenger Corp.*,
    513 U.S. 374 (1995) ........................................................................................... 20

*Lexmark International Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ............................................................................................. 8

*Lostutter v. Kentucky*,
    No. 22-5703, 2023 WL 4636868 (6th Cir. July 20, 2023).... 5, 6, 21, 22, 23, 24, 25, 26, 27, 28

*Lovell v. Griffin*,
  303 U.S. 444 (1938) ....................................................................... 2, 5

*McCutcheon v. Federal Election Commission*,
  572 U.S. 185 (2014) ........................................................................ 17

*McIntyre v. Ohio Elections Commission*,
  514 U.S. 334 (1995) ........................................................................ 19

*National Association for Advancement of Colored People v. Button*,
  371 U.S. 415 (1963) ........................................................................ 20

*Norman v. Reed*,
  502 U.S. 279 (1992) ........................................................................ 18

*North Carolina State Conference of the NAACP v. Raymond*,
   981 F.3d 295 (4th Cir. 2020) ............................................................ 8

*Novak v. City of Parma*,
  932 F.3d 421 (6th Cir. 2019) ...................................................... 24, 25

*Ohio Adult Parole Authority v. Woodard*,
  523 U.S. 272 (1998) ........................................................................ 16

*Ostergren v. Frick*,
  856 F. App'x 562 (6th Cir. 2021) ................................................... 25

*Pitt County v. Hotels.com, L.P.*,
  553 F.3d 308 (4th Cir. 2009) ............................................................ 6

*Press-Enter. Co. v. Superior Court of California for Riverside County*,
  478 U.S. 1 (1986) ............................................................................ 20

*Prime Media, Inc. v. City of Brentwood*,
  485 F.3d 343 (6th Cir. 2007) ......................................................... 30

*Quackenbush v. Allstate Insurance Co.*,
  517 U.S. 706 (1996) ........................................................................ 23

*Randall v. Sorrell*,
  548 U.S. 230 (2006) ........................................................................ 17

*Republican Party of North Carolina v. Martin*
  980 F.2d 943 (4th Cir. 2015). .......................................................... 15

*Richardson v. Ramirez*,
    418 U.S. 24 (1974) ........................................................................... 10, 11, 12

*Roach v. Stouffer*,
    560 F.3d 860 (8th Cir. 2009) ...................................................................... 30

*Shuttlesworth v. City of Birmingham*,
    394 U.S. 147(1969) ....................................................................................... 3

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) ...................................................................................... 8

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998) ........................................................................................ 6

*Southern Walk at Broadlands Homeowners Association, Inc. v. OpenBand at Broadlands, LLC.*
    713 F.3d 175 (4th Cir. 2013) ...................................................................... 8

*Tashjian v. Republican Party of Connecticut*
    479 U.S. 208 (1986) .................................................................................... 11

*Tennessee Wine & Spirits Retailers Association v. Thomas*,
    139 S. Ct. 2449 (2019) ................................................................................ 17

*Trump v. Hawaii*,
    —— U.S. ——, 138 S. Ct. 2392, 2416, 201 L.Ed.2d 775 (2018) .......................... 6

*United States v. Alicea*,
    58 F.4th 155, 162 (4th Cir. 2023) .............................................................. 24

*United States v. Reorganized CF & I Fabricators of Utah, Inc.*,
    518 U.S. 213 (1996) .................................................................................... 24

*Virginia v. Black*,
    538 U.S. 343 (2003) .................................................................................... 19

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977) .................................................................................... 28

*Vogel v. U.S. Office Products Co.*
    259 F.3d 509 (6th Cir. 2001) ...................................................................... 24

*Wag More Dogs Liab. Corp. v. Cozart*,
    680 F.3d 359 (4th Cir. 2012) ...................................................................... 20

*Washington v. Finlay*
    664 F.2d 9123 (4th Cir. 1981) ........................................................................ 14, 15


*Wesberry v. Sanders*,
    376 U.S. 1 (1964) .......................................................................................... 18, 19

*Williams v. Rhodes*,
    393 U.S. 23 (1968) .................................................................................. 11, 18, 19

## <u>Statutes</u>

Kentucky (Rev.) Stat. § 196.045(1)(e) ........................................................................ 21

Virginia Code Ann. § 24.2-101 ................................................................................... 21

Virginia Code Ann. § 24.2-1016 ................................................................................. 21

## <u>Other Authorities</u>

U.S. Const. art. I, § 4,  cl. 1 ...................................................................................... 11

U.S. Const. art. XIV, § 2, .......................................................................................... 11

Virginia Const. art. II, § 1, ......................................................................................... 21

Virginia Const. art. V, § 12, ....................................................................................... 21

# I.    INTRODUCTION

Plaintiffs Nolef Turns, Inc. and George Hawkins[1] (collectively, "Plaintiffs") seek an end to arbitrary restoration of voting rights in Virginia—and *not*, as Defendants would have this Court believe, an end to felony disenfranchisement in Virginia or even an end to their own personal disenfranchisement. As Plaintiffs have asserted two *facial* First Amendment claims, they suffer a constitutional injury by virtue of being subjected to an arbitrary voting rights licensing scheme and seek only a non-arbitrary restoration system in its stead. If Virginia disenfranchised all people with felony convictions permanently and without exception, Plaintiffs could not pursue these First Amendment claims. However, because Virginia law has created a path to restoration—an exception to the default rule—a government official may not arbitrarily administer that exception by selectively conferring voting rights on the disenfranchised on a case-by-case basis. This the First Amendment forbids.

# II.    NATURE OF PLAINTIFFS' ACTION

Plaintiffs have asserted two claims under longstanding First Amendment doctrine. First, in Count One, Plaintiffs claim that Virginia's voting rights restoration system functions as a licensing system governing First Amendment-protected conduct, triggering the operation of the unfettered discretion doctrine under *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), and related Supreme Court precedents. This prophylactic doctrine requires the invalidation of licensing schemes governing the exercise of First Amendment-protected expression or expressive conduct where officials have been vested with unfettered discretion to grant or deny the requested licenses. *City of Lakewood*,

---

[1] Defendant Governor Glenn Youngkin has restored Plaintiff Gregory Williams's right to vote, and his claim is, therefore, moot. Accordingly, Mr. Williams filed a notice of voluntary dismissal on August 31, 2023. ECF No.28.

486 U.S. at 757, 763–64. Plaintiffs also claim in Count Two that a lack of reasonable definite time limits on the exercise of the licensor's discretion also violates the First Amendment. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990)(overruled on other grounds by *City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 774-775 (2004)).

Under such an arbitrary licensing system, the applicant is subjected to the risk of undetectable viewpoint or speaker-based discrimination and pressured into self-censorship so as not to jeopardize their application. *City of Lakewood*, 486 U.S. at 759, 762–63. The Supreme Court has also explained that in the absence of "standards to fetter the licensor's discretion," as-applied challenges are not viable, and the licensor's decision is "effectively unreviewable." *Id.* at 758–59. "[A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Id.* at 759. "Facial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision." *Forsyth Cnty.*, 505 U.S. at 133 n.10. The existence of an actual, improper discriminatory or biased motive need not be shown to strike down such a law on its face: "[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance *preventing* him from doing so." *Id.* (emphasis added).

