**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| NOLEF TURNS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-232-JAG |
| | ) | |
| GLENN YOUNGKIN, Governor of Virginia, | ) | |
| in his official capacity, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF
THEIR MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)**

Jason S. Miyares
  *Attorney General*

Steven G. Popps (VSB #80817)
  *Deputy Attorney General*


Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
AFerguson@oag.state.va.us

Andrew N. Ferguson (VSB #86583)
  *Solicitor General*

Erika L. Maley (VSB #97533)
  *Principal Deputy Solicitor General*

Kevin M. Gallagher (VSB #87548)
  *Deputy Solicitor General*

Travis S. Andrews (VSB #90520)
  *Assistant Attorney General*

*Counsel for Defendants Glenn Youngkin and Kelly Gee*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

    I.   The Complaint should be dismissed because Plaintiffs have not established standing ...... 2

      A.   Nolef Turns lacks standing ........................................................................ 2

      B.   Hawkins lacks standing ............................................................................. 4

    II.  Plaintiffs' claims lack merit and should be dismissed ............................................ 7

      A.   The First Amendment doctrines on which Plaintiffs rely do not apply here ............... 7

      B.   Plaintiffs cannot avoid the Fourteenth Amendment through inapplicable First Amendment doctrines ............................................................................. 14

CONCLUSION ................................................................................................................. 18

CERTIFICATE OF SERVICE ............................................................................................ 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CASA de Maryland, Inc. v. Trump*,
  971 F.3d 220 (4th Cir. 2020) ................................................................................3

*City of Austin, Tex. v. Reagan Nat'l Advertising of Austin, LLC*,
  142 S. Ct. 1464 (2022) ...............................................................................17, 18

*City of Lakewood v. Plain Dealer Publishing Co.*,
  486 U.S. 750 (1988)...........................................................................1, 5, 6, 13

*City of Sacramento v. Lewis*,
  523 U.S. 833 (1998)..............................................................................................15

*Connecticut Bd. of Pardons v. Dumschat*,
  452 U.S. 458 (1981)..............................................................................................10

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v.*
  *Amos*,
  483 U.S. 327 (1987)..............................................................................................15

*D.C. v. Fairfax Cnty. Sch. Bd.*,
  2023 WL 4765583 (E.D. Va. July 25, 2023) ........................................................3, 4

*Doe v. Reed*,
  561 U.S. 186 (2010)..............................................................................................16

*Doe v. Virginia Dep't of State Police*,
  713 F.3d 745 (4th Cir. 2013) ...............................................................................7

*Feldman v. Arizona Sec'y of State's Office*,
  843 F.3d 366 (9th Cir. 2016) ...............................................................................16

*Forsyth Cnty. v. Nationalist Movement*,
  505 U.S. 123 (1992)..............................................................................................13

*Gallagher v. Commonwealth*,
  284 Va. 444 (2012) ...............................................................................................7

*Hand v. Scott*,
  888 F.3d 1206 (11th Cir. 2018) ................................................................1, 8, 9, 11

*Harrison v. Spencer*,
  449 F. Supp. 3d 594 (E.D. Va. 2020) ...................................................................3, 4

*Harvey v. Brewer*,
　605 F.3d 1067 (9th Cir. 2010) (O'Connor, J.) ........................................................10

*Hayden v. Pataki*,
　2004 WL 1335921 (S.D.N.Y. June 14, 2004) ............................................................8

*Herrera v. Collins*,
　506 U.S. 390 (1993)......................................................................................................7

*Houston Community College Sys. v. Wilson*,
　142 S. Ct. 1253 (2022)................................................................................................18

*Howard v. Gilmore*,
　205 F.3d 1333, 2000 WL 203984 (4th Cir. Feb. 23, 2000) ..............................10, 11

*Irby v. Virginia State Bd. of Elecs.*,
　889 F.2d 1352 (4th Cir. 1989) ..........................................................................2, 9, 15

*Johnson v. Bush*,
　214 F. Supp. 2d 1333 (S.D. Fla. 2002), *aff'd sub nom. Johnson v. Governor of*
　*Fla.*, 405 F.3d 1214 (11th Cir. 2005) (en banc)........................................................8

*Lane v. Holder*,
　703 F.3d 668 (4th Cir. 2012) ......................................................................................3

*League of Women Voters of N.C. v. North Carolina*,
　769 F.3d 224 (4th Cir. 2014) ......................................................................................9

*Lostutter v. Beshear*,
　2022 WL 2912466 (E.D. Ky. Jul. 22, 2022)............................................................11

*Lostutter v. Kentucky*,
　2023 WL 4636868 (6th Cir. July 20, 2023)................................................... *passim*

*Martin v. Duffy*,
　977 F.3d 294 (4th Cir. 2020) ....................................................................................10

*Miller v. Thurston*,
　967 F.3d 727 (8th Cir. 2020) ....................................................................................16

*N.A.A.C.P., Los Angeles Branch v. Jones*,
　131 F.3d 1317 (9th Cir. 1997) ..................................................................................16

*Nevada Commission on Ethics v. Carrigan*,
　564 U.S. 117 (2011)....................................................................................................16

