**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| GEORGE HAWKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-232-JAG |
| | ) | |
| GLENN YOUNGKIN, Governor of Virginia, | ) | |
| in his official capacity, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 56**

Jason S. Miyares
*Attorney General*

Andrew N. Ferguson (VSB #86583)
*Solicitor General*

Steven G. Popps (VSB #80817)
*Deputy Attorney General*

Erika L. Maley (VSB #97533)
*Principal Deputy Solicitor General*

Kevin M. Gallagher (VSB #87548)
*Deputy Solicitor General*

Charles J. Cooper (*Pro Hac Vice*)
Haley N. Proctor (VSB #84272)
Joseph O. Masterman (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants Glenn Youngkin and
Kelly Gee*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
AFerguson@oag.state.va.us

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................................... 6

LEGAL STANDARD............................................................................................................... 7

ARGUMENT ........................................................................................................................... 7

   I.   Virginia's Voting Restoration Process Is Constitutional ..................................................... 7

     A.   The Governor's Discretionary Clemency Power To Restore Voting Rights Does Not
       Violate The Constitution............................................................................................. 8

     B.   Plaintiff's Contrary Arguments Are Meritless ...............................................................11

   II.   Plaintiff's Requested Remedy Demonstrates That His Claims Fail ................................. 15

CONCLUSION........................................................................................................................ 19

CERTIFICATE OF SERVICE ................................................................................................ 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Beacham v. Braterman*,
300 F. Supp. 182 (S.D. Fla.), *aff'd*, 396 U.S. 12 (1969)..........................................10

*Beacham v. Braterman*,
396 U.S. 12 (1969)..........................................................................................10, 11

*Bowens v. Quinn*,
561 F.3d 671 (7th Cir. 2009) ..................................................................................17

*City of Austin, Tex. v. Reagan Nat'l Advertising of Austin, LLC*,
596 U.S. 61 (2022)........................................................................................14, 15

*Connecticut Bd. of Pardons v. Dumschat*,
452 U.S. 458 (1981)......................................................................8, 9, 14, 16

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990)..........................................................................................12

*Gallagher v. Commonwealth*,
284 Va. 444 (2012) ..........................................................................................2, 3

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999)..........................................................................................17

*Hand v. DeSantis*,
946 F.3d 1272 (11th Cir. 2020) ..............................................................................13

*Hand v. Scott*,
888 F.3d 1206 (11th Cir. 2018) ...................................................................... *passim*

*Herrera v. Collins*,
506 U.S. 390 (1993)..........................................................................................8, 14

*Houston Comm. College Sys. v. Wilson*,
595 U.S. 468 (2022)..........................................................................................14

*Howard v. Gilmore*,
205 F.3d 1333, 2000 WL 203984 (4th Cir. Feb. 23, 2000) ..............................................11, 12

*Howell v. McAuliffe*,
292 Va. 320 (2016) ..........................................................................................3, 18

ii

*Irby v. Virginia State Bd. of Elections,*
889 F.2d 1352 (4th Cir. 1989) ...................................................................11, 12

*Lostutter v. Kentucky,*
No. 22-5703, 2023 WL 4636868 (6th Cir. July 20, 2023)................................13, 14

*Mandel v. Bradley,*
432 U.S. 173 (1977) (per curiam) ........................................................................10

*Ohio Adult Parole Auth. v. Woodard,*
523 U.S. 272 (1998)................................................................................8, 9, 14

*In re Phillips,*
265 Va. 81 (2003) .................................................................................................3

*Republican Party of North Carolina v. Martin,*
980 F.2d 943 (4th Cir. 1992) .......................................................................11, 12

*Richardson v. Ramirez,*
418 U.S. 24 (1974).............................................................................9, 10, 11, 12

*Rucho v. Common Cause,*
139 S. Ct. 2484 (2019)..................................................................................16, 17, 18

*Variety Stores, Inc. v. Wal-Mart Stores, Inc.,*
888 F.3d 651 (4th Cir. 2018) ................................................................................7

*Washington v. Finlay,*
664 F.2d 913 (4th Cir. 1981) .......................................................................11, 12

## Other Authorities

2 A.E. Dick Howard, Commentaries on the Constitution of Virginia (1974) ...............................3

Fed. R. Civ. P. 56(a) ....................................................................................................7

Va. Const. art. V, § 12 ...............................................................................................3

**INTRODUCTION**

Decades of Supreme Court precedent, centuries of historical practice, and two cases directly on point from the courts of appeals all confirm that Plaintiff Hawkins's claims fail as a matter of law. Hawkins argues that the Governor's discretionary clemency power to restore convicted felons' voting rights is *facially* unconstitutional under the First Amendment. Because Hawkins brings a facial challenge, this case is *not* about whether the Governor may discriminate based on viewpoint, race, or any other constitutionally forbidden criterion when restoring felons' voting rights. Everyone agrees he may not. Instead, this case is about whether the mere fact that the Governor possesses discretion to restore voting rights—discretion the Governor has held for 150 years—makes Virginia's voting-restoration process unconstitutional. As Supreme Court precedent and recent decisions from the Sixth and Eleventh Circuits demonstrate, the answer is no.