This case implicates all the same concerns and principles that have animated the unfettered discretion doctrine for eighty-five years. *Lovell v. City of Griffin*, 303 U.S. 444 (1938). Disenfranchised individuals submit an application to regain their voting rights, and no rules or criteria govern Defendant Governor Glenn Youngkin's decision to grant or deny that application. Defendants, notably, have not argued that there is a fixed, objective list of rules or criteria the

Governor is using to decide whether to grant or deny voting rights restoration applications.[2] Far from denying the arbitrariness of the challenged system, Defendants admit to and embrace it by seeking to label voting rights restoration as clemency, which, as they note, is based "'on purely subjective evaluations and on predictions of future behavior by those entrusted with the decision.'" Defendants' Memorandum in Support of Their Motion to Dismiss, ECF No. 27 at 27 (quoting *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981)). Deciding whether to grant or deny an application to engage in First Amendment-protected expressive conduct based on wholly subjective and arbitrary "practicing grace" and "ensuring public safety" standards is precisely what the First Amendment unfettered discretion doctrine prohibits. Second Amended Complaint, ECF No. 22 ¶ 4 (quoting Letter from Defendant Secretary Kay Coles James to Senator Lionel Spruill (Mar. 22, 2023)); *see Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–53 (1969) (invalidating permit scheme for marches or demonstrations that lacked "narrow, objective, and definite standards" and was "guided only by [Commissioners'] own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience'"). Under Virginia's purely discretionary vote-licensing system, which is devoid of rules and criteria, a governor may review any information on the applicant's political viewpoints, including campaign donations, previous registration history, and social media posts, and selectively grant or deny applicants based on their viewpoints without ever disclosing these discriminatory motives. Such a scheme would understandably deter current or future restoration applicants from expressing certain viewpoints. Accordingly, this system violates the principles articulated in *City of Lakewood*.

---

[2] Defendant Secretary of the Commonwealth Kay Coles James abstractly references "the Governor's standards for restoration of rights" but does not provide any further detail. Declaration of Kay Coles James, ECF No. 27-1 ¶ 2.

This Court need only consider a voting rights restoration applicant with a social media presence filled with claims that the 2020 presidential election was stolen and expressing support for those convicted in connection with January 6, or an applicant who publicly states they are for or against abortion or for or against a nationwide ban on the same. Nothing in Virginia law prevents a Governor from covertly discriminating against such applicants and, in the absence of rules and criteria, there is simply no way to prove intentional viewpoint discrimination in an as-applied challenge, *City of Lakewood*, 486 U.S. at 758–59, as Defendants erroneously contend is required. ECF No. 27 at 33–34. Additionally, some restoration applicants will hold the above beliefs but remain deterred from publicly sharing them because their restoration application is pending with a governor known to have opposing political views: "The mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech . . ." *City of Lakewood*, 486 U.S. at 757.

Accordingly, while ballots may be secret, Governor Youngkin has readily available means to review evidence of a restoration applicant's viewpoints and grant or deny the right to vote on that discriminatory basis: "[T]he licensor does not necessarily view the text of the words about to be spoken, but can measure their probable content or viewpoint by speech already uttered." *Id*. at 759. Proof of invidious discrimination is not required, as the Supreme Court has instructed that unfettered discretion is per se prohibited, "even if the discretion and power are never actually abused." *Id*. at 757.

## III.     ARGUMENT

### A.     Plaintiffs have standing to pursue their First Amendment claims against Defendants' arbitrary voting rights restoration scheme.

#### 1.     George Hawkins

Defendants' argument against Plaintiff George Hawkins's standing is almost entirely premised on the facts that Mr. Hawkins only recently applied for restoration of his rights, and his application has not yet been granted or denied. However, this argument is foreclosed by the First Amendment unfettered discretion doctrine. The U.S. Supreme Court has held since *Lovell*, 303 U.S. at 452–453, that the denial of a plaintiff's application for a license or permit is not a prerequisite to asserting a *facial* unfettered discretion challenge under the First Amendment. *City of Lakewood*, 486 U.S. at 755–56 (collecting cases) ("[O]ur cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license."). A license application's denial is also obviously not a prerequisite to filing suit under the corollary First Amendment precedents requiring reasonable, definite time limits in licensing, because the point of that related doctrine is to prevent arbitrary, selective delays in rendering decisions on license applications. Here, Mr. Hawkins has already applied for his right to vote and, even if he had not taken that step, would be subject to a licensing scheme without any substantive rules or criteria or any reasonable definite time limits on the licensor's decision-making. His standing to bring Counts One and Two under these related First Amendment doctrines is established by virtue of his being subject to Virginia's arbitrary vote-licensing system. Accordingly, Defendants' unripeness argument (ECF No. 27 at 21–22) is entirely meritless, and *Doe v. Virginia Department of State Police*, 713 F.3d 745 (4th Cir. 2013)—which did not concern a First Amendment unfettered discretion claim—is inapposite.

Defendants also cite to the panel decision in *Lostutter v. Kentucky* for the proposition that a Governor's purely discretionary voting rights restoration system is not a licensing or permitting

scheme. No. 22-5703, 2023 WL 4636868 (6th Cir. July 20, 2023).[3] Plaintiffs respond to this

argument in full in Section III.B.4 below, and this argument must be addressed as a merits question.

If the First Amendment unfettered discretion doctrine applies, then *City of Lakewood* holds that a

plaintiff need not first apply for a license and have that application denied. 486 U.S. at 755-56.

Because resolving this question compels this Court to reach the merits of Plaintiffs' First

Amendment claims, it cannot be decided as a matter of Article III standing. *Steel Co. v. Citizens*

*for a Better Env't*, 523 U.S. 83, 89–90 (1998) ("[J]urisdiction … is not defeated … by the

possibility that the averments might fail to state a cause of action on which [the plaintiff] could

actually recover. Rather, the district court has jurisdiction if the right of the [plaintiffs] to recover

under their complaint will be sustained if the Constitution and laws of the United States are given

one construction and will be defeated if they are given another . . .")(internal quotations

omitted);*Bell v. Hood*, 327 U.S. 678, 682–83, 685 (1946) ("[I]t is well settled that the failure to

state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of

jurisdiction."). The Fourth Circuit reaffirmed this principle just last year:

> The district court began its analysis by finding that Dr. DiCocco failed to state a
> valid cause of action because she alleged no injury and therefore lacked standing.
> *DiCocco*, 2020 WL 902530, at *3–5. But this approach improperly conflated the
> threshold standing question with the merits of her claims. *Pitt Cnty. V. Hotels.com,*
> *L.P.*, 553 F.3d 308, 312 (4th Cir. 2009). Standing does not turn on whether a plaintiff
> has definitively stated a valid cause of action. . . *Id.* In other words, a valid claim
> for relief is not a prerequisite for standing. *See, e.g., Trump v. Hawaii*, ––– U.S. —
> —, 138 S. Ct. 2392, 2416, 201 L.Ed.2d 775 (2018) (rejecting an argument that
> plaintiffs lacked Article III standing because the Establishment Clause did not "give
> them a legally protected interest").

*DiCocco v. Garland*, 52 F.4th 588, 591 (4th Cir. 2022). The *Lostutter* panel was briefed on these

precedents but decided the appeal on jurisdictional grounds anyway. 2023 WL 4636868, at *1, 6.

Plaintiffs respectfully believe this was in error.

---

[3] Plaintiffs' counsel in this case represent the Appellants in *Lostutter*.