*Plyler v. Doe*,
　457 U.S. 202 (1982)....................................................................................................17

*Police Dep't of Chicago v. Mosley*,
    408 U.S. 92 (1972) ............................................................................14

*Republican Party of N.C. v. Martin*,
    980 F.2d 943 (4th Cir. 1992) ..........................................................9

*Richardson v. Ramirez*,
    418 U.S. 24 (1974) ...............................................................1, 10, 15

*Santa Monica Food Not Bombs v. City of Santa Monica*,
    450 F.3d 1022 (9th Cir. 2006) ........................................................6

*Schmitt v. LaRose*,
    933 F.3d 628 (6th Cir. 2019) ........................................................16

*Shackelford v. Shirley*,
    948 F.2d 935 (5th Cir. 1991) ........................................................15

*Sioux City Bridge Co. v. Dakota Cnty.*,
    260 U.S. 441 (1923) ......................................................................17

*Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013) ..........................................................2

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ....................................................................4, 5

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997) ......................................................................16

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ....................................................................4

*Trump v. New York*,
    141 S. Ct. 530 (2020) ..................................................................6, 7

*United States v. Lanier*,
    520 U.S. 259 (1997) ......................................................................15

*United States v. O'Neil*,
    11 F.3d 292 (1st Cir. 1993) ..........................................................14

*United States v. Roof*,
    10 F.4th 314 (4th Cir. 2021) ........................................................17

*United States v. Smith*,
    945 F.3d 729 (2d Cir. 2019) ..........................................................6

*Voting for Am. Inc. v. Steen*,
   732 F.3d 382 (5th Cir. 2013) ............................................................................16

*Washington v. Finlay*,
   664 F.2d 913 (4th Cir. 1981) ..........................................................................2, 9

*Williams v. City of Columbia*,
   906 F.2d 994 (4th Cir. 1990) ............................................................................15

*Wisconsin v. Mitchell*,
   508 U.S. 476 (1993)..........................................................................................15

*Wright v. North Carolina*,
   787 F.3d 256 (4th Cir. 2015) ............................................................................17

## Other Authorities

Federal Rule of Civil Procedure 25(d)......................................................................3

U.S. Const. amend. XIX ..........................................................................................17

U.S. Const. amend. XXVI ........................................................................................17

## INTRODUCTION

Plaintiffs' opposition demonstrates the core deficiency with their claims: the First Amendment "unfettered discretion" doctrine does not apply to the felon re-enfranchisement process. That doctrine applies where the government requires citizens to obtain a license in order to engage in protected speech, such as a parade on public streets, leafletting in a park, or the circulation of newspapers. See *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757 (1988). Felon re-enfranchisement is a very different matter. It is an exercise of discretionary executive clemency to remove a civil disability resulting from the conviction of a serious crime. Felon voting is not protected speech. It is thus unsurprising that Plaintiffs can point to no case that has ever held that the "unfettered discretion" doctrine applies to felon re-enfranchisement processes. To the contrary, multiple Courts of Appeals have rejected these exact same claims. See *Hand v. Scott*, 888 F.3d 1206 (11th Cir. 2018); *Lostutter v. Kentucky*, 2023 WL 4636868 (6th Cir. July 20, 2023). This Court should do the same.

First, this Court need not consider the merits of Plaintiffs' claims because they lack standing. Plaintiffs argue that Hawkins has standing only under the relaxed standing rules that apply to facial First Amendment challenges. But those First Amendment standing doctrines are inapplicable here, and Hawkins therefore cannot establish jurisdiction by relying upon them. As for Nolef Turns, Plaintiffs claim that the organization has standing because it will allegedly spend more time and money doing exactly what it was formed to do. But advocacy organizations cannot manufacture standing by voluntarily expending resources to conduct advocacy in their chosen field. This Court therefore does not have jurisdiction to consider Plaintiffs' claims.

Second, Plaintiffs' claims also fail on the merits. Plaintiffs concede that Virginia's disenfranchisement of felons is constitutional under *Richardson v. Ramirez*, 418 U.S. 24 (1974). They argue that felon re-enfranchisement is entirely distinct, and triggers special First Amendment

1

protections. But they have no authority for this argument. They have not identified a case holding that the franchise itself is expressive conduct protected by the First Amendment, much less that felons have a First Amendment right to vote or to any particular re-enfranchisement process. Rather, the Fourth Circuit has held that, assuming the First Amendment applies at all, "[i]n voting rights cases, the protections of the First and Thirteenth Amendments 'do not in any event extend beyond those more directly, and perhaps only, provided by the fourteenth and fifteenth amendments.'" *Irby v. Virginia State Bd. of Elecs.*, 889 F.2d 1352, 1359 (4th Cir. 1989) (quoting *Washington v. Finlay*, 664 F.2d 913, 927 (4th Cir. 1981)). This rule is not, as Plaintiffs argue, limited to "vote dilution" cases, but applies broadly to "voting rights cases."