Hawkins's First Amendment claims fail several times over, and every appellate court to have encountered the theory has rejected it. First, the Supreme Court has made clear that a state executive's clemency decisions are rarely, if ever, subject to judicial review given clemency's historical role in our constitutional system. And the Supreme Court has both summarily affirmed and favorably cited previous precedent rejecting a constitutional challenge to a discretionary voting-restoration process. Second, the Fourth Circuit has held numerous times that the First Amendment does not provide any greater protections to voting rights than the Fourteenth Amendment, and all parties agree that Virginia's voting-restoration process satisfies the Fourteenth Amendment's requirements. Third, Hawkins's analogy to speech-licensing cases fails because felons have no constitutional right to vote, while a would-be speaker in a licensing regime does have the right to free speech.

Moreover, Hawkins's requested remedy only underscores that his claims fail as a matter of law. Hawkins asks this Court to direct the Governor in his exercise of the clemency power by setting forth "criteria," "rules," and "time limits" the Governor must follow when restoring voting rights. But the decision to grant or withhold executive clemency is a quintessential nonjusticiable political question. Moreover, the injunction Hawkins contemplates vastly exceeds the scope of federal courts' equitable powers. There is no historical precedent for such an intrusive judicial interference with a state chief executive's longstanding historical clemency power. Finally, even if Hawkins obtains an injunction requiring the categorical rules he seeks, it is unclear how the Governor could comply with it while also complying with the Virginia Constitution's requirement that he restore felons' voting rights on an individualized, case-by-case basis. The conflict between the requested injunction and the Virginia Constitution's command would be difficult to reconcile.

In short, the Governor is entitled to exercise the discretion vested in him by Virginia's Constitution to restore the voting rights of felons who will be responsible citizens and members of the political body—as Virginia's Governors have done for 150 years and Governor Youngkin has done for *thousands* of felons during his administration. Thus, Hawkins's First Amendment claims fail as a matter of law, and the Court should grant summary judgment for Defendants.

## BACKGROUND

The undisputed material facts are set forth below, but Defendants provide this background to illuminate the Governor's clemency power to restore voting rights and the Commonwealth's current voting-restoration process. The Governor's clemency power was first established in Virginia's 1776 Constitution. See *Gallagher v. Commonwealth*, 284 Va. 444, 451 (2012). That Constitution required the Governor to obtain the concurrence of an advisory council when exercising his clemency power, but Virginia's 1851 Constitution removed that limitation and vested the clemency power in the Governor alone. *Ibid.* In 1870, Virginia added the power to

"'remove political disabilities consequent to conviction of offenses'" to the Governor's clemency power. *Ibid.* (quoting 2 A.E. Dick Howard, Commentaries on the Constitution of Virginia, 641–42 (1974)). And to this day, the Governor's clemency power includes the right to restore the voting rights of felons. Article V, section 12 of the Virginia Constitution—entitled "Executive clemency"—grants the Governor the power "to remove political disabilities consequent upon conviction for offenses."

Through the decades, Virginia's Governors generally exercised this discretionary power in a similar manner. Specifically, until 2016, all Governors exercised their power to restore felons' voting rights "on an individualized case-by-case basis taking into account the specific circumstances of each." *Howell v. McAuliffe*, 292 Va. 320, 341 (2016). The "unbroken historical record" of Governors exercising individualized discretion to restore voting rights spanned 71 Governors. *Ibid.* But in 2016, Governor McAuliffe issued an executive order purporting to restore voting rights to all "Virginians who had been convicted of a felony but who had completed their sentences of incarceration and any periods of supervised release, including probation and parole." *Id.* at 327–28. The Virginia Supreme Court held this executive order to be in violation of Virginia's Constitution. "Never before," the court explained, "have any of the prior 71 Virginia Governors issued a" voting-restoration order "to an entire class of unnamed felons without regard for the nature of the crimes or any other individual circumstances relevant to the request" for voting restoration. *Id.* at 337. The court held that Virginia's Constitution instead requires the Governor to exercise his clemency power to restore voting rights "on an individualized case-by-case basis." See *id.* at 341. And under Virginia law, the Governor "may grant or deny any request without explanation, and there is no right of appeal from the Governor's decision." *In re Phillips*, 265 Va. 81, 87–88 (2003).