Finally, Defendants misunderstand the nature of Plaintiffs' facial challenges. Naturally, because Plaintiff Hawkins's claims are not as-applied challenges, the constitutional injury of being subjected to an arbitrary licensing scheme governing the right to vote is held in common by many Virginians. That does not deprive Mr. Hawkins of a concrete and personal injury, however.

### 2. Nolef Turns, Inc.

Plaintiff Nolef Turns, Inc. has organizational standing to challenge Defendants' enforcement of an arbitrary voting rights restoration scheme. Nolef Turns, Inc. is a non-profit organization founded in 2016 with the primary organizational objective to "advocate for people with felony convictions throughout Virginia," reintegrate their clients into society, and reduce recidivism. ECF No. 22 ¶¶ 16, 43. Advancing these objectives are four paid staff members who work with those affected by the criminal justice system and assist with employment and financial literacy, restoration of voting rights, and voter registration after restoration. ECF No. 22 ¶ 16. Voting rights restoration assistance is one of Nolef Turns, Inc.'s core programs and is offered alongside other key programming such as its Back to Work program, food pantry, annual holiday help program, voter registration drives, pardon and expungement resource workshops, Parenting Promises campaign, Beyond Home program, healthcare initiatives, First Thursdays community feeding, drug and alcohol treatment referrals, mental health referrals, character-building program, notary services, financial literacy program, and Finding Forgiveness campaign. ECF No. 22 ¶ 16. Each of these programs is key to Nolef Turns, Inc.'s core mission. ECF No. 22 ¶ 43. When Defendants upended Virginia's non-arbitrary rights restoration system, the direct result was both an increase in the resources required to maintain Nolef Turns, Inc.'s rights restoration assistance program and an increase in the demand from individuals seeking rights restoration assistance. ECF No. 22 ¶¶ 43–48. Therefore, Nolef Turns, Inc. has been forced to divert its limited resources from other programming that is central to its mission to its rights restoration programming. ECF No. 22

¶ 43. Consequently, Nolef Turns, Inc. has "a direct stake in the outcome" of this case. *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972); *see also Allen v. Wright*, 468 U.S. 737, 755–56 (1984)(abrogated on other grounds, *Lexmark International Inc. v. Static Control Components, Inc.,* 572 U.S. 118 (2014)). By asking the Court to enjoin Defendants' arbitrary rights restoration scheme, Nolef Turns, Inc. seeks to eliminate a policy that impairs its ability to accomplish its core mission and causes a significant diversion of its limited money, resources, and staff time.

A plaintiff suffers an organizational injury if a challenged policy or practice frustrates an organization's purpose and, as a consequence, causes a drain on its resources. *S. Walk at Broadlands Homeowners Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 183 (4th Cir. 2013) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "When an action 'perceptibly impair[s]' an organization's ability to carry out its mission and 'consequent[ly] drain[s] . . . the organization's resources,' 'there can be no question that the organization has suffered injury in fact.'" *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020) (citations omitted) (altered text in the original). For example, this Court recently found in favor of organizational standing where an organization's limited staff and financial resources were strained because governmental action caused a significant increase in individuals seeking assistance from the organization. *Harrison v. Spencer*, 449 F. Supp. 3d 594, 603 (E.D. Va. 2020). In *Harrison*, over several years, the plaintiff observed a significant increase in requests for help from individuals seeking legal assistance regarding the military's accession and retention policies, with the most notable increase following the military's announcement of its "Deploy or Get Out" policy in February 2018. *Id*. The plaintiff "faced immediate difficulties accommodating this increase in requests for help, especially given its limited staff and financial resources." *Id*. Ultimately, the plaintiff "had to delay at least nine specific advocative, educational, and legal

projects, all of which lay at the core of its mission, to serve the needs of those who had requested help." *Id*. Consequently, this Court ruled that the defendant's policies "perceptibly impaired" the plaintiff's ability to carry out its mission and caused a consequent drain on its resources. *Id*.

Similarly, Defendants' actions have directly impaired Nolef Turns, Inc.'s ability to accomplish its mission and caused a drain on its resources. From its founding, Nolef Turns, Inc. provided applicants with assistance on rights restoration under Virginia's non-arbitrary, non-discretionary rights restoration system—a system that restored over 300,000 Virginians with felony convictions. ECF No. 22 ¶¶ 16, 34–36. Consequently, resources were allocated to Nolef Turns, Inc.'s voting rights restoration program based on assisting applicants in navigating Virginia's former non-arbitrary system. ECF No. 22 ¶¶ 16, 34–36. Now, under Defendants' wholly arbitrary rights restoration scheme, ECF No. 22 ¶¶ 37, 46–47, Nolef Turns, Inc. has suffered harmful costs to and a diversion of its finances and staff time, as it assists applicants through the significant additional burdens that did not exist under the non-arbitrary system. ECF No. 22 ¶ 43.

To address the resource deficits caused by Defendants' actions, Nolef Turns, Inc. has diverted paid staff time, money, and other resources to its voting rights restoration program and away from its other core programming. ECF No. 22 ¶¶ 44–48. Under Defendants' arbitrary system, additional paid staff time is needed for each case as each restoration application is now more individualized and requires more specific documentation. ECF No. 22 ¶ 45. For example, on any application, Nolef Turns, Inc.'s four paid staff members may need to: (1) verify the specific offenses against the judgment, which may even require staff to conduct a background check; and (2) verify the completed or ongoing payment of legal financial obligations as well as help their clients obtain and submit the requisite paperwork documenting the completed payment of fines, fees, and restitution or the ongoing payment plan. ECF No. 22 ¶ 45. Further, Nolef Turns, Inc.'s

staff needs to engage more deeply with each restoration applicant, helping them to respond to Virginia state agencies' informational requests, as well as any requests for the submission of documents to Defendants' offices for consideration along with their application. ECF No. 22 ¶ 46. For all these reasons, the per-applicant and aggregate costs for Nolef Turns, Inc.'s rights restoration program have increased as a result of Defendants' change to Virginia's rights restoration system. ECF No. 22 ¶ 48. Nolef Turns, Inc. is therefore less able to fulfill its core mission, ECF No. 22 ¶¶ 45–48, and its resources are consequently strained, as it must continue diverting funds and staff time away from other core programs. ECF No. 22 ¶ 43. Accordingly, the burdens Defendants have imposed on Nolef Turns, Inc. are substantially similar to those imposed on the plaintiff in *Harrison* and, therefore, Nolef Turns, Inc. has organizational standing to pursue its claims.

### B. Plaintiffs have stated a claim for relief under longstanding First Amendment precedents.

#### 1. The Fourteenth Amendment and cases construing it do not preclude Plaintiffs' First Amendment challenges to arbitrary voting rights restoration.

As a threshold matter, Plaintiffs rebut Defendants' nexus of arguments that the Fourteenth Amendment and the precedents construing it foreclose this action.

The parties at least agree that Section 2 of the Fourteenth Amendment, as construed by the U.S. Supreme Court in *Richardson v. Ramirez*, 418 U.S. 24, 53–56 (1974), authorizes felony disenfranchisement. Virginia law could, consistent with the Fourteenth Amendment, permanently disenfranchise every person with a felony conviction, without exception or path to restoration. However, once the Governor creates an exception to the default rule of felony disenfranchisement and establishes a path to restoration of the right to vote, the Governor may not arbitrarily bestow voting rights on this population. Defendants, therefore, mistakenly read Plaintiffs' claims to challenge felony disenfranchisement itself. They argue "Plaintiffs' First Amendment claim would

require the Court "'to conclude that the same Constitution that recognizes felon disenfranchisement under § 2 of the Fourteenth Amendment also *prohibits disenfranchisement* under other amendments.'" ECF No. 27 at 28 (quoting *Farrakhan v. Locke*, 987 F. Supp. 1304, 1314 (E.D. Wash. 1997) (emphasis added)). It would do no such thing. If Plaintiffs prevail, Virginia law may continue to disenfranchise all people with felony convictions. Instead, the injunction Plaintiffs seek would prohibit arbitrarily bestowing voting rights on the disenfranchised. A ruling in Plaintiffs' favor would be entirely consistent with *Ramirez*.