That does not mean there is a constitutional "black hole" for voting rights. Quite to the contrary, multiple provisions of the federal Constitution secure the right to vote. But they apply different rules than those Plaintiffs invoke here. Plaintiffs accuse Defendants of "seek[ing] to blur the line between the First Amendment and Fourteenth Amendment doctrines," and "make the [one] play by the [other]'s rules." Opp. 29. But Defendants argue for exactly the opposite. Instead, Plaintiffs invoke a uniquely First Amendment doctrine for licensing protected speech that simply does not apply to the very different issue of felon re-enfranchisement. The motion to dismiss should be granted.

## ARGUMENT

## I. The Complaint should be dismissed because Plaintiffs have not established standing

### A. Nolef Turns lacks standing

Nolef Turns has abandoned associational standing. Opp. 7–10. The opposition also shows that it has failed to established standing in its own right. See *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013)

2

(association must establish standing either in its own right or under a theory of associational standing).

"As do many organizations," Nolef Turns "claims that it is and will continue to suffer a cognizable injury" because Defendants'[1] conduct "caused an 'involuntary diversion of resources' which 'frustrated [Nolef Turns'] ability to carry out its mission.'" *D.C. v. Fairfax Cnty. Sch. Bd.*, 2023 WL 4765583, at *3 (E.D. Va. July 25, 2023). The Fourth Circuit "has routinely rejected similar arguments." *Ibid.* (citing *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012), and *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 238 (4th Cir. 2020)). "Simply put, [Nolef Turns] is an advocacy organization; and as such, it is not injured simply because Defendants['] action compelled the organization to do the very thing it was formed to do." *Ibid.*; see also Opp. 7 (Nolef Turns' "primary organizational objective" is to "advocate for people with felony convictions throughout Virginia, reintegrate their clients into society, and reduce recidivism"). "If this Court were to allow a party whose organizational mission is to engage in policy advocacy to claim injury on the basis of a need to engage in that exact activity, any advocacy group could find standing to challenge laws when there are changes in policy." *D.C.*, 2023 WL 4765583, at *3 (cleaned up).

Nolef Turns relies heavily upon *Harrison v. Spencer*, 449 F. Supp. 3d 594 (E.D. Va. 2020), but that case is inapposite. See Opp. 8–10. In *Harrison*, the organization did not merely conduct more counseling; rather, it "experienced a significant increase in requests for help from individuals seeking legal assistance," "faced immediate difficulties accommodating this increase in requests," and "ultimately delayed at least nine specific advocative, educational, and legal projects, all of

---

[1] Plaintiffs named Kay Coles James as a defendant in her official capacity as Secretary of the Commonwealth of Virginia. See SAC ¶ 20. As of September 1, 2023, Kelly Gee serves as Secretary of the Commonwealth. She is automatically substituted as a party per Federal Rule of Civil Procedure 25(d).

which lay at the core of its mission, to serve the needs of those who had requested help." *Harrison*, 449 F. Supp. 3d at 604. Nolef Turns does not allege any injuries of that sort. Instead, Nolef Turns alleges only that "additional paid staff time is needed for each case as each restoration application is now more individualized and requires more specific documentation." Opp. 9. Rather than alleging a flood of requests for assistance that Nolef Turns cannot handle, or any resulting delay or cancellation of specific programs, Nolef Turns alleges only that it spends more time helping its clients—something it was already doing and indeed was created to do. See *D.C.*, 2023 WL 4765583, at *3 (when organization's "core purpose" was "pursuing precisely the type of advocacy it undertook," the resources spent on such advocacy are "very much in line with the plaintiff's core mission rather than a diversion of resources away from it" (quotation marks omitted)). Accordingly, Nolef Turns cannot establish standing.

### B. Hawkins lacks standing

Hawkins does not contest that if ordinary standing doctrine applies, he cannot establish standing because he has not yet obtained a decision from the Governor on his recently submitted re-enfranchisement application. See Mot. 14–17. Indeed, Hawkins' alleged injury is not a "concrete" harm under Article III. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quotation marks omitted). To be concrete, a harm must have "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (quotation marks omitted). "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Ibid.* Hawkins has identified no such analogue for the injury he has pled. Notably, Hawkins has *not* pled that his speech is chilled or that his right to vote has been wrongfully abridged. Indeed, he affirmatively disavows any need to make such an allegation. See Opp. 30 ("Whether or not the requested injunctive relief to create a non-arbitrary system ultimately would result in [Hawkins's] personal

4

re-enfranchisement is irrelevant."). But he cites no case where merely "being subjected to" a discretionary *clemency regime* establishes a concrete injury.

Nor is the injury Hawkins has pled "particularized." "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (quotation marks omitted). But at page 1 of his brief, Hawkins has made clear he is "*not*" seeking "an end to [his] own personal disenfranchisement." Opp. 1 (emphasis in original). Similarly, Hawkins argues that he would have standing to challenge the Governor's discretionary clemency authority "even if he had not taken th[e] step" of actually submitting an application. *Id.* at 5. This theory of standing fails to satisfy the requirement of a concrete and particularized injury.