In January 2022, Governor Youngkin took office. See Joint Stipulation of Undisputed Facts (JSUF) ¶ 6 (ECF No. 59). During his first year in office, the Governor decided to pursue his own process for voting restoration—which was fully implemented in December 2022 and remains the process to this day. JSUF ¶ 7. That process begins with an application submitted by the disenfranchised felon. See JSUF ¶ 10. That application form is posted on the Secretary of the Commonwealth's website and is provided to all individuals who are going through the process of being released from incarceration. JSUF ¶ 9. Applicants may fill out and submit the application online or mail a paper copy. JSUF ¶ 10. The application requests information regarding the applicant's identity, prior felonies, and status with respect to state supervision and fines, fees, or restitution. See JSUF ¶ 12.

Once the Secretary's Office receives the application, the Secretary's Office reviews the application for accuracy, completeness, eligibility, and previous restorations. JSUF ¶ 16. If an applicant failed to complete the application properly, the Secretary's Office will contact the applicant and request the missing information. JSUF ¶ 17. Applicants will be denied if they are still incarcerated, currently subject to a pending felony charge, under supervised release for an out-of-state or federal conviction, or if they otherwise fail to satisfy the voting qualifications set forth by Virginia law, such as age, citizenship status, and residency requirements. JSUF ¶ 28.

Once an applicant has provided the necessary information, the Secretary's Office engages in a multi-agency review process for each applicant. Specifically, the Secretary's Office will send applicants' names and information to the Central Criminal Records Exchange, the Virginia Department of Elections, the Virginia Department of Behavioral Health and Development Services, the Virginia Department of Corrections, and the Virginia Compensation Board. JSUF ¶¶ 18, 21.

In return, these agencies send information on each applicant back to the Secretary's Office. JSUF ¶ 22. The Central Criminal Records Exchange sends an applicant's criminal history record. JSUF ¶ 18. The Department of Elections states whether an applicant is deceased, mentally incapacitated, or a non-citizen. JSUF ¶ 23. The Department of Behavioral Health states whether the applicant is under state supervision, on conditional or unconditional release, incarcerated at a state hospital or with the Virginia Center for Behavioral Rehabilitation, or has been found not guilty by reason of insanity. JSUF ¶ 24. The Virginia Compensation Board states whether the applicant is under state supervision, on supervised release, released to an out-of-state authority, released to a mental hospital, awaiting trial, bonded with pre-trial services, or is an inmate with a federal offense. JSUF ¶ 25. Finally, the Department of Corrections states whether the applicant is under state supervision, on community supervision, under interstate compact community supervision, incarcerated in a Department of Corrections facility or local jail, or an absconder or fugitive. JSUF ¶ 26.

Once the multi-agency review is complete, the Secretary's Office reviews the sum-total of this information for each individual applicant. JSUF ¶ 27. This review results in a recommendation by the Secretary to the Governor as to whether the Governor should grant or deny the application. *Ibid.* The Secretary and Governor engage in a holistic, case-by-case consideration of the information gathered from the application and multi-agency review, including whether the applicant committed a violent crime, how recent the conviction is, and the applicant's conduct since the conviction. Ex. 1 at 3 (Gov. Youngkin Resps. to Pl.'s First Set of Interrogs. & Reqs. for Admis.). Armed with the Secretary's recommendation and the results of the multi-agency review, the Governor is the ultimate decisionmaker and may grant or deny the application in his discretion. JSUF ¶ 27; JSUF ¶ 15. Ultimately, his decision to grant or deny an application is based on a

predictive judgment regarding whether an applicant will live as a responsible citizen and member of the political body. JSUF ¶ 15. Once the Governor has made his decision, the Secretary's Office notifies the applicant. JSUF ¶¶ 32–33. If an application is denied, the applicant must wait one year to reapply or his application will be deemed a duplicate of the previously denied application. See JSUF ¶ 45. If an application is granted, the Secretary's Office congratulates the applicant, sends the official restoration order, and provides instructions for registering to vote. See Ex. 2 (Hawkins_Def_000030).

The Governor takes seriously his clemency power to restore convicted felons' voting rights. He has expressed his admiration for those who have turned their lives around after receiving a felony conviction: "I applaud those who have committed to starting fresh with renewed values and a will to positively contribute to our society." Ex. 3 (Hawkins_Def_000026). And he has stated that "[s]econd chances are essential to ensuring Virginians who have made mistakes are able to move forward toward a successful future." *Ibid.* Consistent with these views, since taking office, Governor Youngkin has restored voting rights to *thousands* of convicted felons. See JSUF ¶ 8.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      In 2010, Plaintiff George Hawkins was convicted of five felony offenses: attempted murder in the first degree, aggravated malicious wounding, drug possession with intent to distribute, and two counts of the use of a firearm in commission of a felony. Decl. of Kay Coles James (ECF No. 27-1) ¶ 17.