The grant of legislative authority in Section 2 of the Fourteenth Amendment that authorizes Virginia lawmakers to disenfranchise people with felony convictions, must be exercised in a manner consistent with other constitutional provisions and rights. "[T]he Constitution is filled with provisions that grant Congress or the States specific power to legislate in certain areas; these granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution." *Williams v. Rhodes*, 393 U.S. 23, 29 (1968). In *Tashjian v. Republican Party of Connecticut*, the Supreme Court stated that the legislative authority given to states in the Elections Clause, U.S. CONST. art. I, § 4, cl. 1, "does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens." 479 U.S. 208, 217 (1986); *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996) (holding Twenty-First Amendment's grant of legislative authority to states does not shield laws regulating commerce in or use of alcoholic beverages from First Amendment challenges). There is no conflict or even tension between permitting felony disenfranchisement under the Fourteenth Amendment and forbidding arbitrary re-enfranchisement under the First Amendment, so this Court need not evaluate which amendment is more "specific" or trumps the

other. There is no need to harmonize constitutional provisions that do not conflict.[4] Section 2 of the Fourteenth Amendment only speaks to the loss of the franchise, not state laws governing the allocation or restoration of the same. The First Amendment unfettered discretion doctrine speaks to the latter, and Defendants have not marshalled any constitutional authority for the proposition that a state official may be given sole and unfettered discretion to selectively mete out voting rights either in the first instance or following disenfranchisement due to a felony conviction.

This is the fundamental flaw in Defendants' argument: They take the true statement that *Richardson v. Ramirez* permits Virginia law to disenfranchise people with felony convictions, even permanently, and cite that as carte blanche for their voting rights restoration system which functions as an arbitrary licensing system. But the Supreme Court has squarely rejected this kind of "greater-includes-the-lesser" argument in the First Amendment context. *City of Lakewood*, 486 U.S. at 766. While Virginia law could uniformly and permanently disenfranchise people with felony convictions, that authority does not enable Governor Youngkin to arbitrarily choose which felons may once again vote or to make such decisions on arbitrary timelines. "[I]n a host of other First Amendment cases," (*id.*) the Supreme Court has struck down arbitrary licensing schemes with "open-ended discretion . . . even where it was assumed that a properly drawn law could have greatly restricted or prohibited the manner of expression . . ." *Id.*

Similarly, Plaintiffs have plainly not argued that the First Amendment bars what the Fourteenth Amendment authorizes—felony disenfranchisement laws—or that it guarantees people with felony convictions the right to vote. ECF No. 27 at 28–30. The First Amendment imposes independent and specific constitutional limitations, and Plaintiffs **only** challenge Defendants'

---

[4] Because the First and Fourteenth Amendments do not conflict regarding felony disenfranchisement and re-enfranchisement, the incorporation of the First Amendment against the states via Section 1 of the Fourteenth Amendment is of no moment.

claimed power to re-enfranchise people with felony convictions ***arbitrarily***, not the state's power to disenfranchise them. Accordingly, Defendants mistakenly cite to a litany of inapposite cases in which plaintiffs challenged felony disenfranchisement *itself* as a per se violation of the First Amendment. ECF No. 27 at 28; *see, e.g.*, *Kronlund v. Honstein*, 327 F. Supp. 71, 73 (N.D. Ga. 1971); *Farrakhan*, 987 F. Supp. at 1314; *Johnson v. Bush*, 214 F. Supp. 2d 1333, 1338 (S.D. Fla. 2002), *aff'd on other grounds sub nom. Johnson v. Governor of the State of Fla.*, 405 F.3d 1214 (11th Cir. 2005) (en banc); *Hayden v. Pataki*, No. 00 Civ. 8586(LMM), 2004 WL 1335921, at *6 (S.D.N.Y. June 14, 2004); *Howard v. Gilmore*, 205 F.3d 1333, at *1 (4th Cir. 2000) (unpublished). But Plaintiffs make no such argument. The sole First Amendment issue adjudicated in the Fourth Circuit's decision in *Howard* was a "complain[t] that cancellation of . . . voting privileges violates the First Amendment." *Id*. at *1. Instead, Plaintiffs have argued that arbitrary *re-enfranchisement* violates the First Amendment, a constitutional challenge not adjudicated in any of those cases.

An analogy is instructive here. The First Amendment permits time, place, and manner restrictions that may categorically exclude some individuals, such as minors, from engaging in certain First Amendment-protected conduct, at least under certain circumstances. In the voting context, state voting eligibility laws clearly do not violate the First Amendment by setting the minimum age at 18, but these laws would violate the unfettered discretion doctrine if they gave election officials unlimited discretion to selectively grant or deny the right to vote to 16- and 17-year-olds upon the submission of right-to-vote applications accompanied by high school transcripts and essays. Such arbitrary decision-making authority over the right to vote would clearly violate the First Amendment. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) (noting arbitrariness is "inherently inconsistent with a valid time, place,

and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view").

As the above example demonstrates, it is indisputable that arbitrary enfranchisement—and also arbitrary disenfranchisement—would be unconstitutional. The Court has not heard otherwise and will not hear otherwise from Defendants. The question before this Court is whether arbitrary *re-enfranchisement* should survive constitutional scrutiny simply based on the prefix "re". Plaintiffs contend that it should not: If it is unconstitutional to selectively and arbitrarily grant or strip U.S. citizens of their right to vote, then it inexorably follows that it is unconstitutional to arbitrarily grant the right to vote to U.S. citizens who currently cannot vote due to a felony conviction. That such individuals once had but lost their right to vote under state law does not change the fact that the First Amendment unfettered discretion doctrine is violated by arbitrarily licensing expressive conduct such as voting.

### 2. The Fourteenth Amendment's guarantees do not displace First Amendment rules in the voting rights context.

Relatedly, Defendants argue that the Fourteenth Amendment is the only source for causes of action against laws governing the exercise of the right to vote. For this proposition, Defendants quote repeatedly from the Fourth Circuit's decision in *Washington v. Finlay*, arguing it holds that the First Amendment "offers no protection of voting rights beyond that afforded by the fourteenth or fifteenth amendments." 664 F.2d 913, 928 (4th Cir. 1981). There is just one problem with this argument: Defendants have omitted the crucial prefatory language from this quotation that narrows *Washington*'s holding to vote dilution challenges. The full and key quotation is:

> *Where, as here, the only challenged governmental act is the continued use of an at-large election system, and where there is no device in use that directly inhibits participation in the political process,* the first amendment, like the thirteenth, offers no protection of voting rights beyond that afforded by the fourteenth or fifteenth amendments.