Hawkins contends that he has standing under the relaxed standards for a "*facial* unfettered discretion challenge under the First Amendment." Opp. 5. But that specialized doctrine does not provide standing here because it does not apply. The Sixth Circuit recently rejected the identical standing argument. *Lostutter v. Kentucky* held that the Supreme Court's decision in *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), "did not allow for an exception to the traditional rules of standing" on virtually identical claims, because the "voting-rights restoration process is not an administrative licensing or permitting scheme." 2023 WL 4636868, at *6 (6th Cir. July 20, 2023). This holding, the court explained, does not "insulate [the] restoration process from constitutional review"; rather, it merely requires "Plaintiffs to satisfy either the traditional rules of standing or some exception other than *City of Lakewood*'s unfettered-discretion doctrine before they may bring suit." *Ibid.* Hawkins does not attempt to do either and therefore lacks standing.

Hawkins' only response is that *Lostutter* was "in error" because it ruled on a "merits question" rather than the jurisdictional issue. Not so. Hawkins—like the plaintiffs in *Lostutter*—

5

contends that he "satisfied all standing requirements under the unfettered-discretion doctrine." *Id.* at *1. For that doctrine to apply, Hawkins must show that the challenged re-enfranchisement process constitutes licensing of protected expression. See *id.* at *1 n.1 (describing the "actual injury" in an unfettered discretion case as "a licensing provision coupled with unbridled discretion" over expressive activity (quotation marks omitted)). Indeed, *Lakewood* itself made clear that the "unfettered discretion" standing doctrine is limited to licensing schemes "directed narrowly and specifically at expression or conduct commonly associated with expression"—in that case, "the circulation of newspapers." 486 U.S. at 760. The doctrine does not apply to "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken." *Id.* at 760–61.

Because, as *Lostutter* held, the felon re-enfranchisement process is not a "licensing" scheme under the First Amendment, the relaxed First Amendment standing doctrine does not apply here. See *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1032 (9th Cir. 2006) (organization could not assert standing to bring First Amendment facial challenge to ordinance regarding food distribution, because "food distribution is [not] on its face an expressive activity"); *United States v. Smith*, 945 F.3d 729, 735 (2d Cir. 2019) (criminal defendant could not bring First Amendment facial challenge because "he does not claim that his attempt to transport gun parts to Turkey in his checked luggage was expressive in its nature or purpose"). Hawkins therefore lacks standing.

Lastly, Hawkins's claims are not ripe. Ripeness is a "doctrine[] of justiciability" that "originate[s] in the case-or-controversy requirement of Article III." *Trump v. New York*, 141 S. Ct. 530, 535 (2020). To be ripe, a case must not be "dependent on contingent future events that may

not occur as anticipated, or indeed may not occur at all." *Ibid.* (quotation marks omitted). "Where an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court." *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). Although Hawkins disputes that he must have submitted an application to demonstrate standing, Opp. 5, he did submit one about five weeks before filing this lawsuit, Mot. 16. "The principles of federalism and comity counsel in favor of providing at the least an opportunity for the processes provided for by Virginia's [law] to address [Hawkins's] claims before intervening." *Doe*, 713 F.3d at 753.

## II.    Plaintiffs' claims lack merit and should be dismissed

### A.  The First Amendment doctrines on which Plaintiffs rely do not apply here

If the Court reaches the merits, it should dismiss the complaint for failure to state a valid claim. Plaintiffs correctly concede that Section 2 of the Fourteenth Amendment "authorizes felony disenfranchisement." Opp. 10. They also concede that the First Amendment does not provide felons a right to vote: "if Virginia disenfranchised all people with felony convictions permanently and without exception, Plaintiffs could not pursue these First Amendment claims." Opp. 1; see *id*. at 13. But felon *re-enfranchisement*, Plaintiffs argue, is an entirely different matter, because it constitutes a "licensing" scheme under the First Amendment, prohibiting "unfettered discretion." *Id*. at 11. The glaring problem with this argument is that Plaintiffs never establish its necessary premise: they cannot show that felons have any First Amendment right to re-enfranchisement, or that the "unfettered discretion" doctrine applies to re-enfranchisement processes at all. Discretionary felon re-enfranchisement regimes have existed since the nineteenth century. See *Herrera v. Collins*, 506 U.S. 390, 414 (1993); *Gallagher v. Commonwealth*, 284 Va. 444, 451 (2012). But Plaintiffs cite no precedent holding that this widespread, longstanding practice violates the First Amendment. To the contrary, Plaintiffs' theory has been rejected by every court that has

considered it, including in two cases brought by Plaintiffs' counsel. It also flies in the face of decades of precedent from the Supreme Court and Fourth Circuit. This Court should join with every other court to have considered this theory and reject it.