2.      For these five felonies, he was sentenced to 78 years of imprisonment, with all but fifteen years suspended. James Decl. ¶ 17.

3.      On January 15, 2022, Governor Youngkin assumed office. JSUF ¶ 6.

4.      On May 3, 2023, Hawkins was released from incarceration. James Decl. ¶ 18.

5. On June 18, 2023, Hawkins submitted an application for the restoration of his voting rights. James Decl. ¶ 15.

6. On August 17, 2023, Governor Youngkin notified Mr. Hawkins that his application was deemed "ineligible at this time." See Defs.' Notice Re. Pl. George Hawkins (ECF No. 39).

## LEGAL STANDARD

A party is entitled to summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (quotation marks omitted).

## ARGUMENT

### I. Virginia's Voting Restoration Process Is Constitutional

Plaintiff Hawkins brings a facial challenge against the voting-restoration process established by the Governor under Virginia's Constitution. Specifically, Hawkins contends that the discretion granted to the Governor by Virginia's Constitution violates the First Amendment because it would permit viewpoint discrimination in the voting-restoration process. Hawkins does not allege that he or anyone else has actually been subjected to unlawful viewpoint discrimination; indeed, he has affirmatively disavowed that such a showing is necessary to his claim. See Memo. in Opp. to Defs. Mot. to Dismiss Pls.' Second Am. Compl. (MTD Opp.) at 28 (ECF No. 30). Instead, Hawkins contends that the Governor's *discretion alone*—irrespective of how that discretion is exercised—violates the First Amendment. That argument fails because discretionary clemency regimes, like Virginia's voting-restoration process, are not typically subject to judicial

review; longstanding tradition confirms that Virginia's process is constitutional; and every court of appeals to encounter Hawkins's First Amendment argument has rejected it.

A.    **The Governor's Discretionary Clemency Power To Restore Voting Rights Does Not Violate The Constitution**

The clemency power of the States dates back to the Founding. See *Herrera v. Collins*, 506 U.S. 390, 414 (1993). Ever "since the British colonies were founded, clemency has been available in America." *Ibid.* As a general matter, the Executive's exercise of the clemency power has not been subject to judicial review. Specifically, "clemency has not traditionally 'been the business of courts'" because "executive clemency exists to provide relief from harshness or mistake in the judicial system, and is therefore vested in an authority other than the courts." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 285 (1998) (plurality) (quoting *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981)). Instead, the "heart of executive clemency" is "to grant clemency as a matter of grace, thus allowing the executive to consider a wide range of factors not comprehended by earlier judicial proceedings and sentencing determinations." *Id.* at 280–81. For example, a clemency decision turns "on purely subjective evaluations and on predictions of future behavior by those entrusted with the decision." *Dumschat*, 452 U.S. at 464. And this type of predictive judgment made by a State's executive branch has "not traditionally been the business of courts" and thus is "rarely, if ever," properly subjected to judicial review. *Ibid.*

The Supreme Court has acknowledged this historic and unique status of executive clemency in our constitutional system. In *Dumschat*, the Court rejected an inmate's Due Process Clause challenge to the State of Connecticut's commutation system—even though that system "conferred 'unfettered discretion' on its Board of Pardons" to make commutation decisions. 452 U.S. at 465–66. And in *Woodard*, the Court rejected an inmate's Due Process Clause challenge to the State of Ohio's clemency system. 523 U.S. at 275–76. Across two opinions in *Woodard*, eight

Justices agreed that clemency decisions are not typically subject to judicial review and "might" warrant judicial review only in extreme circumstances such as "a scheme whereby a state official flipped a coin to determine whether to grant clemency" or "arbitrarily denied a prisoner any access to its clemency process." See *Woodard*, 523 U.S. at 289 (O'Connor, J., concurring). Absent those extraordinary hypotheticals, however, the Court reaffirmed its holding in *Dumschat* and held that the "Due Process Clause is not violated" when clemency procedures merely "confirm that the clemency and pardon powers are committed, as is our tradition, to the authority of the executive." *Id.* at 276. Here, the Governor's clemency determinations are not based on a coin flip, nor on any constitutionally suspect factors: rather, the Governor engages in a holistic, case-by-case determination of each application, including whether the applicant committed a violent crime, how recent the applicant's conviction is, and the applicant's conduct since the conviction, in order to make a predictive judgment as to whether the applicant is likely to be a responsible citizen and member of the political body. See pp.5–6, *supra*.