*Id.* at 928 (emphasis added). The omitted clauses strictly limit *Washington*'s holding to challenges to the dilution of an *otherwise-intact* right to vote. Accordingly, all that *Washington* holds is that when vote dilution is at issue, the First Amendment offers no distinct cause of action, and only the Fourteenth Amendment is violated *in those circumstances*. But Plaintiffs have not asserted a vote dilution claim. *Washington* did not express any opinion as to the First Amendment implications of a law that directly regulates whether a person is eligible or not to vote, *i.e.* that "directly inhibits participation in the political process," *id.*, such as an arbitrary voting rights restoration scheme.

Furthermore, none of *Washington*'s progeny has extended this language Defendants are selectively quoting to the context of vote denial. In *Irby v. Virginia State Board of Elections*, the Fourth Circuit considered a challenge to an appointive system for filling a particular public office and summarily reaffirmed *Washington* without the limiting language. 889 F.2d 1352, 1359 (4th Cir. 1989). The Court had no occasion and no ability to extend *Washington* to the context of vote denial; in an appointive system, there is no voting whatsoever. Similarly, in *Republican Party of North Carolina v. Martin*, the Fourth Circuit rejected the attempt to assert a First Amendment challenge to alleged partisan gerrymandering in the method of electing judges. 980 F.2d 943, 959 n.28 (4th Cir. 1992). As this too was a species of vote dilution claim, this decision also did not break new ground. Accordingly, no court—including the U.S. Supreme Court and the Fourth Circuit—has ever held that the First Amendment *categorically* offers no protection to voting rights *in any context* simply because the Fourteenth Amendment exists. Ultimately, even Defendants abandon this argument later in their brief with their contradictory assertion that "'a discretionary felon-reenfranchisement scheme that was facially or intentionally designed to discriminate based on viewpoint . . . *might*

*violate the First Amendment.*'" ECF No. 27 at 33 (quoting *Hand v. Scott*, 888 F.3d 1206, 1211–12 (11th Cir. 2018) (order granting motion to stay permanent injunction) (emphasis added)).[5]

Finally, notwithstanding the fact that Plaintiffs have only sued under First Amendment doctrines, Defendants cite to cases that addressed only Fourteenth Amendment claims. *Beacham v. Braterman*, 300 F. Supp. 182, 182–83 (S.D. Fla. 1969), *summarily aff'd* 396 U.S. 12 (1969), has no application here as that decision only considered an equal protection challenge. Defendants also cite to two precedents narrowly construing the role of the Fourteenth Amendment's Due Process Clause in the context of pardons and other forms of clemency: *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458 (1981), and *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998). But Plaintiffs have also not asserted any due process challenges under the Fourteenth Amendment. Plaintiffs' Count One under the unfettered discretion doctrine concerns the lack of *substantive* rules or criteria governing Defendant Governor Youngkin's power over the ultimate disposition of rights restoration applications, *not* the lack of process or its adequacy.

### 3.    Voting is politically expressive conduct protected by the First Amendment.

Having established that the First Amendment is an independent and viable source of constitutional challenges to voting regulations and that the Fourteenth Amendment does not foreclose this action, Plaintiffs now turn to Defendants' more specific merits arguments.

A threshold argument Defendants raise late in their brief is that voting is not politically expressive conduct and, therefore, is not protected by the First Amendment. ECF No. 27 at 32.

---

[5] Defendants repeatedly cite to this ruling but fail to note that it was a stay order decided on a 2-1 vote with respect to the First Amendment claims, *Hand*, 888 F.3d at 1207; *id.* at 1215 (Martin, J., concurring in part and dissenting in part), and that the appeal eventually became moot after voters approved an amendment to the Florida Constitution in 2018 that imposed a non-discretionary rights restoration system for most people with felony convictions in the state. *Hand v. DeSantis*, 946 F.3d 1272, 1274–75 (11th Cir. 2020). There was never a final judgment on the merits in *Hand*.

Defendants urge this Court to adopt a "black hole" theory of the First Amendment in the electoral context. This theory posits that the politically expressive conduct at the very center of our electoral system is *not* protected under the First Amendment, but every other form of expressive conduct, communication, advocacy, and persuasion orbiting and seeking to influence voters' political views and choices—from the collective to the individual, and across all actors and entities involved in democratic elections, including voters themselves—*is* protected. These protected forms of expression and expressive conduct include: campaign contributions and expenditures (*McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 192 (2014); *Randall v. Sorrell*, 548 U.S. 230, 241–42 (2006)); advocacy for the election or defeat of candidates (*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 326 (2010)); the formation and expression of political parties (*Colorado Republican Federal Campaign Comm'n v. Federal Election Comm'n*, 518 U.S. 604, 616 (1996) ("The independent expression of a political party's views is 'core' First Amendment activity no less than is the independent expression of individuals, candidates, or other political committees.")); candidates and parties securing a spot on the ballot (*Anderson v. Celebrezze*, 460 U.S. 780, 793–94 (1983)); campaign yard signs (*City of Ladue v. Gilleo*, 512 U.S. 43, 54–59 (1994)); liking a political candidate's campaign page (*Bland v. Roberts*, 730 F.3d 368, 386 (4th Cir. 2013), *as amended* (4th Cir. Sept. 23, 2013) (liking a political candidate's campaign page "is the Internet equivalent of displaying a political sign in one's front yard")); and electioneering outside a polling place (*Burson v. Freeman*, 504 U.S. 191, 197–98 (1992)). All of this protected activity is directed at influencing the expressive conduct at the center of our democracy: voting. It would be absurd to interpret this body of precedent to mean that there is a void or black hole at the center of First Amendment protection. *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2462 (2019) (noting U.S. Constitution must be construed to avoid "absurd results").

The U.S. Supreme Court has never endorsed such an internally contradictory view of the First Amendment in the electoral context and has instead long stated that when citizens express their political views and preferences at the ballot box, that vote, though secret, is nevertheless protected by the First Amendment as politically expressive conduct. *See Norman v. Reed*, 502 U.S. 279, 288 (1992) (recognizing "the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of *all voters to express their own political preferences*") (emphasis added); *Anderson v*, 460 U.S. at806 (evaluating burdens on "the voters' freedom of choice and freedom of association"); *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (describing ballot access restrictions as "impair[ing] the voters' ability to express their political preferences"). Defendants wrongly dismiss these cases as solely implicating candidates or political parties' First Amendment interests in access to the ballot—indeed, they posit that these cases "do not involve voting rights at all." ECF No. 27 at 32.

However, as is clear from the language quoted above, the Supreme Court has repeatedly spoken of political parties' and candidates' access to the ballot and voters' expression of support for parties, candidates, and causes as two sides of the same coin. Defendants' argument is belied by the text and reasoning of these opinions. For instance, Defendants assert that *Anderson* did not "involve the right of any voter to cast a ballot," ECF No. 27 at 32, but the Supreme Court actually held that Ohio's filing deadline "place[d] a particular burden on an identifiable segment of Ohio's independent-minded *voters*." 460 U.S. at 792 (emphasis added). As political parties' and candidates' political expression and association are protected by the First Amendment, it follows that voters' expression of support for those parties and candidates at the ballot box must also be protected by the First Amendment. *See Williams*, 393 U.S. at 38–39 ("The rights of *expression* and assembly may be 'illusory if the right to vote is undermined.'")(quoting *Wesberry v. Sanders,* 376

U.S. 1, 17 (1964)(emphasis added)). Accordingly, the First Amendment protects voting as a form of expressive conduct, just as it protects expressions of support for candidates, parties, and causes, regardless of the format or medium.