It is "clear that the First Amendment does not guarantee felons the right to vote." *Johnson v. Bush*, 214 F. Supp. 2d 1333, 1338 (S.D. Fla. 2002), *aff'd sub nom. Johnson v. Governor of Fla.*, 405 F.3d 1214 (11th Cir. 2005) (en banc); see also *Hayden v. Pataki*, 2004 WL 1335921, at \*6 (S.D.N.Y. June 14, 2004) ("[T]he case law is clear that the First Amendment does not guarantee felons the right to vote." (collecting cases)). Indeed, Plaintiffs do not contest this point. See Opp. 1, 13. They argue that nonetheless the First Amendment guarantees felons the right to a particular type of re-enfranchisement process. But they cite no support for this argument, and multiple cases have rejected it: "every First Amendment challenge to a discretionary vote-restoration regime … has been summarily rebuffed." *Hand v. Scott*, 888 F.3d 1206, 1212 (11th Cir. 2018) (collecting cases). This includes two cases brought by Plaintiffs' counsel making precisely the same arguments in different States. See *id.* at 1207 (holding that State was likely to succeed on the merits in facial First Amendment challenge to "Florida's scheme of voter reenfranchisement for convicted felons" on grounds that the executive "exercised 'unbridled discretion' to deny voter reenfranchisement in the absence of any articulable standards"); *Lostutter*, 2023 WL 4636868, at \*1 (affirming dismissal of First Amendment challenge to Kentucky's felon reenfranchisement scheme on standing grounds because the process does not "constitute[] an administrative licensing or permitting scheme").

The claims fail because Fourteenth Amendment doctrines, not First Amendment doctrines, govern felon re-enfranchisement. "[I]n a reenfranchisement case, the specific language of the Fourteenth Amendment controls over the First Amendment's more general terms." *Hand*, 888 F.3d

at 1212. Indeed, the Fourth Circuit has made clear that the First Amendment, if it applies at all, "offers no protection of voting rights beyond that afforded by the fourteenth or fifteenth amendments." *Washington v. Finlay*, 664 F.2d 913, 928 (4th Cir. 1981). Although Plaintiffs attempt to cabin *Washington*'s holding to vote-dilution cases, Opp. 14–16, the Fourth Circuit has not so limited it. Rather, the Fourth Circuit has held that the principle applies broadly to "voting rights cases." See *Irby v. Virginia State Bd. of Elecs.*, 889 F.2d 1352, 1359 (4th Cir. 1989) ("In voting rights cases, the protections of the First and Thirteenth Amendments 'do not in any event extend beyond those more directly, and perhaps only, provided by the fourteenth and fifteenth amendments.'" (quoting *Washington*, 664 F.2d at 927)); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 959 n.28 (4th Cir. 1992) (similar). Nor would any such limitation make doctrinal sense, given that vote dilution is a denial of the right to vote, which is what Plaintiffs allege here. See, *e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 239 (4th Cir. 2014) ("[T]he principles that make vote dilution objectionable under the Voting Rights Act logically extend to vote denial."). Although the factual allegations in *Washington*, *Irby*, and *Martin* may differ from the factual allegations in this case, the Fourth Circuit has categorically held that "in voting rights cases, no viable First Amendment claim exists in the absence of a Fourteenth Amendment claim." *Martin*, 980 F.2d at 959 n.28 (citing *Irby*, 889 F.2d at 1359, and *Washington*, 664 F.2d at 927)).[2]

---

[2] Plaintiffs contend that "Defendants abandon this [categorical] argument later in their brief with their contradictory assertion that '"a discretionary felon-reenfranchisement scheme that was facially or intentionally designed to discriminate based on viewpoint … *might violate the First Amendment*."'" ECF No. 27 at 33 (quoting *Hand v. Scott*, 888 F.3d 1206, 1211–12 (11th Cir. 2018))." Opp. 15–16. Defendants did not "abandon" any argument. Mot. 26. There is no distinct First Amendment right to vote, and the specialized First Amendment licensing doctrine that Plaintiffs rely on is categorically inapplicable to felon re-enfranchisement processes. Defendants instead point out that, as *Hand* noted, the Court need not reach the broader question whether any re-enfranchisement process could ever violate the First Amendment. For instance, Plaintiffs' speculation that a government could intentionally use the re-enfranchisement process to retaliate against an applicant for his protected expression, see Opp. 3–4, might implicate the First

Here, the Fourteenth Amendment expressly provides that States may exclude felons from voting. See *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) (O'Connor, J.) (citing *Richardson*, 418 U.S. at 26–27) ("[O]nce a felon is properly disenfranchised a state is at liberty to keep him in that status *indefinitely* and *never revisit* that determination." (emphasis added)); Mot. 18–21. Plaintiffs thus have no constitutional right to any felon re-enfranchisement process, much less one with the procedural protections they seek. Indeed, the Supreme Court has made clear that discretionary clemency powers like Virginia's re-enfranchisement process typically lie beyond the purview of judicial review altogether. These discretionary powers "have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review." *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981). Plaintiffs attempt to distinguish *Connecticut Board of Pardons* on the ground that they "have also not asserted any due process challenges under the Fourteenth Amendment." Opp. 16. But the Supreme Court did not cabin its holding to the context of the Fourteenth Amendment: discretionary clemency powers are "rarely, if ever" appropriate for judicial review under any circumstance. 452 U.S. at 464.

Against this weight of binding authority, Plaintiffs' counterarguments fall short. They attempt to explain away the bevy of courts that have rejected First Amendment challenges to discretionary vote-restoration regimes by arguing that "arbitrary *re-enfranchisement* violat[ing] the First Amendment" was not "a constitutional challenge [] adjudicated in any of those cases." Opp. 12–13. That is not so. In *Howard v. Gilmore*, 205 F.3d 1333 (Table), 2000 WL 203984 (4th

---

Amendment, see, *e.g.*, *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) ("To state a colorable First Amendment retaliation claim, a plaintiff must allege (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." (cleaned up)), but would have nothing to do with the unfettered discretion doctrine.