The rule that the clemency power is committed to executive discretion extends to voting restoration. In *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974), the Court held that felon disenfranchisement does not violate the Fourteenth Amendment. Specifically, the Court exhaustively canvassed the text, history, and precedent regarding the Fourteenth Amendment and concluded "that the understanding of those who adopted the Fourteenth Amendment, as reflected in the express language of s[ection] 2 and in the historical and judicial interpretation of the Amendment's applicability to state laws disenfranchising felons," confirmed that States could lawfully exclude convicted felons from the franchise. *Ibid.* "As we have seen," the Court summed up, "the exclusion of felons from the vote has an affirmative sanction in s[ection] 2 of the Fourteenth Amendment." *Ibid.*

Especially relevant here, the Court's opinion favorably cited its summary affirmance of a three-judge district court's decision in *Beacham v. Braterman*. See *Ramirez*, 418 U.S. at 53 (citing *Beacham v. Braterman*, 300 F. Supp. 182 (S.D. Fla.), *aff'd*, 396 U.S. 12 (1969)). *Beacham* involved a convicted felon's challenge to Florida's pardon process after he "was refused the right to register" to vote "because he was a convicted felon whose civil rights had not been restored." 300 F. Supp. at 182–83. The plaintiff "applied for a pardon, which would have included a restoration of his civil rights, and his application was denied," so he challenged the process because "[n]either the Governor of Florida nor members of the State Cabinet ha[d] established specific standards to be applied to the consideration of petitions for pardon." *Id.* at 183. Specifically, the plaintiff sought "to enjoin the Governor of Florida from continuing to grant and deny petitions for pardons in a purely discretionary manner without resort to specific standards." *Ibid*. The court framed the case as a constitutional challenge to the Governor's ability, with approval of three cabinet members, "to restore discretionarily the right to vote to some felons and not to others." *Id.* at 184. And the court rejected that challenge because the power to restore felons' right to vote was "an act of executive clemency not subject to judicial control." *Ibid.* "The historic executive prerogative to grant a pardon as an act of grace has always been respected by the Courts," *Beacham* explained. *Ibid.* "Where the people of a state have conferred unlimited pardon power upon the executive branch of their government, the exercise of that power should not be subject to judicial intervention." *Ibid.*

The Supreme Court summarily affirmed *Beacham*. See *Beacham v. Braterman*, 396 U.S. 12 (1969). Given this summary affirmance, a court may not come "to opposite conclusions on the precise issues presented and necessarily decided" by *Beacham*. See *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam). And the conclusion in *Beacham* was that a discretionary vote-restoration process was "not subject to judicial control." 300 F. Supp. at 184. But even if there

were doubt about the effect of the Court's summary affirmance, the Supreme Court affirmatively endorsed *Beacham* in *Ramirez* as part of the "settled historical and judicial understanding of the Fourteenth Amendment's effect on state laws disenfranchising convicted felons." *Ramirez*, 418 U.S. at 53–54. Thus, *Beacham* confirms that Virginia's discretionary voting-restoration process is constitutional, and Defendants are entitled to summary judgment.

### B. Plaintiff's Contrary Arguments Are Meritless

Despite the precedent and historical analysis detailed above, Hawkins argues that Virginia's discretionary vote-restoration process violates the First Amendment. Specifically, his theory is that Virginia's voting-restoration process should be subject to the First Amendment doctrine governing the licensing of protected speech. That argument fails for numerous reasons—as multiple courts of appeals have held.

First, the First Amendment does not prohibit the discretionary restoration of voting rights. The Fourth Circuit has held—multiple times—"that in voting rights cases, no viable First Amendment claim exists in the absence of a Fourteenth Amendment claim." *Republican Party of North Carolina v. Martin*, 980 F.2d 943, 959 n.28 (4th Cir. 1992). Put differently, "the protections of the First" Amendment do not "'extend beyond those more directly, and perhaps only, provided by the fourteenth and fifteenth amendments.'" *Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352, 1359 (4th Cir. 1989) (quoting *Washington v. Finlay*, 664 F.2d 913, 927 (4th Cir. 1981)).

This longstanding principle helps explain why the Fourth Circuit had no difficulty previously rejecting a First Amendment challenge to Virginia's voting-restoration process in an unpublished opinion. See *Howard v. Gilmore*, 205 F.3d 1333 (Table), 2000 WL 203984, at *1 (4th Cir. Feb. 23, 2000). In *Howard*, a convicted felon sought to have his voting rights restored under the First Amendment. *Ibid.* The Fourth Circuit swiftly affirmed dismissal of that challenge because

the "First Amendment creates no private right of action for seeking reinstatement of previously canceled voting rights." *Ibid.* So too here: under *Irby*, *Finlay*, *Martin*, and *Howard*, Hawkins has no First Amendment claim arising from the Governor's consideration of his restoration application.