Finally, Defendants label voting "political action," implying that it lacks expressive content. ECF No. 27 at 32. However, expressive conduct is of course protected by the First Amendment. *See, e.g.*, *Virginia v. Black*, 538 U.S. 343, 358, 360 (2003) (construing cross-burning as First Amendment-protected expressive conduct) ("The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech."). Defendants must intend to argue that the legal effect of voting negates its expressive conduct. But this argument is foreclosed by *Doe v. Reed*, in which the Supreme Court stated that it "[did] not see how adding such legal effect to an expressive activity somehow deprives that activity of its expressive component, taking it outside the scope of the First Amendment." 561 U.S. 186, 195 (2010).[6]

> **4.** **The First Amendment commands a functional analysis, and Virginia's voting rights restoration system functions as a licensing scheme.**

The First Amendment commands a functional analysis. State law semantics are irrelevant to the First Amendment question at issue, because the U.S. Supreme Court has repeatedly stated for decades that First Amendment rights and doctrines must be evaluated functionally, not formalistically. *See Garcetti v. Ceballos*, 547 U.S. 410, 424–25 (2006) (in First Amendment retaliation claim concerning whether public employee had spoken as government employee or private citizen, "[t]he proper inquiry is a practical one" and "[f]ormal job descriptions" are not

---

[6] Additionally, anonymity does not undermine or eliminate First Amendment protection for expression or expressive conduct. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–43 (1995) (rehearsing "respected tradition of anonymity in the advocacy of political causes" in striking down Ohio's ban on anonymous campaign literature); *id*. at 343 ("This tradition is perhaps best exemplified by the secret ballot, the hard-won right to vote one's conscience without fear of retaliation.").

dispositive); *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392–93 (1995) ("The Constitution constrains governmental action by whatever instruments or in whatever modes that action may be taken . . . And under whatever congressional label.") (citation omitted); *Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1, 7–10 (1986) ("[T]he First Amendment question cannot be resolved solely on the label we give the event, *i.e.*, 'trial' or otherwise, particularly where the preliminary hearing functions much like a full-scale trial."); *Branti v. Finkel*, 445 U.S. 507, 518–19 (1980) ("[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position . . ."); *Bigelow v. Virginia*, 421 U.S. 809, 818–26 (1975) ("Regardless of the particular label asserted by the State—whether it calls speech 'commercial' or 'commercial advertising' or 'solicitation'—a court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation."); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) ("We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief."); *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 429 (1963) ("[A] State cannot foreclose the exercise of constitutional rights by mere labels."); *Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 366 (4th Cir. 2012) ("Eschewing a formalistic approach to evaluating content neutrality that looks only to the terms of a regulation, the Supreme Court has instead embraced a more practical inquiry." (citing *Hill v. Colorado*, 530 U.S. 703, 719–20 (2000))). Such a functional, practical approach is necessary given the fundamental importance of the First Amendment's guarantees.

Virginia's voting rights restoration system *functions* as a licensing scheme and triggers the application of the First Amendment unfettered discretion doctrine. Defendants' argument to the

contrary ignores the Supreme Court's and the Fourth Circuit's instructions to apply a functional approach to First Amendment challenges. Functionally, there is no material difference between the state's voting rights restoration system and licensing. Defendants do not identify any differences between voting rights restoration and licensing, let alone a difference that has some material impact on the functional analysis the First Amendment commands. Instead, they cite *Lostutter v. Kentucky*, No. 22-5703, 2023 WL 4636868 (6th Cir. July 20, 2023). Defendants have waived the specific arguments in the *Lostutter* panel's decision; they cannot simply incorporate them by mere citation to the panel's ultimate conclusion. Nevertheless, in this section, Plaintiffs present a full response to the Sixth Circuit panel's decision.

The challenged provisions in the Virginia Constitution and Virginia statutes give the Governor the power to "restore[ ]" voting rights, VA. CONST. art. II, § 1, Va. Code Ann. § 24.2-101, or, alternatively, "to remove political disabilities." VA. CONST. art. 5, § 12. They do not reference the Governor's pardon power. In Virginia, "[a] pardon may be full or partial, absolute or conditional." *Blount v. Clarke*, 291 Va. 198, 205 (2016). Voting rights restoration is just one of the many legal effects of a full or absolute pardon in Virginia, whereas a partial pardon may omit voting rights restoration. *Id.* at 205–06, 210–11. Voting rights restoration is not itself a pardon, and it is not inherently part of a pardon. Eschewing the required functional analysis, the *Lostutter* panel proceeded to erroneously compare the features of pardons and licensing because, unlike in Virginia, Kentucky law expressly labels restoration as a "partial pardon." KY. REV. STAT. § 196.045(1)(e); *Lostutter*, 2023 WL 4636868, at *4. And though Defendants quote liberally from *Lostutter* for the proposition that "[f]elon re-enfranchisement is a type of 'partial executive pardon,'" ECF No. 27 at 30, they fail to cite any Virginia law or case that says that. As it turns out, the Supreme Court of Virginia's decision in *Howell v. McAuliffe* refers to voting rights restoration

and pardons as two distinct forms of clemency. 292 Va. 320, 337 (2016) ("Never before, however, have any of the prior 71 Virginia Governors issued a sua sponte clemency order of any kind, *whether to restore civil rights or grant a pardon*, to an entire class of unnamed felons . . .") (emphasis added); *see also id*. at 343 ("The Governor provides no explanation for why *the power to remove political disabilities* alone should be any different in its essential character from *all the other clemency powers, such as the pardon power . . .*") (emphasis added). In any event though, it would be formalistic to let state law labels dictate this First Amendment analysis. As only a functional analysis may resolve the First Amendment claims in this case, the labels assigned by Virginia law do not control. Instead, the proper inquiry is whether voting rights restoration, not the pardon power, functions as a licensing scheme such that the First Amendment unfettered discretion doctrine applies.

As a practical, functional matter, the mechanics and outcomes of the voting rights restoration system are remarkably similar to those of a licensing system. Individuals disenfranchised by reason of a felony conviction apply to a government office seeking permission to vote. ECF No. 22 at 9. The Secretary of the Commonwealth reviews the application, investigates the applicant, and then refers the application to the Governor who then grants or denies that application in his absolute discretion. *Id*. at 9, 11. Absent permission from the Governor, the applicant may not lawfully engage in the unlicensed politically expressive conduct. Va. Code Ann. § 24.2-1016. The practical result of this restoration system is exactly the same as in any licensing system: "[T]he result of the felon re-enfranchisement scheme is that a felon is 'allowed' to vote again, where previously prohibited. And the result of a license or permit is that a person is 'allowed' to engage in regulated conduct, where they were previously prohibited." *Lostutter*, 2023 WL 4636868, at *6.

Notwithstanding this commonality in the practical outcomes of voting rights restoration and licensing, the Sixth Circuit panel in *Lostutter* erred by failing to conduct a proper functional analysis. Emblematic of this central error is the panel's summation:

> Mere similarity in result does not change the nature of the vehicle used to reach that result, and Kentucky law is clear that it restores felons their voting rights through a partial executive pardon, not through the granting of an administrative license. . . So, regardless of any similarity in outcome—in that a pardoned felon and a licensed civilian may both engage in conduct previously forbidden—the vehicles to achieve that outcome remain fundamentally different.