Cir. Feb. 23, 2000), for instance, the Fourth Circuit explicitly held that "[t]he First Amendment creates no private right of action for seeking reinstatement of previously canceled voting rights." *Id.* at *1. And, of course, *Hand* and *Lostutter* both involved challenges to allegedly arbitrary re-enfranchisement schemes under the exact same First Amendment theories. See *Hand*, 888 F.3d at 1210 ("The appellees allege that Florida's felon-reenfranchisement regime facially violates the First Amendment because it vests the Executive Clemency Board with unfettered discretion to engage in a standard-less process of arbitrary and discriminatory decision-making …" (quotation marks omitted)); *Lostutter*, 2023 WL 4636868, at *5 ("Plaintiffs insist that … the state's system of giving its governors sole power to restore the right to vote to individuals with felony convictions—unbounded by any rules or criteria—is in all material respects a completely arbitrary licensing system no different from those long prohibited in the First Amendment context." (quotation marks omitted)).

Plaintiffs thus cannot and do not distinguish *Hand* or *Lostutter*. Indeed, despite *Hand*'s obvious relevance, Plaintiffs do not engage with the decision at all. Instead, they ask this Court to ignore *Hand* because it "was a stay order decided on a 2-1 vote" in an appeal that "eventually became moot." Opp. 16 n.5. But that procedural posture does not diminish the persuasive force of *Hand*'s analysis. As in *Lostutter*, this Court should look to *Hand* as a ruling that "recently, and persuasively, considered similar arguments." *Lostutter v. Beshear*, 2022 WL 2912466, at *4 n.2 (E.D. Ky. Jul. 22, 2022); see *Lostutter*, 2023 WL 4636868, at *5 ("Plaintiffs offer no authority to the contrary equating a partial pardon to a type of administrative license, or even treating the two similarly … The State, on the other hand, points to Eleventh Circuit precedent holding that First Amendment cases invoking the unfettered-discretion doctrine are 'inapposite to a reenfranchisement case.'" (quoting *Hand*, 888 F.3d at 1210)).

11

Plaintiffs' arguments regarding *Lostutter* fare no better. Again, they do not attempt to distinguish *Lostutter*, but instead declare that that the unanimous Sixth Circuit decision "was in error." Opp. 6. But Plaintiffs' arguments do not undermine the persuasive force of the Sixth Circuit's well-reasoned opinion.[3] *Lostutter* correctly held that felon re-enfranchisement is not a First Amendment "licensing" scheme, because a discretionary clemency regime "functions differently than an administrative license or permit." *Lostutter*, 2023 WL 4636868, at *5. Plaintiffs argue that *Lostutter* erred because re-enfranchisement is distinct from a "pardon." Opp. 21–22. But they do not contest that felon re-enfranchisement under Virginia law is a species of executive clemency, and they do not explain why the distinction between a "pardon" and "clemency" makes any difference to the First Amendment analysis. *Ibid*. Plaintiffs further argue that this Court should not place "undue weight upon the 'clemency' label associated with voting rights restoration in [Virginia] law." *Lostutter*, 2023 WL 4636868, at *5. But as in *Lostutter*, "Plaintiffs never persuasively explain *why* voting restoration is more similar to a licensing scheme than to" a clemency scheme. *Ibid.*; see also *ibid.* ("They never list the defining features of a licensing or permitting scheme, much less explain how the voting-rights restoration process possesses those characteristics.").

Plaintiffs primarily argue that the Court should apply "a functional analysis." Opp. 22. They contend that felon re-enfranchisement is "remarkably similar to ... a licensing system," because it involves "apply[ing] to a government office seeking permission" to engage in conduct, which the government investigates, then "grants or denies." Opp. 22. But at that level of generality,

---

[3] Plaintiffs' arguments appear to be lifted nearly verbatim from the petition for rehearing en banc in *Lostutter*. Compare Plaintiffs-Appellants' Petition for Rehearing and Rehearing En Banc at 7–16, *Lostutter v. Kentucky*, No. 22-5703, ECF No. 29, with Opp. 21–28. The Sixth Circuit denied the petition for rehearing en banc, with no judge requesting a vote. See Order, *Lostutter v. Kentucky*, No. 22-5703, ECF No. 31-1.

Plaintiffs' description would apply equally to any application to the government to engage in any conduct at all, from building a pipeline, to repairing the roof on a historic building, to opening a business. The *Lakewood* "unfettered discretion" doctrine that Plaintiffs seek to invoke is not nearly so broad. It applies only where government officials have "unbridled discretion *directly to license speech*, or conduct commonly associated with speech." *Lakewood*, 486 U.S. at 767; see pp. 5–6, *supra*. Indeed, *Lakewood* was careful to note that it was not holding "that the press or a speaker may challenge as censorship any law involving discretion to which it is subject." *Id*. at 759; see *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992) ("The Forsyth County ordinance contains more than the possibility of censorship through uncontrolled discretion."). Although any permitting system could theoretically trigger the sort of fear of viewpoint discrimination and concomitant self-censorship about which Plaintiffs speculate here, see Opp. 2, that does not mean that courts apply to every permitting system the same stringent constitutional test that applies where the government requires a license to engage in constitutionally protected speech.