Second, the speech-licensing cases are inapposite. Hawkins analogizes a felon's voting-restoration application to a would-be speaker's application to engage in protected speech, such as a parade. See MTD Opp. at 2. But there is a fundamental and dispositive distinction between a challenge to a licensing scheme for protected speech and a challenge to a discretionary voting-restoration process. In the speech-licensing cases, the licensing schemes burdened *a constitutional right*—the right to free speech. See, *e.g.*, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990) ("a licensing scheme creates the possibility that *constitutionally protected speech* will be suppressed where there are inadequate procedural safeguards" (emphasis added)). Therefore, when a speech-licensing regime is deemed unconstitutional, the plaintiff is returned to the default of free speech. Here, in contrast, felons do not have a constitutional right to vote. *Ramirez*, 418 U.S. at 54. So if Virginia's voting-restoration process were deemed unconstitutional, Hawkins would be returned to the default of being a convicted felon who cannot vote. See *ibid.*; MTD Opp. at 10 (conceding that felon disenfranchisement is constitutional). Because the voting-restoration process does not burden any existing constitutional right, unlike a speech-licensing regime, the speech-licensing cases do not apply.

Two courts of appeals have already rejected Hawkins's theory for these very reasons. In *Hand v. Scott*, 888 F.3d 1206, 1210 (11th Cir. 2018), convicted felons brought an identical challenge to Florida's discretionary voting-restoration process, making the same analogy to the speech-licensing cases that Hawkins makes here. The district court initially ruled for the plaintiffs, but the Eleventh Circuit stayed that decision less than a month later. In concluding that the

plaintiffs' First Amendment challenge likely failed, the Eleventh Circuit first highlighted that, as in the Fourth Circuit, it "is well established in this Circuit that the First Amendment provides no greater protection for voting rights than is otherwise found in the Fourteenth Amendment." *Id.* at 1211. And "[b]ecause a standardless pardon process, without something more, does not violate the Fourteenth Amendment, it follows that it does not run afoul of the First Amendment." *Ibid.* Next, the Eleventh Circuit recognized that "every First Amendment challenge to a discretionary vote-restoration regime" that the court found "has been summarily rebuffed." *Id.* at 1212 (collecting cases). And finally, the Eleventh Circuit rejected the plaintiffs' analogy to the speech-licensing cases because "none of the cited cases involved voting rights or even mentioned the First Amendment's interaction with the states' broad authority expressly grounded in § 2 of the Fourteenth Amendment to disenfranchise felons and grant discretionary clemency." *Id.* at 1212–13.[1]

More recently, in *Lostutter*, the Sixth Circuit also rejected Hawkins's First Amendment theory. See *Lostutter v. Kentucky*, No. 22-5703, 2023 WL 4636868 (6th Cir. July 20, 2023). That case involved a nearly identical challenge to Kentucky's discretionary voting-restoration process. See *id.* at *1. There, as here, the plaintiffs argued that "Kentucky's voting-rights restoration process constitutes an administrative licensing or permitting scheme," and the court of appeals rejected the argument. *Ibid.* Specifically, the Sixth Circuit concluded that a clemency regime "is fundamentally different from obtaining an administrative license or permit" for several reasons. *Id.* at *3–4. First,

---

[1] After the Eleventh Circuit stayed the lower court's decision, but before it issued its opinion in the merits appeal of the preliminary injunction, Florida amended its Constitution with respect to felon-voting restoration, and the Florida Legislature revised the relevant statutory scheme, which mooted the appeal. See *Hand v. DeSantis*, 946 F.3d 1272 (11th Cir. 2020). But these subsequent procedural developments do not undermine the persuasiveness of the Eleventh Circuit's stay opinion. See, *e.g.*, *Lostutter v. Kentucky*, No. 22-5703, 2023 WL 4636868, at *5 (6th Cir. July 20, 2023) (relying on *Hand* as "Eleventh Circuit precedent").

the court noted differences in both the timing and nature of a grant of clemency as opposed to an award of a license to engage in protected speech. *Id.* at *4. Next, the court highlighted that voting restoration is a form of "executive clemency power, which the Supreme Court has rarely subjected to judicial review." *Ibid.* (citing *Woodard*, *Dumschat*, and *Herrera*).