*Lostutter*, 2023 WL 4636868, at *11–12. The Sixth Circuit panel's unsubstantiated assertion that the "nature of the vehicle"—and not the "result" or "outcome"—is dispositive, directly contradicts the litany of Supreme Court precedents above, which forbid formalistic analysis in a wide spectrum of First Amendment contexts and require a practical, functional inquiry. *See infra* at 20–21. The panel's focus on "the nature of the vehicle" erroneously privileged means over ends and minimized the practical effects of discretionary, arbitrary voting rights restoration systems.

*Lostutter*'s reasoning is in clear conflict with U.S. Supreme Court precedents, which consistently establish that a functional analysis requires an examination of practical effects. For instance, the Supreme Court's decision in *Quackenbush v. Allstate Insurance Co.*, which held that a remand order was appealable even though such orders "do not meet the traditional definition of finality." 517 U.S. 706, 715 (1996). Nonetheless, this difference in "the nature of the vehicle," to use *Lostutter*'s phrase, was immaterial because the remand order was "functionally indistinguishable" from a stay order the Court had previously found appealable in a separate case. *Id*. at 714–15. Like a stay order, a remand "puts the litigants . . . 'effectively out of court,' […] and its effect is 'precisely to surrender jurisdiction of a federal suit to a state court.'" *Id*. (citations omitted). *Quackenbush*'s focus on practical effects—properly privileging ends over means—is

what a functional analysis requires. The *Lostutter* panel upended this framework and erased the dichotomy between formalism and functionality.

Many decisions equate a functional analysis with an evaluation of practical effects or outcomes. In *Vogel v. U.S. Office Products Co.*, this Court held that a remand order is dispositive and, therefore, can only be granted by a district court, not a magistrate judge. 258 F.3d 509, 517 (6th Cir. 2001). In so ruling, the Sixth Circuit wrote:

> [W]e apply a functional equivalency test to see if a particular motion has the same practical effect as a recognized dispositive motion [in the federal statute]. Applying that test . . ., we too find that a remand order is the functional equivalent of an order to dismiss. The practical effect of remand orders and orders to dismiss can be the same; in both, cases are permitted to proceed in state rather than federal court.

*Id.*. Crucially, *Vogel* did not dwell on the substantial differences between remand orders and orders to dismiss—the quite dissimilar "nature" of those two "vehicle[s]," *Lostutter*, 2023 WL 4636868, at *6—but rather on the practical effect of each. *Vogel*, 258 F.3d at 514–17. The same understanding of functional analyses is obtained in the Fourth Circuit. *See, e.g.*, *United States v. Alicea*, 58 F.4th 155, 162 (4th Cir. 2023) ("[W]hen determining whether a governmental exaction is a tax or penalty for bankruptcy purposes, Supreme Court precedent *requires* us to apply a functional analysis that ignores the label given to the exaction and instead considers whether the exaction operates as a tax or a penalty . . ." (citing *U.S. v. Reorganized CF & I Fabricators of Utha, Inc.*, 518 U.S. 213, 220 (1996)(emphasis in original)); *Carter v. Cummins Inc.,* No. 2:10-CV-1408-DCN-RSC, 2010 WL 5139842, at *3 (D.S.C. Dec. 10, 2010) (citing Sixth Circuit's decision in *Vogel* and adopting its holding).

The Sixth Circuit panel's analysis also cannot be squared with that Court's own recent First Amendment rulings assessing what qualifies as a prior restraint. In *Novak v. City of Parma*, the Sixth Circuit Court wrote that "in light of our long history of guarding against prior restraints on

speech, we should not be overly formalistic in defining what counts as an administrative order. . . [T]he formality of these classic cases should be a sufficient condition for prior restraint, not a necessary one." 932 F.3d 421, 432–33 (6th Cir. 2019)(citations omitted). The same kind of functional inquiry articulated in *Novak* must also apply in the closely related context of evaluating whether a challenged practice, action, or law functions as a licensing scheme. *See Ostergren v. Frick*, 856 F. App'x 562, 570 n.10 (6th Cir. 2021) (unpublished) (citing *Novak*'s "recognition that the prior-restraint doctrine should be applied functionally" and noting "it may be possible for a government to create a de facto licensing scheme").

To the extent the panel decision did compare the features of voting rights restoration and licensing, it neither considered the highly similar mechanics between the two nor explained why any of the perceived differences it enumerated materially impact the First Amendment analysis. The panel seized upon several purported differences between voting rights restoration, as practiced in Kentucky, and licensing, but each is an immaterial distinction because none alters the practical effects of voting rights restoration. Though Defendants do not raise and have therefore waived these specific arguments, Plaintiffs will address them here.

First, the *Lostutter* panel concludes that pardons have retrospective effect. 2023 WL 4636868, at *4. But voting rights restoration, which is not itself a pardon, is functionally and predominantly prospective in effect, notwithstanding any concurrent retrospective effect. Indeed, the purported prospective/retrospective distinction is not rigid. While it may be accurate to say that restoration reverses or nullifies one of the consequences of a felony conviction, *Lostutter*, 2023 WL 4636868, at *4, this legal effect is not principally retrospective. As a functional matter, the practical effect of voting rights restoration is felt prospectively: even once an individual's right to vote is restored, that person cannot regain the ability to vote in past elections. Re-enfranchisement

does not and cannot restore these citizens' opportunities to express their political views through the ballot box in elections that have gone by.

Additionally, with respect to those convicted as juveniles, voting rights restoration has no retrospective effect. To the extent the panel concluded that voting rights restoration is backward-looking because it "restores the felon to the status quo before the conviction," *Lostutter*, 2023 WL 4636868, at *4, individuals convicted of felonies as juveniles never could vote and have never voted in their lives. For them, voting rights "restoration" is functionally first-time enfranchisement, not re-enfranchisement.

Most importantly, the *Lostutter* panel fails to articulate why its proffered prospective/retrospective binary or restoration to the status quo ante has any material bearing on the First Amendment unfettered discretion analysis and the principles and concerns articulated in *City of Lakewood* and related precedents. Whether one views voting rights restoration as having prospective effects or *both* prospective and retrospective effects does not functionally alter the manifest risk of undetectable viewpoint discrimination in giving a government official like Governor Youngkin sole and unfettered power to selectively bestow voting rights on a particular class of individuals without any reasonable definite time limits on such determinations.

Second, the *Lostutter* panel states that voting rights restoration is a "one-time act of clemency." 2023 WL 4636868, at *4. Restoration applicants who are denied one or more times will have recurring encounters with the Governor's discretionary vote-licensing system. In the meantime, an applicant will understandably be deterred from public political expression that might compromise pending or future attempts to secure the Governor's permission to vote. The ballot may be secret, but applicants' political views are just a Google, social media, or database search away. *City of Lakewood*, 486 U.S. at 759 ("[T]he licensor does not necessarily view the text of the

words about to be spoken, but can measure their probable content or viewpoint by speech already uttered."). However, even assuming the accuracy of this characterization for argument's sake, the panel fails to explain what functional, material difference the "one-time" nature of restoration could possibly make in evaluating the manifest risk of viewpoint discrimination in giving a government official sole and absolute power to bestow voting rights selectively. Once again, focusing on the practical effects, as is required in a functional analysis, demonstrates that this perceived difference has no bearing on the constitutional inquiry.