Rather, *Lakewood* and *Forsyth County* apply only where the plaintiff must obtain a license before "attempting to exercise his or her First Amendment right to freedom of speech." *Lostutter*, 2023 WL 4636868, at *4. A "felon can invoke no comparable right" when applying for re-enfranchisement, because the felon has no underlying First Amendment right to vote. *Ibid.*; see p.8, *supra*. Indeed, Plaintiffs concede that felons have no underlying constitutional right to vote, under either the First or Fourteenth Amendments. See Opp. 13 (agreeing that "Virginia law could uniformly and permanently disenfranchise people with felony convictions"). Because felons have no First Amendment right to vote, they likewise cannot invoke the First Amendment rules governing the process by which the government permits constitutionally protected speech. See

*Lostutter*, 2023 WL 4636868, at *5 (noting plaintiffs' failure to identify "a single case in which a court interpreted a restored right to vote as a license or permit to vote").

Plaintiffs' argument that "the greater [does not] include[] the lesser" power, Opp. 12, fails for the same reason. That principle is likewise limited to government regulations of the First Amendment right to free expression; for instance, providing that speech regulations must be content-neutral, even if the government could ban speech on the property at issue altogether. See, *e.g.*, *Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972). But where, as here, there is no underlying First Amendment right, the doctrine is simply inapplicable. See, *e.g.*, *United States v. O'Neil*, 11 F.3d 292, 296 (1st Cir. 1993) ("The principle that the grant of a greater power includes the grant of a lesser power is a bit of common sense that has been recognized in virtually every legal code from time immemorial."). As in *Lostutter*, Plaintiffs "fail to explain why [this Court] should conflate the distinct processes of licensing and pardons, rooted as they are in separate provisions of [Virginia] law, subject to differing levels of judicial scrutiny by the Supreme Court, and implemented to accomplish unrelated goals." 2023 WL 4636868, at *4.

### B. Plaintiffs cannot avoid the Fourteenth Amendment through inapplicable First Amendment doctrines

Finally, Plaintiffs argue that the First Amendment must apply here because it applies to political expression, but this argument fails for several reasons. Plaintiffs contend that Defendants "urge this Court to adopt a 'black hole' theory of the First Amendment in the electoral context," in which "the politically expressive conduct at the very center of our electoral system is *not* protected under the First Amendment, but every other form of expressive conduct, communication, advocacy, and persuasion orbiting and seeking to influence voters' political views and choices" is. Opp. 17. But there is no need for this Court to reach the broad question whether the First Amendment covers the right to vote, because Plaintiffs' claims fail regardless. It is undisputed that

14

the First Amendment does not confer a right for *felons* to vote, and there is also no First Amendment right of felons to be re-enfranchised. See p.8, *supra*. In addition, the Fourth Circuit has already held that, even assuming the First Amendment applies to the right to vote at all, its protections of that right are no broader than those provided by the Fourteenth Amendment. *Irby*, 889 F.2d at 1359, see pp.8–9, *supra*.[4] And it is undisputed that the Fourteenth Amendment permits felon disenfranchisement. *Richardson*, 418 U.S. at 56; see p.10, *supra*. Thus, regardless whether the First Amendment applies to the right to vote, Plaintiffs' claims still fail as matter or law.

Even if the Court were to take up the broader question about whether voting is a First Amendment right, Plaintiffs' arguments would still fail. The First Amendment protects "expressive conduct, communication, advocacy, and persuasion" in politics because it protects "speech" and "association." See, *e.g.*, *Shackelford v. Shirley*, 948 F.2d 935, 938 (5th Cir. 1991) (the First Amendment "was designed to protect" the "values of persuasion, dialogue and free exchange of ideas"). It does not protect conduct that is not primarily expressive. See, *e.g.*, *Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993) ("[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment.").

---

[4] The Fourth Circuit's ruling follows the typical constitutional principle that where one provision specifically covers a subject, its doctrine controls over those of more general provisions that might otherwise be thought to apply. See, *e.g.*, *City of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (a general constitutional provision applies only if the matter presented is not "covered by" a more specific provision). Thus, Plaintiffs cannot bootstrap their way into a more stringent level of review by choosing to ignore the directly applicable constitutional provision. See, *e.g.*, *Williams v. City of Columbia*, 906 F.2d 994, 999 (4th Cir. 1990) (when an "ordinance is a content-neutral time, place and manner restriction, [it] therefore is not an unconstitutional infringement of the right to free speech" under the Equal Protection Clause); *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987) (where a statute draws religious distinctions, there is "no justification for applying strict scrutiny [under the Equal Protection Clause] to a statute that passes" Establishment Clause scrutiny); *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.").