Moreover, the Sixth Circuit underscored the material difference between a convicted felon seeking a restoration of his voting rights and an individual seeking a license to engage in protected speech. *Ibid.* Specifically, the restoration of a felon's voting rights "restores the felon to the status quo before the conviction, in that he or she regains a right once held but lost due to illegal conduct." *Ibid.* In contrast, "licenses regulating First Amendment activity by their nature do not restore any 'lost' rights; they only regulate how persons may engage in or exercise a right they already possess." *Ibid.* "So, while a person applying for a newspaper rack or parade permit is attempting to exercise his or her First Amendment right to freedom of speech," the court explained, "a felon can invoke no comparable right when applying to the Governor for a pardon because the felon was constitutionally stripped of the First Amendment right to vote." *Ibid.* Thus, like the Eleventh Circuit, the Sixth Circuit also rejected Hawkins's theory.

Finally, the longstanding tradition of Virginia's discretionary voting-restoration process further demonstrates that it does not violate the First Amendment. Both "history and tradition of regulation" are "relevant when considering the scope of the First Amendment." *City of Austin, Tex. v. Reagan Nat'l Advertising of Austin, LLC*, 596 U.S. 61, 75 (2022) (quotation marks omitted). "When faced with a dispute about the Constitution's meaning or application, long settled and established practice is a consideration of great weight." *Houston Comm. College Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (cleaned up). In the nearly 250 years of discretionary clemency regimes, and the 150 years of Virginia's discretionary voting-restoration process, there is no case holding

that a discretionary voting-restoration process violates the First Amendment. Indeed, "every First Amendment challenge to a discretionary vote-restoration regime" that Defendants are aware of "has been summarily rebuffed." *Hand*, 888 F.3d at 1212. This "unbroken tradition" of discretionary voting-restoration regimes, standing alone, forecloses "the adoption of [Hawkins's] novel rule." *City of Austin*, 596 U.S. at 75.

In sum, Hawkins's First Amendment claims fail as a matter of law several times over. First, Supreme Court precedent and longstanding historical practice establishes the constitutionality of discretionary voting restoration. Second, Fourth Circuit precedent forecloses a First Amendment claim for the restoration of voting rights. And third, Hawkins's speech-licensing cases do not apply to discretionary voting restoration. As the Sixth and Eleventh Circuits recognized, Hawkins's First Amendment claims are meritless, and the Court should hold that they fail as a matter of law.

## II.    Plaintiff's Requested Remedy Demonstrates That His Claims Fail

Hawkins's vision of federal judicial superintendence over the clemency power of Virginia's governor only underscores that Hawkins's claims must fail. Hawkins asks this Court to "order Defendants . . . to replace" the current restoration process with a process "based upon specific, neutral, objective, and uniform rules and/or criteria and within reasonable, definite time limits." Second Am. Compl. at 25 (ECF No. 22). Hawkins's remedy would presumably mean that every restoration decision made by the Governor would be subject to judicial review to ensure adherence to these "rules and/or criteria" (whatever they may be) and "time limits" (however long those are). And to the extent Hawkins instead purports to ask this Court to merely provide "guidance" that Defendants are then obligated to implement, that maneuver fares no better. Hawkins's request for this drastic and intrusive interference with a State Executive's exercise of clemency shows that his claims are meritless for several reasons.

First, any standard governing the grant of executive clemency is a political question not fit for judicial review. Cases present a political question if they "lack judicially discoverable and manageable standards for resolving them." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019) (quotation marks omitted). This rule applies in the voting context. In *Rucho*, the Supreme Court held that partisan gerrymandering presented a political question because there was no judicially discoverable and manageable standard to adjudicate partisan gerrymandering claims. *Id.* at 2506–07. In assessing whether any standard could be used, the Court explained that opposition to gerrymandering generally turned on "fairness" or "how much representation particular political parties *deserve*." *Id.* at 2499–2500 (emphasis in original). But deciding among different conceptions of fairness or what an individual or entity deserves "poses basic questions that are political, not legal," because there "are no legal standards discernible in the Constitution for making such judgments." *Id.* at 2500. "Any judicial decision on what is 'fair' in this context," the Court concluded, "would be an unmoored determination of the sort of characteristic of a political question beyond the competence of the federal courts." *Ibid.* (quotation marks omitted).

*Rucho*'s analysis applies equally here. As the Supreme Court has explained, a clemency decision, by its nature, "depends not simply on objective factfinding, but also on purely subjective evaluations and on predictions of future behavior by those entrusted with the decision." *Dumschat*, 452 U.S. at 464. Consistent with this understanding, the Governor has explained that his voting-restoration decisions turn on a predictive judgment of whether an applicant will live as a responsible citizen and member of the political body. See JSUF ¶ 15. But what "criteria" or "rules" should a court impose on the Governor's exercise of his clemency power? Would a court develop rules based on type of felony, time since conviction, community service, or number of volunteer activities in order to determine the typical felon who *deserves*, in the *court's* opinion, voting

restoration? The Constitution "provides no basis whatever to guide the exercise of judicial discretion" in this endeavor. *Rucho*, 139 S. Ct. at 2506.