Third, the panel reasons that "[p]ermits or licenses regulating First Amendment activity by their nature do not restore any 'lost' rights; they only regulate how persons may engage in or exercise a right they already possess." *Lostutter*, 2023 WL 4636868, at *4. But even the panel does not seem to believe in this purported distinction, noting the commonality between permitting a restoration applicant "to vote again, where previously prohibited" and permitting a license applicant "to engage in regulated conduct, where they were previously prohibited." *Id*. at *6. The fact that a person with a felony conviction is ineligible to vote prior to securing permission to do so is not a point of divergence, as license applicants also cannot engage in the "regulated conduct" prior to securing a permit to do so. That the latter group enjoys a freedom of speech or assembly directly under the Constitution whereas the right to vote is conferred by state law is another immaterial distinction, as all such license applicants are strictly prohibited by criminal laws from engaging in the specific First Amendment-protected expression or expressive conduct until they secure a license to do so. The First Amendment protects all forms of politically expressive conduct, regardless of the source of legal authority creating the right to engage in that protected conduct. The *Lostutter* panel and Defendants appear to imply that First Amendment rights may be exercised without time, place, and manner restrictions enforced by licensing requirements. However,

restoration applicants and license applicants are in the exact same posture: seeking permission to engage in specific expression or expressive conduct that is forbidden without prior authorization.

Accordingly, the *Lostutter* panel decision, not binding here in any event, impermissibly allowed state law labels, rather than practical effects, to dictate the scope of the First Amendment's protection and relied upon distinctions reflecting no functional, material difference from licensing to conclude that voting rights restoration does not operate as a licensing scheme.

### 5. The First Amendment unfettered discretion doctrine does not require a showing of actual invidious discrimination—arbitrary licensing of protected expressive conduct is per se prohibited.

Finally, Defendants argue that "Plaintiffs do not allege facts demonstrating any actual invidious discrimination . . ." ECF No. 27 at 34. This assertion runs afoul of binding precedent. Defendants confuse the First Amendment unfettered discretion doctrine with Fourteenth Amendment equal protection law, attempt to erase the line between facial and as-applied challenges, and simply ignore any opinion that forecloses their arguments.

As the U.S. Supreme Court has made clear, the First Amendment unfettered discretion doctrine affords significantly more robust protection than the Fourteenth Amendment's Equal Protection Clause. This doctrine is not medicine for an ill patient, the way Fourteenth Amendment discrimination law is, but rather a vaccination inoculating First Amendment-protected expressive conduct against disease. *Compare Forsyth Cnty.*, 505 U.S. at 130–33 (striking down local government's arbitrary permit application process on its face without any proof of actual discrimination), *with Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–65 (1977) (requiring proof of actual, intentional discrimination in equal protection case challenging local government's denial of rezoning application). The Supreme Court has shown zero tolerance for even the risk of discriminatory or arbitrary treatment in the First Amendment context, whereas

discrimination claims under the Fourteenth Amendment require proof that discrimination has already occurred.

Defendants concede that disenfranchised individuals can suffer *federal* constitutional injuries even though they are presently ineligible to vote under *state* law. They point to racial discrimination under the Fourteenth and Fifteenth Amendments and "facial[] or intentional[]" political viewpoint discrimination under the First Amendment as viable constitutional claims for disenfranchised people with felony convictions to assert. ECF No. 27 at 33; *see Hunter v. Underwood*, 471 U.S. 222, 231–33 (1985) (striking down Alabama's felony disenfranchisement regime as racially discriminatory). But Defendants fail to explain why a facial challenge under the 85-year-old First Amendment unfettered discretion doctrine is not viable. Instead, they mischaracterize Plaintiffs' claim as seeking to vindicate "the proposed right of felons to vote." ECF No. 27 at 33. But Plaintiffs do not claim that they are entitled to vote under the First Amendment or any other. Instead, they argue that the First Amendment guarantees them a non-arbitrary voting rights restoration system *regardless* of whether that non-arbitrary system ultimately results in the restoration of their personal right to vote.

Nevertheless, Defendants seek to blur the line between the First Amendment and Fourteenth Amendment doctrines, as well as the line between facial and as-applied challenges, and to make the former play by the latter's rules. Their assertion that Plaintiffs must demonstrate "actual invidious discrimination" (ECF No. 27 at 34) has been rejected by the U.S. Supreme Court. *Forsyth County* underscored what is and what is not required for a facial unfettered discretion challenge:

> Facial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision. . . . [T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion

in a content-based manner, but whether there is anything in the ordinance *preventing* him from doing so.

505 U.S. at 133 n.10 (emphasis added)(citations omitted). Defendants ignore this passage. Because Plaintiffs have asserted facial challenges, they suffer an injury from the arbitrariness of the state's voting rights restoration system. Whether or not the requested injunctive relief to create a non-arbitrary system ultimately would result in their personal re-enfranchisement is irrelevant. The existence of an actual, improper discriminatory or biased motive need not be shown to strike down such a law on its face. *See Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 351 (6th Cir. 2007) ("[A] licensing provision coupled with unbridled discretion itself amounts to an actual injury.") (citations omitted); *Roach v. Stouffer*, 560 F.3d 860, 869 & n.5 (8th Cir. 2009) (holding pro-life group "need not prove, or even allege" viewpoint discrimination in successful facial First Amendment challenge to officials' "unbridled discretion" in specialty license plate program). Regardless of whether or how often it is exercised, and regardless of the disposition of any particular license application, such unfettered discretion is per se unlawful in the First Amendment context.

## IV.    CONCLUSION

As all of Defendants' jurisdictional and merits arguments fail under the governing law, their motion to dismiss should be denied in full.

Dated: September 5, 2023                                Respectfully Submitted,

                                                        */s/ Terry C. Frank*
                                                        Terry C. Frank, Esq. (VSB No. 74890)
                                                        Terry Frank Law
                                                        6722 Patterson Ave., Ste. B
                                                        Richmond, VA 23226
                                                        P: 804.899.8090
                                                        F: 804.899.8229

terry@terryfranklaw.com

Fair Elections Center
1825 K St. NW, Suite 701
Washington, DC 20006
P: (202) 331-0114

*/s/ Jonathan Lee Sherman*
Jonathan Lee Sherman, Esq.)
(D.C. State Bar No. 998271
jsherman@fairelectionscenter.org
*Pro hac vice*

*/s/ Michelle Elizabeth Kanter Cohen*
Michelle Elizabeth Kanter Cohen, Esq.
(D.C. State Bar No. 989164)
Fair Elections Center
1825 K St. NW, Suite 701
Washington, DC 20006
P: (202) 331-0114
mkantercohen@fairelectionscenter.org
*Pro hac vice*

*/s/ Beauregard William Patterson*
Beauregard William Patterson, Esq.
(WI State Bar No. 1102842)
bpatterson@fairelectionscenter.org
*Pro hac vice*

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on September 5, 2023, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a "Notice of Electronic Filing" to the following CM/ECF participants:

Steven G. Popps, Esq. (VSB No. 80817)
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, VA 23219
P: 804-786-6731
F: 804-371-2087
spopps@oag.state.va.us

Andrew N. Ferguson, Esq. (VSB #86583)
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, VA 23219
P: 804-786-2071
F: 804-786-1991
aferguson@oag.state.va.us

Kevin M. Gallagher, Esq. (VSB No. 87548)
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, VA 23219
P: 804-786-2071
F: 804-786-1991
kgallagher@oag.state.va.us

*/s/ Terry C. Frank*
Terry C. Frank, Esq. (VSB No. 74890)
Terry Frank Law
6722 Patterson Ave., Ste. B
Richmond, VA 23226
P: 804.899.8090
F: 804.899.8229
terry@terryfranklaw.com