Voting is primarily political action, as opposed to expression. For instance, several federal courts, including the Fifth and Ninth Circuits, have determined that collecting ballots does not qualify as expressive conduct protected by the First Amendment. See, *e.g.*, *Feldman v. Arizona Sec'y of State's Office*, 843 F.3d 366, 372 (9th Cir. 2016) (holding that collecting ballots is not expressive conduct "[e]ven if ballot collectors intend to communicate that voting is important"); *Voting for Am. Inc. v. Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (finding the collection and delivering of voter-registration applications are not expressive conduct). Similarly, notarizing and returning ballot initiative petitions is not expressive conduct. *Miller v. Thurston*, 967 F.3d 727, 738–39 (8th Cir. 2020). "Elections do not have a general expressive function." *N.A.A.C.P., Los Angeles Branch v. Jones*, 131 F.3d 1317, 1323 (9th Cir. 1997).

Plaintiffs cite no case holding that voting is expressive conduct under the First Amendment. They rely on *Doe v. Reed*, 561 U.S. 186 (2010) (cited at Opp. 19). But the Supreme Court itself has counseled courts not to read *Doe* in that way. Noting that a party and dissent had cited *Doe* "as establishing 'the expressive character of voting,'" the Court in *Nevada Commission on Ethics v. Carrigan*, 564 U.S. 117 (2011), explained that *Doe* "did no such thing." *Id.* at 128. Rather, "[t]hat case held only that a citizen's signing of a petition—core political speech—was not deprived of its protected status simply because, under state law, a petition that garnered a sufficient number of signatures would suspend the state law to which it pertained, pending a referendum." *Ibid.* (quotation marks and citation omitted); see also *Schmitt v. LaRose*, 933 F.3d 628, 638 (6th Cir. 2019) ("Moreover, although the Supreme Court has acknowledged that a person or party may express beliefs or ideas through a ballot, it has also stated that '[b]allots serve primarily to elect candidates, not as forums for political expression.'" (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997))).

16

That does not mean, as Plaintiffs put it, that the right to vote falls into some kind of constitutional "black hole" any more than does the right to keep and bear arms. Opp. 17. Rather, like the right to keep and bear arms is protected by the Second rather than the First Amendment, the right to vote is secured by constitutional provisions other than the First Amendment. Specifically, the Equal Protection Clause in Section 1 of the Fourteenth Amendment guarantees "the initial allocation of the franchise—that is, the right to vote," *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015), and the Fifteenth Amendment includes "protections of the right to vote," *United States v. Roof*, 10 F.4th 314, 394 (4th Cir. 2021); see also U.S. Const. amend. XIX (prohibiting the denial of the right to vote on the basis of sex); U.S. Const. amend. XXVI (lowering the minimum voting age to eighteen). That is why "it is indisputable that arbitrary enfranchisement—and also arbitrary disenfranchisement—would be unconstitutional." Opp. 14; *Plyler v. Doe*, 457 U.S. 202, 216–17 (1982) ("The Equal Protection Clause was intended as a restriction on state legislative action … that impinge[s] upon the exercise of a 'fundamental right.'"); *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441, 445 (1923) ("The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination."). But again—as Plaintiffs concede— the Fourteenth Amendment specifically permits felon disenfranchisement. See Opp. 10. Plaintiffs cannot evade that principle by invoking irrelevant First Amendment doctrines, especially given that their argument would requiring interpreting the same amendment to both permit and prohibit felon disenfranchisement. See Mot. 21–22.

Both "history and tradition of regulation" are "relevant when considering the scope of the First Amendment." *City of Austin, Tex. v. Reagan Nat'l Advertising of Austin, LLC*, 142 S. Ct. 1464, 1474–75 (2022). And "[w]hen faced with a dispute about the Constitution's meaning or

application, long settled and established practice is a consideration of great weight." *Houston Community College Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022) (cleaned up). In the more than 150 years of discretionary clemency regimes both in Virginia and around the United States, Plaintiffs have failed to offer *a single case* holding that a discretionary vote-restoration regime violates the First Amendment. "The unbroken tradition" of discretionary vote-restoration regimes forecloses "the adoption of [Plaintiffs'] novel rule." *City of Austin*, 142 S. Ct. at 1475.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Plaintiffs' claims.


Dated: September 19, 2023                    Respectfully submitted,

                                             GLENN YOUNGKIN
                                             KELLY GEE


                                             By:    */s/ Andrew N. Ferguson*
                                                 Andrew N. Ferguson (VSB #86583)
                                                    *Solicitor General*

Jason S. Miyares                             Erika L. Maley (VSB #97533)
   *Attorney General*                            *Principal Deputy Solicitor General*

Steven G. Popps (VSB #80817)                 Kevin M. Gallagher (VSB #87548)
   *Deputy Attorney General*                     *Deputy Solicitor General*

Office of the Attorney General               Travis S. Andrews (VSB #90520)
202 North Ninth Street                           *Assistant Attorney General*
Richmond, Virginia 23219
(804) 786-2071 – Telephone                   *Counsel for Defendants Glenn Youngkin and*
(804) 786-1991 – Facsimile                   *Kelly Gee*
AFerguson@oag.state.va.us

18

**CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on September 19, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all parties of record.

*/s/ Andrew N. Ferguson*
Andrew N. Ferguson (VSB #86583)
*Solicitor General*

19