The same goes for "time limits." When presented with a similar request, the Seventh Circuit conceded it had "no idea what a 'reasonable' time for deciding a clemency petition would be." *Bowens v. Quinn*, 561 F.3d 671, 676 (7th Cir. 2009) (Posner, J., for the court). "Executive clemency," the Seventh Circuit explained, "is a classic example of unreviewable executive discretion because it is one of the traditional royal prerogatives" that was "borrowed by republican governments for bestowal on the head of government." *Ibid.* The court did not mince words: "We therefore balk at the idea of federal judges' setting timetables for action on clemency petitions by state governors." *Ibid.*

To the extent Plaintiff purports to ask the Court to provide mere guidance that Defendants must then implement through regulation, that request raises additional constitutional concerns. The Supreme Court has "long held" that the equitable power of federal courts "is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (quotation marks omitted). And there is no historical basis for equity courts issuing guidelines that an executive must follow in exercising his clemency power.

The Eleventh Circuit recognized this problem in *Hand*. There, the district court had entered an injunction directing the Florida executive branch "to promulgate new standards" that would "determine when and how to exercise the Governor's power in order to reenfranchise convicted felons." 888 F.3d at 1214. That was "a tall order" for "a court sitting in equity," as the Eleventh Circuit saw it, "even assuming the district court had the authority to enter this command in the first place." *Ibid.* "After all," the court explained, echoing the concerns highlighted in *Rucho*, "there

are a multitude of considerations" to a voting-restoration decision, "including but not limited to whether [the government] should adopt mathematical criteria, how 'specific and neutral' the criteria should be, whether arrests or convictions for certain kinds of misdemeanor or felony offenses (and there are many) should be either relevant or categorically disqualifying," among others. *Ibid.* The Eleventh Circuit deemed this unprecedented remedy an independent basis for concluding that the plaintiffs' challenge likely failed on the merits. *Ibid.*

Finally, restoring voting rights in a manner that complies with the injunction Hawkins requests would likely violate *Virginia's* Constitution. In *Howell*, the Virginia Supreme Court held that the Virginia Constitution *requires* the Governor to make voting-restoration decisions "on an individualized case-by-case basis taking into account the specific circumstances of each." 292 Va. at 341. But it is difficult to see how restricting the Governor's clemency power to a mechanical application of the categorical "rules," "criteria," and "time limits" that Hawkins demands would still enable the "individualized" and "case-by-case" consideration required under *Howell*. Thus, if this Court entered the injunction requested by Hawkins, it is unclear how the Governor could restore rights while complying both with this Court's ruling and the Virginia Supreme Court's ruling in *Howell*.

In sum, Hawkins's requested remedy underscores the flaws in his First Amendment claims. Hawkins asks this Court to determine how the Governor should exercise his clemency power to restore felons' voting rights through the issuance of rules, criteria, and time limits. This Court must decline that invitation because, although it is the Court's duty to say what the law is, sometimes that "duty is to say 'this is not law.'" *Rucho*, 139 S. Ct. at 2508. Hawkins's First Amendment claims raise political questions and ask this Court to exceed its equitable power in directing the Governor in the exercise of his clemency power. Those claims thus fail as a matter of law.

## CONCLUSION

For these reasons, the Court should grant Defendants' Motion for Summary Judgment, dismiss this action with prejudice, and award the Defendants any further such relief the Court deems necessary and appropriate.

Dated: February 14, 2024

Respectfully submitted,

GLENN YOUNGKIN
KELLY GEE

By:    */s/ Andrew N. Ferguson*
     Andrew N. Ferguson (VSB #86583)
     *Solicitor General*

     Jason S. Miyares
     *Attorney General*

Charles J. Cooper (*Pro Hac Vice*)
Haley N. Proctor (VSB #84272)
Joseph O. Masterman (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants Glenn Youngkin and Kelly Gee*

     Steven G. Popps (VSB #80817)
     *Deputy Attorney General*

     Erika L. Maley (VSB #97533)
     *Principal Deputy Solicitor General*

     Kevin M. Gallagher (VSB #87548)
     *Deputy Solicitor General*

     Office of the Attorney General
     202 North Ninth Street
     Richmond, Virginia 23219
     (804) 786-2071 – Telephone
     (804) 786-1991 – Facsimile
     AFerguson@oag.state.va.us

**CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on February 14, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all parties of record.

*Andrew N. Ferguson*
Andrew N. Ferguson (VSB #86583)
*Solicitor General*