**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

GEORGE HAWKINS                          )
                                        )
       Plaintiff,               )
                                        )
v.                                      )
                                        )          Civil Action No. 3:23-cv-00232
GLENN YOUNGKIN, in this official        )
capacity as Governor of Virginia, and   )
KELLY GEE, in her official capacity     )
as Secretary of the Commonwealth        )
of Virginia                             )
                                        )
       Defendants.              )
                                        )

<u>**PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................. 1

II. RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS . 3

III. ARGUMENT ................................................................................................................... 5

    A.    Virginia's discretionary voting rights restoration scheme functions as a licensing scheme................................................................................................................... 5

    B.    Plaintiff has not challenged Virginia's felony disenfranchisement laws............. 13

    C.    The "clemency" label affords no defense. .......................................................... 15

    D.    The Fourteenth Amendment's guarantees do not displace the First Amendment's more robust rules in the voting rights context. ...................................................... 19

    E.    Plaintiff's requested remedy is standard and necessary to redress the federal constitutional violation........................................................................................... 22

    F.    Defendants' argument premised on the political question doctrine fails............. 25

IV. CONCLUSION................................................................................................................ 30

## TABLE OF AUTHORITIES

**Cases**

*Aleman v. Beshear*, No. 23-590, 2024 WL 674760 (U.S. Feb. 20, 2024) ...................................... 2

*Am. Entertainers, L.L.C. v. City of Rocky Mount, North Carolina*,
    888 F.3d 707 (4th Cir. 2018) ................................................................................................ 27

*Baker v. Carr*, 369 U.S. 186 (1962)............................................................................... 25, 26

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)............................................................ 6

*Baten v. McMaster*, 967 F.3d 345 (4th Cir. 2020), *as amended* (July 27, 2020)........................ 25

*Beacham v. Braterman*, 300 F. Supp. 182 (S.D. Fla. 1969) ............................................. 16

*Beacham v. Braterman*, 396 U.S. 12 (1969)...................................................................... 16

*Bigelow v. Virginia*, 421 U.S. 809 (1975)............................................................................ 6

*Blount v. Clarke*, 291 Va. 198 (2016)............................................................................... 12

*Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006) ................................................... 23

*Bowens v. Quinn*, 561 F.3d 671 (7th Cir. 2009) ......................................................... 16, 30

*Branti v. Finkel*, 445 U.S. 507 (1980)................................................................................. 6

*Brown v. Kentucky Legislative Research Comm'n,* 966 F. Supp. 2d 709 (E.D. Ky. 2013).......... 23

*Buckley v. Valeo*, 424 U.S. 1 (1976) .................................................................................. 6

*Chesapeake B & M, Inc. v. Harford Cnty., Md.*, 58 F.3d 1005 (4th Cir. 1995) ......................... 27

*Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*,
    457 F.3d 376 (4th Cir. 2006) ......................................................................................... 18, 27

*Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*,
    470 F.3d 1062 (4th Cir. 2006) ....................................................................................... 27, 28

*Citizens United v. FEC*, 558 U.S. 310 (2010)........................................................................ 7, 8

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988) ........................... passim

*Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604 (1996) .................... 6

*Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458 (1981)........................................ 17, 29

*Cosner v. Dalton*, 522 F. Supp. 350 (E.D. Va. 1981) .................................................. 23

*FEC v. Colorado Republican Federal Campaign Comm.*, 533 U.S. 431 (2001) .......................... 7

*FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007)............................................ 7

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992).................................. 1, 18, 20, 21

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990)............................................. 26, 30

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ...................................................... 5

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ................................................... 26

*Hand v. DeSantis*, 946 F.3d 1272 (11th Cir. 2020) .............................................. 2

*Hand v. Scott*, 888 F.3d 1206 (11th Cir. 2018)................................................ 2, 20

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981)............................ 14

*Herrera v. Collins*, 506 U.S. 390 (1993) ....................................................... 16

*Howard v. Gilmore*, No. 99-2285, 205 F.3d 1333, 2000 WL 203984 (4th Cir. 2000)............... 13

*Howell v. McAuliffe*, 292 Va. 320 (2016) .................................................. 11, 22, 23, 24

*Hunter v. Underwood*, 471 U.S. 222 (1985)............................................... 1, 15, 29

*Irby v. Virginia State Board of Elections*, 889 F.2d 1352 (4th Cir. 1989).................................. 20

*Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010) .............................................. 15

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) ........................................ 6

*Lostutter v. Kentucky*, No. 22-5703, 2023 WL 4636868 (6th Cir. July 20, 2023) ............... passim

*National Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415 (1963)................... 6

*Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998) ................................. 17, 29

*Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1 (1986) ................ 5

*Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343 (6th Cir. 2007) ......................... 21

*Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706 (1996) ....................................................... 8

*Republican Party of North Carolina v. Martin*, 980 F.2d 943 (4th Cir. 1992)........................... 20

*Reynolds v. Sims*, 377 U.S. 533 (1964)................................................................................. 23, 24

*Richardson v. Ramirez*, 418 U.S. 24 (1974) ............................................................................... 17

*Roach v. Stouffer*, 560 F.3d 860 (8th Cir. 2009) ........................................................................ 21

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) .................................................................. 25, 27

*Saia v. People of State of New York*, 334 U.S. 558 (1948)............................................................. 9

*Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189 (11th Cir. 1991)............................................... 28

*Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) ........................................................ 17

*Tashjian v. Republican Party of Connecticut*, 479 U.S. 208 (1986) ........................................... 25

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977) .......................... 21

*Washington v. Finlay*, 664 F.2d 913 (4th Cir. 1981) ................................................................... 19

*Williams v. Rhodes*, 393 U.S. 23 (1968) ............................................................................... 25, 26

*Wise v. Lipscomb*, 437 U.S. 535 (1978)...................................................................................... 23

## Constitutional Provisions

ARK. CONST. amend. 51, § 11(d) ................................................................................................ 12

COLO. CONST. art. 7, § 10 ........................................................................................................... 12

GA. CONST. art. II, § I, para. III.................................................................................................. 12

ILL. CONST. art. III, § 2 .............................................................................................................. 12

MASS. CONST. amend. art. III...................................................................................................... 12

ME. CONST. art. II, § 1 ................................................................................................................ 12

MONT. CONST. art. IV, § 2 .......................................................................................................... 12

R.I. CONST. art. II, § 1 ................................................................................................................ 12

U.S. CONST. art. VI, cl. 2 ................................................................. 24

VA. CONST. art. 5, § 12 ................................................................. 11

VA. CONST. art. II, § 1 ................................................................. 11

**<u>Statutes</u>**

25 PA. CONS. STAT. §§ 2602(t), 2602(w), 3146.1 ................................. 12

42 U.S.C. § 1983 ................................................................. 22

730 ILL. COMP. STAT. 5/5-5-5 ....................................................... 12

ALASKA STAT. § 15.05.030 ............................................................. 12

CAL. ELEC. CODE § 2101(a) ............................................................ 12

COLO. REV. STAT. § 1-2-103(4) ....................................................... 12

CONN. GEN. STAT. §§ 9-46, 9-46a .................................................. 12

HAW. REV. STAT. § 831-2(a)(1) ....................................................... 12

IDAHO CODE ANN. § 18-310(2) ....................................................... 12

IND. CODE §§ 3-7-13-4, 3-7-13-5 .................................................. 12

KAN. STAT. ANN. §§ 21-6613, 22-3722 .......................................... 12

KY. REV. STAT. § 196.045(1)(e) .................................................. 8, 11

LA. STAT. ANN. § 18:102(A)(1)(b) .................................................. 12

MASS. GEN. LAWS ch. 51, § 1 ....................................................... 12

MD. CODE ANN. ELEC. LAW § 3-102(b)(1) ..................................... 12

MICH. COMP. LAWS § 168.758b ..................................................... 12

MINN. STAT. § 609.165 ................................................................. 12

MO. REV. STAT. § 115.133 ............................................................. 12

MONT. CODE ANN. § 46-18-801(2) .................................................. 12

N.C. Gen. Stat. Ann. §§ 13-1, 13-2 ................................................................................. 12

N.D. Cent. Code Ann. §§ 12.1-33-01, 12.1-33-03 ........................................................ 12

N.H. Rev. Stat. Ann. §§ 607-A:2, 607-A:3 .................................................................... 12

N.J. Stat. Ann. §§ 2C:51-3, 19:4-1(8) ............................................................................ 12

N.M. Stat. Ann. § 31-13-1 ............................................................................................... 12

N.Y. Elec. Law § 5-106(3) .............................................................................................. 12

Neb. Rev. Stat. Ann. § 29-112 ........................................................................................ 12

Nev. Rev. Stat. § 213.157 ................................................................................................ 12

Ohio Rev. Code Ann. § 2961.01(A) ................................................................................ 12

Okla. Stat. tit. 26, § 4-101 ............................................................................................... 12

OR. Rev. Stat. § 137.281(7) ............................................................................................ 12

S.C. Code Ann. § 7-5-120(B) .......................................................................................... 12

S.D. Codified Laws § 24-5-2 ........................................................................................... 12

Tex. Elec. Code Ann. § 11.002 ........................................................................................ 12

Utah Code Ann. § 20a-2-101.5(2) ................................................................................... 12

Va. Code Ann. § 24.2-101 ............................................................................................... 11

Va. Code Ann. § 24.2-1016 ............................................................................................. 10

Vt. Stat. Ann. tit. 28, § 807(a) ......................................................................................... 12

W.Va. Code § 3-2-2 ......................................................................................................... 12

Wash. Rev. Code § 29A.08.520(1) .................................................................................. 12

Wis. Stat. § 304.078(2) .................................................................................................... 12

**Regulations**

D.C. Mun. Regs. tit. 3 § 500.2 ........................................................................................ 12

# I.   INTRODUCTION

Plaintiff George Hawkins ("Plaintiff" or "Mr. Hawkins") has challenged the selective, arbitrary re-enfranchisement of Virginians with felony convictions. It is no defense that Governor Glenn Youngkin has restored voting rights to thousands of individuals, ECF No. 61 at 10, because he is also arbitrarily, selectively denying restoration to many Virginians. Just as Defendants could not impose an arbitrary vote-licensing scheme for eligible Virginia voters, they also cannot impose an arbitrary vote-licensing scheme on individuals who are presently ineligible to vote as a matter of Virginia law. Plaintiff and other similarly situated Virginians have not lost their rights under the First Amendment or any other part of the U.S. Constitution; to argue otherwise would run directly contrary to the U.S. Supreme Court's decision in *Hunter v. Underwood*, 471 U.S. 222 (1985), which struck down Alabama's felony disenfranchisement law as racially discriminatory. Furthermore, Plaintiff does not seek to end felony disenfranchisement in Virginia but to compel Defendants to adopt a non-arbitrary restoration system.

At the outset, what Defendants are *not* arguing is telling. Defendants no longer contend that the First Amendment does not protect voting as expressive conduct. This time around, Defendants have also not argued that the First Amendment unfettered discretion doctrine requires a showing of actual invidious discrimination. They appear to acknowledge that where the line of First Amendment cases culminating in *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), and *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), applies, the arbitrary licensing of protected expressive conduct is per se prohibited. Finally and crucially, Defendants make no argument that their voting rights restoration policies and procedures satisfy the demands of the First Amendment doctrine enforced in those precedents. They simply do not believe their restoration scheme must conform to this federal constitutional doctrine.

So then what is Defendants' explanation as to why this longstanding First Amendment doctrine should not apply? Defendants' answer is one word: clemency. In their view, because Virginia law chooses to confer the exclusive power of voting rights restoration on the Governor and does not restore the franchise by operation of law based on objective indicia like the completion of a term of incarceration, parole, and/or probation, the entire system is immune from First Amendment challenges. That is, regardless of the clear implications for First Amendment-protected expressive conduct and the pervasive risk of viewpoint discrimination that the Supreme Court has recognized in arbitrary licensing schemes, Defendants posit that the state-law choice to label voting rights restoration as "clemency" should bar all First Amendment scrutiny. They rely principally on a handful of Fourteenth Amendment equal protection and due process cases that have nothing to say about how the First Amendment and state executive clemency should be reconciled. Moreover, privileging state-law executive clemency regimes over First Amendment doctrine, as Defendants advocate, would turn the Supremacy Clause on its head.

As to similar First Amendment cases, there is no final decision on the merits that supports Defendants' argument. Defendants cite an Eleventh Circuit motions panel's order staying a decision that *did* find voting rights restoration subject to the First Amendment unfettered discretion doctrine. *Hand v. Scott*, 888 F.3d 1206 (11th Cir. 2018). But that appeal became moot upon the adoption of a constitutional amendment in Florida and *before* the separate merits panel could decide the First Amendment questions. *Hand v. DeSantis*, 946 F.3d 1272, 1274–75 (11th Cir. 2020). Defendants also point to a more recent Sixth Circuit decision affirming the dismissal of a similar First Amendment challenge. *Lostutter v. Kentucky*, No. 22-5703, 2023 WL 4636868 (6th Cir. July 20, 2023), *cert. denied sub nom. Aleman v. Beshear*, No. 23-590, 2024 WL 674760 (U.S. Feb. 20, 2024). But that case was dismissed for lack of standing, *not* based on any finding that

2

clemency is per se immune from First Amendment review. Further, that decision strays far afield from the U.S. Supreme Court's precedents commanding a functional analysis in First Amendment cases. Ultimately, Plaintiff's case presents a question of first impression in the Fourth Circuit.[1]

Finally, Defendants mischaracterize the nature of the relief sought in this case and misapply the political question doctrine. They erroneously argue that Plaintiff's request that this Court order Defendants to implement a non-arbitrary restoration system that comports with the First Amendment raises a non-justiciable political question and would violate the Virginia Constitution. But the requested relief is standard to cure violations of the First Amendment unfettered discretion doctrine. The legal doctrine at issue here is judicially manageable in the same way all longstanding, well-established constitutional tests are. And even though the Supremacy Clause of the U.S. Constitution means First Amendment rules trump any contrary state law or precedent, it would be quite simple for Defendants to replace the current arbitrary system with a restoration scheme that satisfies both federal and Virginia constitutional requirements.

## II.    RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants propose just *six* "undisputed material facts"—all of which relate to Mr. Hawkins. ECF No. 61 at 10–11. Yet, two proposed facts are immaterial, and two other proposed facts are incomplete and, therefore, misleading.

1.    The accuracy of the facts set forth in Paragraph 1 is undisputed, but they are immaterial. The nature of Mr. Hawkins' particular felony convictions is irrelevant to the

---

[1] Defendants' assertion that longstanding tradition supports the constitutionality of Virginia's restoration process is meritless. ECF No. 61 at 18–19. The fact that Virginia's rights restoration system has not been challenged previously on First Amendment grounds does not make it constitutional. In any event, as discussed *infra* at 24, Governor Youngkin's current arbitrary process dispensed with the non-discretionary, objective process of the prior three administrations. If anything, Virigina was nearly a decade into a new tradition.

adjudication of his constitutional claims, and Defendants have never claimed otherwise. It is indisputable that the nature of an applicant's felony convictions does not determine whether Governor Youngkin will grant or deny a voting rights restoration application. *See* ECF No. 57-1, Sherman Decl. ¶ 6, Ex. E. Yet, by singling out and highlighting the nature of Mr. Hawkins's convictions in a vacuum, Defendants seek only to prejudice him.

2.      The accuracy of the facts set forth in Paragraph 2 is undisputed, but they are immaterial. The length of Mr. Hawkins's prison sentence is irrelevant, and Defendants have never claimed otherwise. If these facts were to be considered, it should be noted that it is undisputed that Mr. Hawkins served a fraction of his prison sentence, having been released from incarceration on May 3, 2023. *See* ECF No. 57-2, Hawkins Decl. ¶ 2.

3.      Undisputed.

4.      Undisputed.

5.      This factual contention is undisputed with the clarification that on June 18, 2023, Mr. Hawkins submitted a *second* voting rights restoration application. Hawkins Decl. ¶ 6.

6.      Plaintiff disputes this fact in part. Mr. Hawkins does not know the date on which Governor Youngkin "notified" him that Governor Youngkin had deemed him "ineligible at this time." Mr. Hawkins knows only that his status changed sometime after July 2023, and that the portal showed the "date closed" for his application was August 17, 2023. Hawkins Decl. ¶ 6, Ex. B. Therefore, Plaintiff disputes Defendants' contention that Governor Youngkin provided notice to Mr. Hawkins on August 17, 2023, which is not supported by the record. The source cited by Defendants for this contention (ECF No. 39) provides only the date on which Defendants' *counsel* learned that Mr. Hawkins' application for re-enfranchisement had been deemed "ineligible at this

time" (*i.e.*, October 4, 2023) and does not support Defendants' proposed factual contention that Governor Youngkin notified Mr. Hawkins on August 17, 2023.

### III.     ARGUMENT

**A.     Virginia's discretionary voting rights restoration scheme functions as a licensing scheme.**

As a threshold matter, this Court will need to resolve whether the First Amendment unfettered discretion doctrine applies, and that will require deciding whether Virginia's voting rights restoration system is *functionally* a licensing system. Taking a formalistic approach, Defendants argue that voting rights restoration is a type of clemency, and "a clemency regime 'is fundamentally different from obtaining an administrative license or permit.'" ECF No. 61 at 17 (quoting *Lostutter*, 2023 WL 4636868, at *3–4). Though Defendants fail to develop this argument, they rely on the Sixth Circuit's decision in *Lostutter*, which is not binding on this Court and runs contrary to Supreme Court precedents requiring a functional analysis for First Amendment cases.

The Supreme Court has repeatedly held that First Amendment challenges must be analyzed functionally, not formalistically, and voting rights restoration in Virginia operates as the functional equivalent of a licensing scheme. Across various First Amendment precedents and doctrines, the governing tests or frameworks always turn on functional analyses. *See, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 424–25 (2006) (in First Amendment retaliation claim implicating question as to whether public employee had spoken as government employee or private citizen, noting "proper inquiry is a practical one" and "[f]ormal job descriptions" are not dispositive); *Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1, 7–10 (1986) (recognizing qualified First Amendment right of access to preliminary hearings) ("[T]he First Amendment question cannot be resolved solely on the label we give the event, *i.e.*, 'trial' or otherwise, particularly where the preliminary hearing functions much like a full-scale trial."); *Branti v. Finkel*, 445 U.S. 507, 518–

19 (1980) (holding First Amendment bars conditioning public defenders' continued employment upon affiliation with political party controlling county government) ("[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position . . . ."); *Bigelow v. Virginia*, 421 U.S. 809, 818–26 (1975) (recognizing First Amendment protects commercial advertisements) ("Regardless of the particular label asserted by the State—whether it calls speech 'commercial' or 'commercial advertising' or 'solicitation'—a court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation."); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) ("We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief."); *National Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 429 (1963) ("[A] State cannot foreclose the exercise of constitutional rights by mere labels."); *see also Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392–93 (1995) ("The Constitution constrains governmental action by whatever instruments or in whatever modes that action may be taken . . . And under whatever congressional label.") (citation omitted).

The Supreme Court has also analyzed First Amendment challenges in the election law context with a functional perspective. One prime example is the line of First Amendment challenges to campaign finance laws using a functional approach. After *Buckley v. Valeo*, 424 U.S. 1, 12–59 (1976), the Court applied the dichotomy between contributions and expenditures flexibly to prevent the evasion of contribution limits. In *Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604, 616–18 (1996) ("*Colorado I*"), the spending limits set by the Federal Election Campaign Act were found unconstitutional where "the expenditures at issue were *not potential alter egos for contributions*, but were independent and therefore *functionally* true

expenditures." *FEC v. Colorado Republican Federal Campaign Comm.*, 533 U.S. 431, 463 (2001) ("*Colorado II*") (emphasis added). Then, in upholding the facial constitutionality of coordinated party expenditure limits against the First Amendment challenge in *Colorado II*, the Supreme Court once again took a practical view of the regulated conduct and found "no significant *functional* difference between a party's coordinated expenditure and a direct party contribution to the candidate." 533 U.S. at 464 (emphasis added). Such pragmatic assessments were necessary "to minimize circumvention of contribution limits." *Id.* at 465.

Functional equivalence is regularly invoked as the standard in First Amendment cases because of the fundamental importance of the constitutional right to political expression or expressive conduct and the risk that an unconstitutional regulation would evade a formalistic test's detection. For example, in *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ("*WRTL*"), the Supreme Court ruled that distinguishing between campaign advocacy and issue advocacy "requires [courts] first to determine whether the speech at issue is the 'functional equivalent' of speech expressly advocating the election or defeat of a candidate for federal office, or instead a 'genuine issue a[d].'" *Id.* at 456 (citations omitted; alteration in quotation). The regulatory scheme and multi-factor balancing test developed in the wake of *WRTL* would be revisited by the Court in *Citizens United v. FEC*, 558 U.S. 310, 334–35 (2010) (citing *WTRL*, 551 U.S. at 470). Once again, the Court evaluated that regulatory framework from a functional perspective and focused on the law's practical consequences. The majority wrote that even though this regulatory scheme would not qualify as "a prior restraint on speech in the strict sense of that term," it was inescapable that

> [a]s a practical matter, . . . given the complexity of the regulations and the deference courts show to administrative determinations, a speaker who wants to avoid threats of criminal liability and the heavy costs of defending against FEC enforcement must ask a governmental agency for prior permission to speak. *These onerous restrictions thus function as the equivalent of prior restraint by giving the FEC power analogous to licensing laws implemented in 16th- and 17th-century*

> *England*, laws and governmental practices of the sort that the First Amendment was
> drawn to prohibit.

*Citizens United*, 558 U.S. at 334–35 (internal citations omitted, emphasis added). This passage
accords with the long line of First Amendment cases across a wide spectrum of doctrines that the
Court has resolved using a functional, not a formalistic, lens. *Citizens United* is particularly
germane here, because it reflects the Court's reasoning by analogy to find a campaign finance
regulation "function[s] as the equivalent" of an arbitrary licensing regime, *id.*, exactly what the
First Amendment unfettered discretion doctrine prohibits.

Even beyond the First Amendment, functional analyses always demand an evaluation of
practical effects or impact. In *Quackenbush v. Allstate Insurance Co.*, the Supreme Court held that
a remand order was appealable, even though such orders "do not meet the traditional definition of
finality." 517 U.S. 706, 715 (1996). Nonetheless, this difference in "the nature of the vehicle" (to
borrow *Lostutter*'s phrase) was immaterial because the remand order was "functionally
indistinguishable" from a stay order the Court had previously found appealable in another case.
*Id.* at 714–15. Like a stay order, a remand "puts the litigants . . . effectively out of court, and its
*effect* is precisely to surrender jurisdiction of a federal suit to a state court." *Id.* (citations omitted,
emphasis added). The Court's focus on practical effects—properly privileging ends over means—
is what a functional analysis requires.

*Lostutter* violated this uniform Supreme Court precedent by focusing on state-law
semantics that are irrelevant to the First Amendment question and therefore is, with respect,
wrongly decided. 2023 WL 4636868, at *3–6. Seizing on the "partial pardon" label in Kentucky
law, Ky. Rev. Stat. § 196.045(1)(e), caused the panel to misapply and breach the Supreme Court's
longstanding directive to engage First Amendment rights cases with a functional perspective. The
panel's summary is emblematic of that central error:

> Mere similarity in result does not change the nature of the vehicle used to reach that result, and Kentucky law is clear that it restores felons their voting rights through a partial executive pardon, not through the granting of an administrative license. . . . So, regardless of any similarity in outcome—in that a pardoned felon and a licensed civilian may both engage in conduct previously forbidden—the vehicles to achieve that outcome remain fundamentally different.

*Id*. at *6. The panel's conclusion that the "nature of the vehicle"—and not the "result" or "outcome"—was dispositive lacked legal support and directly contradicted the litany of Supreme Court precedents requiring a functional inquiry in a wide spectrum of First Amendment contexts. The panel's focus on the purported "nature of the vehicle" erroneously privileged means over ends and minimized the practical effects of a purely discretionary voting rights restoration system.

The Sixth Circuit's failure to apply a functional analysis is particularly erroneous in this context as it runs directly contrary to the purpose of the First Amendment unfettered discretion doctrine. From its inception, the unfettered discretion doctrine has been applied to strike down both obviously and *less* obviously unconstitutional schemes governing the licensing of protected expression and expressive conduct—*i.e.*, both overt and covert threats of viewpoint discrimination. In *Saia v. People of State of New York*, the Supreme Court invalidated an arbitrary permit scheme for loudspeaker use precisely because viewpoint discrimination is easily concealed by a licensing system with no definite rules or criteria:

> In this case a permit is denied because some persons were said to have found the sound annoying. In the next one a permit may be denied because some people find the ideas annoying. Annoyance at ideas can be cloaked in annoyance at sound.

334 U.S. 558, 562 (1948). As *Saia* and later cases articulated, this preventative doctrine is in large part animated by the risk that viewpoint discrimination will evade detection and judicial review. *See City of Lakewood*, 486 U.S. at 759 (citing "the difficulty of effectively detecting, reviewing, and correcting content-based censorship 'as applied'" as one of two "major First Amendment risks associated with unbridled licensing schemes"); *see also id.* at 762 (noting "the twin threats of self-

censorship and undetectable censorship"). Given the Supreme Court's stated objective to head off and neutralize difficult-to-detect risks of viewpoint discrimination, the constitutional ban on arbitrary licensing of expressive conduct must be construed functionally and flexibly.

Given the Supreme Court's consistent precedent in the First Amendment context, this Court must apply a functional analysis in assessing whether Plaintiff may invoke the First Amendment unfettered discretion doctrine. Functionally, there is no material difference between Virginia's voting rights restoration system and a licensing scheme. The mechanics and outcomes of this restoration system are remarkably similar to those of a licensing system. Disenfranchised individuals with any felony conviction must apply to a government office seeking permission to vote. ECF No. 59, Joint Stipulation of Undisputed Facts ("JSUF") ¶¶ 9–11.[2] And Governor Youngkin has sole and unlimited discretion to decide whether to grant or deny a license to vote to these individual applicants. *Id*. ¶¶ 14–15. Therefore, an individual applies for a license to engage in expressive conduct, and a state official selectively and arbitrarily grants or denies that license. If denied, the applicant can reapply. *Id*. ¶ 45. Further, absent this license from the Governor, the applicant may not lawfully engage in this form of political expressive conduct. Virginians with felony convictions may not register and vote prior to restoration: if an individual with a felony conviction willfully registers to vote prior to restoration, that is a Class 5 felony. Va. Code Ann. § 24.2-1016. As *Lostutter* acknowledged, "the result of the felon reenfranchisement scheme is that a felon is 'allowed' to vote again, where previously prohibited. And the result of a license or permit is that a person is 'allowed' to engage in regulated conduct, where they were previously

---

[2] The current restoration of civil rights application also embraces several other civil rights, but Petitioners' First Amendment challenge is solely focused on the right to vote.

prohibited." 2023 WL 4636868, at *6. Accordingly, Virginia's voting rights restoration system has all the trappings of an administrative licensing scheme governing expressive conduct.

Defendants have also characterized *Lostutter* as "a nearly identical challenge," ECF No. 61 at 17, but carefully omit an important distinction between Kentucky law and Virginia law. Whereas Kentucky law labels voting rights restoration as a "partial pardon," Ky. Rev. Stat. § 196.045(1)(e)—and, contrary to Supreme Court precedent, *Lostutter* placed significant and undue weight on this state-law label, 2023 WL 4636868, at *3–6—Virginia law and even the current rights restoration form developed by Defendants expressly disclaim that voting rights restoration is in any way a pardon. Defendants' rights restoration form expressly states at the bottom: "This is not a pardon . . . ." Sherman Decl. ¶ 9, Ex. H. This disclaimer mirrors the Supreme Court of Virginia's jurisprudence in this area which refers to voting rights restoration and pardons as distinct executive actions. *See Howell v. McAuliffe*, 292 Va. 320, 337 (2016) ("Never before, however, have any of the prior 71 Virginia Governors issued a sua sponte clemency order of any kind, *whether to restore civil rights or grant a pardon*, to an entire class of unnamed felons . . .") (emphasis added); *id*. at 343 (distinguishing "the power to remove political disabilities alone" from "all the other clemency powers, such as the pardon power"). In their motion to dismiss, trying to make *Lostutter* work for them, Defendants had argued "[f]elon re-enfranchisement is a type of 'partial executive pardon,'" ECF No. 27 at 30, but they have since abandoned this characterization.

This is consistent with the challenged provisions in the Virginia Constitution and Virginia statutes, which give the Governor the power to "restore[ ]" voting rights, VA. CONST. art. II, § 1, Va. Code Ann. § 24.2-101, or, alternatively, "to remove political disabilities." VA. CONST. art. 5, § 12. None of these provisions reference the Governor's pardon power. Consistent with that, in Virginia, "[a] pardon may be full or partial, absolute or conditional." *Blount v. Clarke*, 291 Va.

11

198, 205 (2016). Voting rights restoration is just one of the many legal effects of a full or absolute

pardon in Virginia, whereas a partial pardon may omit voting rights restoration. *Id.* at 205–06,

210–11. Voting rights restoration is not itself a pardon, and it is not inherently part of a pardon.

Furthermore, and of greater relevance given Defendants' pivot to calling voting rights restoration

a form of clemency, voting rights restoration is not even intrinsically or necessarily a species of

clemency. Forty states plus D.C. handle voting rights restoration entirely outside their clemency

systems by creating a non-discretionary path to re-enfranchisement by restoring voting rights upon

the completion of incarceration, parole and probation, and/or a waiting period, or not

disenfranchising people upon a felony conviction.[3] In any event, it would be formalistic and

contrary to Supreme Court precedent to let state-law labels dictate the outcome of Plaintiff's First

---

[3] There are four categories of non-discretionary restoration schemes: (1) non-discretionary restoration upon release from incarceration (21 states), *see* CAL. ELEC. CODE § 2101(a); COLO. CONST. art. 7, § 10; COLO. REV. STAT. § 1-2-103(4); CONN. GEN. STAT. §§ 9-46, 9-46a; HAW. REV. STAT. § 831-2(a)(1); ILL. CONST. art. III, § 2, 730 ILL. COMP. STAT. 5/5-5-5; IND. CODE §§ 3-7-13-4, 3-7-13-5; MD. CODE ANN. ELEC. LAW § 3-102(b)(1); MASS. CONST. amend. art. III, MASS. GEN. LAWS ch. 51, § 1; MICH. COMP. LAWS § 168.758b; MONT. CONST. art. IV, § 2, MONT. CODE ANN. § 46-18-801(2); NEV. REV. STAT. § 213.157; N.D. CENT. CODE ANN. §§ 12.1-33-01, 12.1-33-03; N.H. REV. STAT. ANN. §§ 607-A:2, 607-A:3; N.J. STAT. ANN. §§ 2C:51-3, 19:4-1(8); N.Y. ELEC. LAW § 5-106(3); OHIO REV. CODE ANN. § 2961.01(A); OR. REV. STAT. § 137.281(7); 25 PA. CONS. STAT. §§ 2602(t), 2602(w), 3146.1, https://www.vote.pa.gov/Resources/Documents/Convicted_felon_brochure.pdf; R.I. CONST. art. II, § 1; UTAH CODE ANN. § 20a-2-101.5(2); WASH. REV. CODE § 29A.08.520(1); (2) non-discretionary restoration five years after release from incarceration (1 state), LA. STAT. ANN. § 18:102(A)(1)(b); (3) non-discretionary restoration following completion of parole and probation (15 states), *see* ALASKA STAT. § 15.05.030; ARK. CONST. amend. 51, § 11(d); GA. CONST. art. II, § I, para. III; IDAHO CODE ANN. § 18-310(2); KAN. STAT. ANN. §§ 21-6613, 22-3722; MINN. STAT. § 609.165; MO. REV. STAT. § 115.133; N.C. GEN. STAT. ANN. §§ 13-1, 13-2; N.M. STAT. ANN. § 31-13-1; OKLA. STAT. tit. 26, § 4-101; S.C. CODE ANN. § 7-5-120(B); S.D. CODIFIED LAWS § 24-5-2; TEX. ELEC. CODE ANN. § 11.002; W.VA. CODE § 3-2-2; WIS. STAT. § 304.078(2); and (4) non-discretionary restoration two years after completion of sentence (1 state), *see* NEB. REV. STAT. ANN. § 29-112. Finally, Maine, Vermont, and the District of Columbia do not disenfranchise felons, even while they are incarcerated. ME. CONST. art. II, § 1; VT. STAT. ANN. tit. 28, § 807(a); D.C. MUN. REGS. tit. 3 § 500.2.

Amendment claims. Instead, the proper inquiry is whether discretionary voting rights restoration in Virginia—and *not* the pardon power or clemency generally—functions as a licensing scheme such that the First Amendment unfettered discretion doctrine applies. As discussed above, the answer to that is clear.[4]

### B.    Plaintiff has not challenged Virginia's felony disenfranchisement laws.

Plaintiff has not argued that the First Amendment bars what the Fourteenth Amendment authorizes—felony disenfranchisement laws—or that it guarantees people with felony convictions the right to vote. The First Amendment imposes independent and specific constitutional limitations, and Plaintiff *only* challenges Defendants' claimed power to re-enfranchise people with felony convictions *arbitrarily*, not the state's power to disenfranchise them. Accordingly, Defendants continue to mistakenly cite inapposite cases in which the plaintiffs challenged felony disenfranchisement *itself* as a per se violation of the First Amendment. *See Howard v. Gilmore*, No. 99-2285, 205 F.3d 1333, 2000 WL 203984, at *1 (4th Cir. 2000) (per curiam) (unpublished). But Plaintiff makes no such argument. The sole First Amendment issue adjudicated in the Fourth Circuit's unpublished decision in *Howard* was a "complain[t] that *cancellation* of . . . voting privileges violates the First Amendment." *Id*. at *1 (emphasis added). Plaintiff has instead argued that arbitrary *re-enfranchisement* violates the First Amendment, a constitutional challenge not adjudicated in *Howard*. Nor does Plaintiff claim that he is entitled to vote under the First Amendment. Rather, Plaintiff argues that the First Amendment guarantees him a non-arbitrary

---

[4] Additional arguments against the *Lostutter* panel's reasoning based on the nature of pardons and the nature of licensing are contained in Plaintiff's response to Defendants' motion to dismiss. Plaintiff does not reproduce these here but incorporates them by reference. ECF No. 30 at 33–36. The panel's reasoning in this vein is of significantly diminished relevance here, given Defendants expressly disclaim any relation between pardons and voting rights restoration under Virginia law.

voting rights restoration system *regardless* of whether that system ultimately results in the restoration of his own right to vote.

An analogy is helpful here. The First Amendment permits time, place, and manner restrictions that may categorically exclude some individuals, such as minors, from engaging in certain First Amendment-protected conduct. State voting eligibility laws clearly do not violate the First Amendment by setting the minimum age at 18 or requiring voters to be U.S. citizens, but they would if they gave election officials unlimited discretion to selectively grant or deny the right to vote to 16- and 17-year-olds or legal permanent residents upon the submission of applications accompanied by high school transcripts or essays on American government. Such arbitrary decision-making authority over the right to vote would clearly violate the First Amendment. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) (noting arbitrariness is "inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view").

As the above example demonstrates, it is indisputable that arbitrary enfranchisement—and also arbitrary disenfranchisement—would be unconstitutional. Defendants do not dispute this. The ultimate question then is whether arbitrary *re-enfranchisement* should survive constitutional scrutiny simply based on the prefix "re". Plaintiff contends that it should not: If it is unconstitutional to selectively and arbitrarily grant or strip U.S. citizens of their right to vote, then it inexorably follows that it is unconstitutional to arbitrarily grant the right to vote to U.S. citizens who are currently ineligible to vote under Virginia law due to a felony conviction. That such individuals once had but lost their right to vote under state law does not change the fact that the First Amendment unfettered discretion doctrine is violated by arbitrarily licensing expressive conduct such as voting.

Finally, Defendants contend that this First Amendment doctrine has no application here because disenfranchised Virginians presently have no right to vote, whereas the plaintiffs in other licensing cases have rights directly under the First Amendment. ECF No. 61 at 16, 18. This argument quickly proves illusory. It is noteworthy that this is *not* an argument that arbitrary vote-licensing is absent from Virginia. Rather, it is an argument that the arbitrary licensing of expressive conduct poses no constitutional problem when the source of the right to engage in the expressive conduct in question is a state statute like a voting eligibility law. Defendants do not substantiate this counterintuitive notion though. The sole authority they can point to is the Sixth Circuit's decision in *Lostutter*, which formalistically concluded that because a disenfranchised person seeks voting rights "restoration," they cannot assert any *current* interest in voting or be injured by the arbitrary allocation of voting rights to people with felony convictions. 2023 WL 4636868, at *4.[5] However, *Lostutter* is on its own in advancing this proposition. There are no First Amendment precedents that find arbitrarily conferring the right to engage in expressive conduct is permissible so long as that right is established by state statute instead of the U.S. Constitution directly.[6]

### C.     The "clemency" label affords no defense.

Beyond those threshold arguments, Defendants' principal argument in opposition to Plaintiff's First Amendment claims is that clemency is immune to constitutional challenges. American democracy inherits clemency from the English monarchy. The Supreme Court recounted this history in *Herrera v. Collins*:

---

[5] By this logic, the Supreme Court's decision in *Hunter v. Underwood* would be wrongly decided. If the disenfranchised lacked any interest in voting, they would lack standing to challenge discriminatory disenfranchisement or re-enfranchisement, just the same as arbitrary disenfranchisement and re-enfranchisement.

[6] The only First Amendment case cited by the Sixth Circuit is *City of Lakewood*. *Lostutter*, 2023 WL 4636868, at *4. The panel's characterization of *Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010) is incorrect; there were no First Amendment claims in that case.

> In England, the clemency power was vested in the Crown and can be traced back to the 700's. Blackstone thought this "one of the great advantages of monarchy in general, above any other form of government; that there is a magistrate, who has it in his power to extend mercy, wherever he thinks it is deserved: holding a court of equity in his own breast, to soften the rigour of the general law, in such criminal cases as merit an exemption from punishment."

506 U.S. 390, 412 (1993) (internal citations omitted); *see also Bowens v. Quinn*, 561 F.3d 671, 676 (7th Cir. 2009) ("Executive clemency is a classic example of unreviewable executive discretion because it is one of the traditional royal prerogatives . . . borrowed by republican governments for bestowal on the head of government."). "Clemency" is just a label or term of art, which has no talismanic power to ward off federal courts' constitutional scrutiny. Its history only underscores why the "power to extend mercy" upon whim, *Herrera*, 506 U.S. at 412, and the right to express one's political preferences at the ballot box are fundamentally antithetical. As previously discussed, voting rights restoration is not even intrinsically or necessarily a form of clemency. *See supra* at 12–13. Ultimately, a ruling in Defendants' favor based on the "clemency" label would elevate formalism over functionality and violate the Supreme Court's directive for First Amendment cases. *See supra* at 5–13.

Defendants nonetheless seek to shore up their formalistic argument by pointing to Fourteenth Amendment cases on clemency. However, there is no Fourteenth Amendment question presented for this Court's resolution, and so these cases are inapplicable. Notwithstanding the fact that Plaintiff has only sued on First Amendment grounds, Defendants cite cases that addressed only Fourteenth Amendment claims. *See* ECF No. 61 at 12–15. *Beacham v. Braterman*, 300 F. Supp. 182, 182–83 (S.D. Fla. 1969), *summarily aff'd Beacham v. Braterman*, 396 U.S. 12 (1969), has no application here as it only considered an equal protection challenge. The Supreme Court had no occasion to rule on the First Amendment claims raised by Plaintiff, and the citation to

*Beacham* in *Richardson v. Ramirez*, 418 U.S. 24, 53 (1974), has no bearing on whether arbitrary *re-enfranchisement* passes muster under the First Amendment.

Defendants also cite to two decisions narrowly construing the role of the Fourteenth Amendment's Due Process Clause in the context of pardons and other forms of clemency: *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458 (1981), and *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998). *See* ECF No. 61 at 12–13. But Plaintiff has also not asserted any due process challenges under the Fourteenth Amendment. It is not a lack of process that Plaintiff challenges. Instead, Plaintiff challenges what is glaringly absent from this system: a set of objective rules and criteria to govern the ultimate dispositions of voting rights restoration applications and reasonable, definite time limits by which these determinations must be made. Indeed, Plaintiff's Count One under the First Amendment unfettered discretion doctrine plainly does not concern *process*, but the lack of *substantive* rules and criteria governing Governor Youngkin's power to grant or deny voting rights restoration applications.

These due process cases are particularly inapposite when one considers the fundamental importance of First Amendment rights and the Supreme Court's solicitous approach to safeguarding them. While it may suffice in the due process context to note that a clemency decision turns "on purely subjective evaluations and on predictions of future behavior by those entrusted with the decision," *Dumschat*, 452 U.S. at 464, subjective standards and arbitrary decision-making based on such vague, amorphous standards are per se prohibited in the First Amendment context. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–53 (1969) (invalidating Birmingham's permit scheme for marches or demonstrations that lacked "narrow, objective, and definite standards" and was "guided only by [Commissioners'] own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience'"). The Governor's admission

that he is "mak[ing] a predictive determination that an individual will live as a responsible citizen and member of the political body" is damning in the First Amendment context because this subjective "responsible citizen" test *directly* controls whether an individual applicant may or may not cast a ballot—the most fundamental of all forms of political expression. Sherman Decl. ¶ 2, Ex. A at Response to Interrog. No. 2, at 3.

Nonetheless, Defendants dismiss the notion "that the Governor's *discretion alone*— irrespective of how that discretion is exercised—violates the First Amendment." ECF No. 61 at 11 (emphasis in original). Yet this is *precisely* what the U.S. Supreme Court has held. *See City of Lakewood*, 486 U.S. at 757 ("[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, *even if the discretion and power are never actually abused*.") (emphasis added); *Forsyth Cnty.*, 505 U.S. at 133 n.10 ("[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests *not on whether the administrator has exercised his discretion in a content-based manner*, but whether there is anything in the ordinance *preventing* him from doing so.") (emphasis added); *see also Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 389 (4th Cir. 2006) (holding that because take-home flyer policy "offer[ed] no protection against the discriminatory exercise of [school district's] discretion, it create[d] too great a risk of viewpoint discrimination to survive constitutional scrutiny"). Defendants confuse the First Amendment unfettered discretion doctrine with Fourteenth Amendment equal protection law and continue to ignore any ruling that forecloses or undermines their arguments.

Accordingly, state-law executive clemency regimes are not immune from the First Amendment's prohibitions. The existing case law on clemency is inapposite and, if anything, only

serves to underscore the constitutional problems that arise when unfettered official discretion and licensing political expressive conduct are combined.

     **D.**     **The Fourteenth Amendment's guarantees do not displace the First Amendment's more robust rules in the voting rights context.**

     In another bid to cut off First Amendment challenges categorically, Defendants revisit their argument that the Fourth Circuit has (quietly and obliquely) taken the momentous step of holding that the Fourteenth Amendment is the only source for causes of action against laws governing the exercise of the right to vote. When they first raised this argument in their motion to dismiss, Defendants quoted repeatedly from *Washington v. Finlay*, arguing it stood for the proposition that the First Amendment "offers no protection of voting rights beyond that afforded by the fourteenth or fifteenth amendments." 664 F.2d 913, 928 (4th Cir. 1981); ECF No. 27 at 25. But Defendants had carefully omitted the crucial prefatory language that clearly narrowed *Washington*'s holding to vote dilution challenges:

> *Where, as here, the only challenged governmental act is the continued use of an at-large election system, and where there is no device in use that directly inhibits participation in the political process,* the first amendment, like the thirteenth, offers no protection of voting rights beyond that afforded by the fourteenth or fifteenth amendments.

664 F.2d at 928 (emphasis added). The omitted clauses strictly limit *Washington*'s holding to challenges to the dilution of an *otherwise-intact* right to vote. All that *Washington* holds is that when vote dilution is at issue, the First Amendment offers no distinct cause of action, and only the Fourteenth Amendment is violated *in those circumstances*. But Plaintiff has not asserted a vote dilution claim, and *Washington* does not discuss the First Amendment implications of a law that directly regulates whether a person is eligible or not to vote, such as an arbitrary voting rights restoration scheme. *Washington* made clear that its holding would not apply in such circumstances, where there is a "device in use that directly inhibits participation in the political process." *Id*.

In their motion for summary judgment, Defendants have shifted and now urge the Court to focus instead on *Washington*'s progeny. ECF No. 61 at 15–16. But despite some broadly phrased dicta, none of these cases has extended or could extend *Washington*'s narrow holding to the context of vote denial. In *Irby v. Virginia State Board of Elections*, the Fourth Circuit considered a challenge to an appointive system for filling a particular public office and summarily reaffirmed *Washington* without the limiting language. 889 F.2d 1352, 1359 (4th Cir. 1989). The Court had no occasion and no ability to extend *Washington* to the context of vote denial; in an appointive system, no voting occurs whatsoever. Similarly, in *Republican Party of North Carolina v. Martin*, the Fourth Circuit rejected an attempt to assert a First Amendment challenge to alleged partisan gerrymandering in the method of electing judges. 980 F.2d 943, 959 n.28 (4th Cir. 1992). As this too was a species of vote dilution claim, this decision also did not break any new ground. Accordingly, no court has ever held that the First Amendment *categorically* offers no protection to voting rights *in any context* simply because the Fourteenth Amendment exists. Even Defendants abandoned this argument by endorsing the idea that "'a discretionary felon-reenfranchisement scheme that was facially or intentionally designed to discriminate based on viewpoint . . . might violate the First Amendment.'" ECF No. 27 at 33 (quoting *Hand*, 888 F.3d at 1211–12).

It stands to reason that the First Amendment's rules remain available to plaintiffs suing over the right to vote. After all, as the Supreme Court has made clear, the First Amendment unfettered discretion doctrine affords significantly more robust protection than the Equal Protection Clause. This doctrine is not medicine for an ill patient, the way Fourteenth Amendment discrimination law is, but rather a vaccination inoculating First Amendment-protected expressive conduct against disease. *Compare Forsyth Cnty.*, 505 U.S. at 130–33 (striking down local government's arbitrary permit application process on its face without any proof of actual

discrimination), *with Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–65 (1977) (requiring proof of actual, intentional discrimination in equal protection case challenging local government's denial of rezoning application). The Supreme Court has shown zero tolerance for even the risk of discriminatory treatment under the First Amendment, whereas discrimination claims under the Fourteenth Amendment require proof that discrimination has already occurred.

Nevertheless, Defendants seek to blur the line between the First Amendment and Fourteenth Amendment doctrines. But they have notably abandoned the argument from their motion to dismiss that Plaintiff must demonstrate "actual invidious discrimination" to bring a First Amendment unfettered discretion claim. ECF No. 27 at 34. This notion was firmly rejected by the U.S. Supreme Court in *Forsyth County*:

> Facial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision. . . . [T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance *preventing* him from doing so.

505 U.S. at 133 n.10 (emphasis added) (citations omitted). Because Mr. Hawkins has asserted facial challenges, he suffers a per se injury from the arbitrariness of the state's voting rights restoration system. Whether or not the requested injunctive relief to create a non-arbitrary system ultimately would result in Mr. Hawkins's personal re-enfranchisement is irrelevant. The existence of an actual, improper discriminatory or biased motive need not be shown to strike down such a law on its face. *See Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 351 (6th Cir. 2007) ("[A] licensing provision coupled with unbridled discretion itself amounts to an actual injury.") (citations omitted); *Roach v. Stouffer*, 560 F.3d 860, 869 & n.5 (8th Cir. 2009) (holding pro-life group "need not prove, or even allege" viewpoint discrimination in successful facial First Amendment challenge to officials' "unbridled discretion" in specialty license plate program).

Regardless of whether or how often it is exercised, and regardless of the disposition of any particular license application, such unfettered discretion is per se unlawful in the First Amendment context.

> **E.     Plaintiff's requested remedy is standard and necessary to redress the federal constitutional violation.**

As a remedy for these First Amendment violations, Plaintiff has requested that this Court declare Defendants' rights restoration scheme unconstitutional, enjoin its arbitrary use, and order *Defendants* to cure their unconstitutionally arbitrary scheme in the first instance. ECF No. 22, Second Am. Compl. at 24–25. Defendants contend that this requested remedy "demonstrates that [Plaintiff's] claims fail" and that granting such relief would be "unprecedented" and violate Virigina's Constitution by running afoul of *Howell*'s individualized basis requirement. ECF No. 61 at 19–22; *see also Howell*, 291 Va. at 341 (requiring restoration on "individualized case-by-case basis taking into account the specific circumstances of each"). These arguments are meritless.

First, the remedy Mr. Hawkins seeks is run-of-the-mill in constitutional rights litigation. Plaintiff has merely requested the invalidation of Defendants' arbitrary restoration scheme and an injunction requiring *Defendants*, in the first instance, to cure that constitutional violation by imposing a new non-arbitrary scheme with objective rules and criteria and reasonable, definite time limits. Plaintiff is *not* asking this Court to fashion and impose a new rights restoration process or order Defendants to use any set of specific objective rules and criteria. Instead, Mr. Hawkins asks this Court to order Defendants to replace their current unconstitutional rights restoration system with objective and uniformly applied rules and criteria that satisfy the First Amendment.

Courts routinely declare challenged laws constitutionally invalid and issue injunctions that give defendants the first opportunity to cure that violation. This is commonplace in other constitutional and federal law challenges under 42 U.S.C. § 1983 to election and voting laws, most

commonly in redistricting cases where courts will enjoin defendants from using unlawful maps and afford defendants the first chance to draw maps that comply with the U.S. Constitution and the Voting Rights Act. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 585–86 (1964) (affirming district court's decision to give Alabama Legislature opportunity to remedy unconstitutional legislative apportionment scheme); *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) ("When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan."); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006) (affirming district court holding that defendants violated Section 2 of the Voting Rights Act and affirming district court's remedial plan) ("When a Section 2 violation is found, the district court is responsible for developing a constitutional remedy. As required, the defendants were afforded the first opportunity to submit a remedial plan."); *see also Cosner v. Dalton*, 522 F. Supp. 350, 364 (E.D. Va. 1981) ("Whenever possible, of course, a state legislature should have an opportunity to redraw a plan found by the courts to be unconstitutional."); *Brown v. Kentucky Legislative Research Comm'n,* 966 F. Supp. 2d 709, 712, 726–27 (E.D. Ky. 2013) (per curiam) (declaring legislative electoral districts unconstitutional, permanently enjoining their use in future elections, and providing state legislature opportunity to enact a constitutional plan for state legislative reapportionment). Many possible permutations of restoration rules and criteria would satisfy the First Amendment unfettered discretion doctrine; Defendants just need to adopt one of them.

Second, Plaintiff's requested relief would not necessarily create a conflict with *Howell*, which required governors to evaluate applicants on an individualized, case-by-case basis. 292 Va. at 341. But even assuming such a conflict emerged, Defendants ignore that the Supreme Court of

Virginia's interpretation of the Virginia Constitution must yield to the dictates of the U.S. Constitution, which is supreme over state law. U.S. CONST. art. VI, cl. 2; *Reynolds*, 377 U.S. at 584 ("When there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls."). If Mr. Hawkins prevails, then the First Amendment violation *requires* a remedy, and federal law trumps any conflicting state law or precedent.

Defendants nevertheless maintain that an objective, rules-based restoration system would violate *Howell*. ECF No. 61 at 22; *Howell*, 292 Va. at 341. Though there is no need to accommodate state law in issuing injunctive relief to cure a federal constitutional violation, Defendants or this Court can easily harmonize a non-arbitrary, rules-based restoration system with the Supreme Court of Virginia's decision in *Howell*. Defendants' flawed reasoning conflates an *individualized* assessment with a *subjective* assessment, but *Howell* never states or even suggests that an individualized process cannot also be objective or that these two concepts are mutually exclusive. And, in fact, they are not. It would be quite simple to devise a process that is individualized per *Howell* and objective and non-arbitrary per the First Amendment. Indeed, Governor Youngkin's predecessors, former Governors Terry McAuliffe and Ralph Northam, accomplished that very goal by implementing an objective, non-arbitrary, and non-discretionary rights restoration process that post-dated and complied with *Howell*. *See* Declaration of Nina Beck, ¶¶ 2–4, Exs. A–C. Eligible individuals can be required to submit an individualized application, and those applications can be individually reviewed against a set of objective rules and/or criteria. Such a system would pose no conflict with *Howell* but, in any event, federal law trumps state law when any such conflict arises.

For all the above reasons, there is nothing unusual about the remedies sought by Plaintiff, which would actually give Defendants themselves the first opportunity to cure these First Amendment violations.

**F.      Defendants' argument premised on the political question doctrine fails.**

Lastly, because Defendants misunderstand the nature of Plaintiff's First Amendment claims and the relief sought, they now contend that Mr. Hawkins' lawsuit is barred by the political question doctrine. ECF No. 61 at 20–22. A case presents a nonjusticiable political question when there is a "lack [of] 'judicially discoverable and manageable standards for resolving'" the dispute. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). The political question doctrine has zero application here, because the First Amendment unfettered discretion doctrine presents a longstanding, well-articulated, and judicially manageable standard, and the remedies awarded in such cases are standard and routine.

Whether Governor Youngkin's rights restoration process violates the First Amendment does not present a political question merely because it concerns a state executive exercising discretion to grant or deny Virginians a right to vote. Federal courts routinely scrutinize the constitutionality of state officials' conduct and state laws and frequently in contexts where political considerations and conflict are in play. It is bedrock constitutional law that even powers specifically committed to the states in the U.S. Constitution cannot be "exercised in a way that violates other specific provisions of the Constitution." *Williams v. Rhodes*, 393 U.S. 23, 29 (1968); *see also Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986) (holding that legislative authority given to states in the Elections Clause, U.S. CONST. art. I, § 4, cl. 1, "does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens."); *Baten v. McMaster*, 967 F.3d 345, 351–52 (4th Cir. 2020), *as amended* (July 27, 2020) (rejecting a political question argument because it is well-settled that

Electors Clause, U.S. CONST. art. II, § 1, cl. 2, "does not vest the states with unreviewable authority" in how they appoint presidential electors). In *Williams*, the Supreme Court rejected Ohio's argument that "the political-question doctrine precludes judicial consideration" of challenges to laws regulating access to the state ballot to choose presidential electors, holding that such cases "do raise a justiciable controversy under the Constitution and cannot be relegated to the political arena." 393 U.S. at 28. State power always "lies within the scope of relevant limitations imposed by the United States Constitution." *Baker*, 369 U.S. at 230 (quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 344-45 (1960)). Any argument that federal courts cannot discern the contours of an 85-year-old constitutional doctrine, apply it to state officials' policies, and compel state officials to bring their policies in line with those constitutional requirements is absurd.

In this case, the exercise of state power—issuing licenses to engage in expressive conduct—is one that federal courts have considerable experience reviewing for constitutional compliance. Federal judges evaluating licensing schemes in First Amendment cases do this *routinely*. Under the unfettered discretion doctrine, federal courts invalidate any licensing schemes governing protected expressive conduct where the officials making the determinations have been vested with unfettered discretion to grant or deny the requested licenses, *City of Lakewood*, 486 U.S. at 757, 763–64, or where there are no reasonable, definite time limits within which the decisionmaker must grant or deny the license. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990). Unlike partisan gerrymandering, where the U.S. Supreme Court repeatedly failed to identify a judicially manageable standard before declaring the question nonjusticiable in *Rucho*, over the last 85 years, the Supreme Court has refined and clarified the standard under which licensing schemes must be reviewed for First Amendment compliance.

Crucially, the reviewing courts ensure that licensing systems are governed by objective rules and criteria and reasonable, definite time limits. *See, e.g.*, *Am. Entertainers, L.L.C. v. City of Rocky Mount, North Carolina*, 888 F.3d 707, 720–22 (4th Cir. 2018) (holding that licensing scheme violated First Amendment by allowing police chief to deny permits if he thought a proposed business would not comply with "all applicable laws") ("[T]he denial provision vests impermissible discretion in the police chief to choose on a case-by-case basis which laws apply in reviewing a particular application and thus is too broad to survive constitutional scrutiny."); *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1069–73 (4th Cir. 2006) (holding unconstitutional provision that allowed school officials to waive space-usage fees when "determined to be in the district's best interest," finding standard both subjective and indefinite); *Child Evangelism Fellowship of Md., Inc.*, 457 F.3d at 387–89 (invalidating policy that gave school district "virtually unlimited discretion" to selectively grant or withdraw approval for flyers distributed to students "[b]ecause the policy offers no protection against the discriminatory exercise of [the school district's] discretion"); *Chesapeake B & M, Inc. v. Harford Cnty., Md.*, 58 F.3d 1005, 1011 (4th Cir. 1995) (striking down licensing scheme for adult bookstores that failed to satisfy constitutional requirement that administrative decision be made within "reasonably brief time"). Because the unfettered discretion doctrine provides "a judicially discoverable and manageable standard[]" for evaluating Virginia's voting rights restoration scheme, the political question doctrine is not implicated in this case. *See Rucho*, 139 S. Ct. at 2494.

In the face of Defendants' admissions that they are not constrained by any criteria or time limits, *see* Sherman Decl. ¶ 3, Ex. B at Response to Interrog. No. 1, at 2 (criteria), *and id*. ¶ 2, Ex. A at Response to Request for Admission No. 4, at 2 (time limits), *this* is the standard that Mr. Hawkins asks this Court to apply. Defendants, however, misconstrue Plaintiff's request as asking

this Court to dictate to the Governor what rules he "should" use in voting rights restoration. ECF No. 61 at 20. Not so. Courts adjudicating these First Amendment licensing cases do not make policy judgments as to the specific kind of non-arbitrary replacement scheme that should be adopted. Plaintiff is simply requesting that this Court order Defendants to bring their restoration process into compliance with the First Amendment by adopting objective rules and criteria and reasonable, definite time limits. *See Child Evangelism Fellowship of S.C.,* 470 F.3d at 1074 ("[The Constitution] does not require that the district adopt any particular concrete, reasonable, and viewpoint-neutral set of rules to govern access—it simply requires that the district adopt some such neutral system of its own choosing."); *see, e.g.*, *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1199–1200 (11th Cir. 1991) ("Some neutral criteria must be established in order to insure that the DBS's permit decision regarding newsracks is not based on the content or viewpoint of the speech being considered.") (internal quotation and citation omitted). Such constitutional review does not substitute the Court's judgment for Defendants' and does not concern what is "fair," which is not the governing legal standard. Instead, if this Court rules in Plaintiff's favor, it need only confirm that Defendants' proposed rules and criteria are objective and non-arbitrary and that the proposed time limits are reasonable and definite. This case is simpler than other First Amendment arbitrary licensing cases because Defendants admit they are unconstrained by *any* criteria or time limits and do not argue that their restoration system satisfies the First Amendment doctrine at issue.

Defendants once again ignore the Supreme Court's *First Amendment* precedents and instead rely on *Dumschat*, a due process challenge to clemency, for the proposition that "a clemency decision, by its nature, 'depends not simply on objective factfinding, but also on purely subjective evaluations and on predictions of future behavior by those entrusted with the decision.'"

ECF No. 61 at 20 (quoting *Dumschat*, 452 U.S. at 464). However, Plaintiff is not asking this Court to review Governor Youngkin's *individual* clemency decisions, but rather to order Defendants to *systemically* change the way they restore voting rights,[7] which is not inherently—and need not be—a part of Virginia's clemency regime. *See supra at* 12–13. If Plaintiff prevails, once that non-arbitrary voting rights restoration regime was put in place, this Court's work remedying the First Amendment violation would be complete. Any garden-variety errors in complying with that new objective restoration regime would be a matter of state law for adjudication in state court.

Defendants have cited no case that holds that the constitutionality of certain aspects of clemency is a political question beyond judicial competence to assess. The U.S. Supreme Court has never suggested that constitutional violations within voting rights restoration or clemency regimes present nonjusticiable political questions. Rather, the U.S. Supreme Court has specifically contemplated such federal court review. In *Hunter*, the Supreme Court indicated that the method for re-enfranchising a voter could violate federal equal protection principles if the scheme had both the purpose and effect of invidious discrimination. 471 U.S. at 227–28. Federal courts also have a role in ensuring that clemency powers are exercised according to due process. *See Woodard*, 523 U.S. at 288–89 (1998) (O'Connor, J., concurring) (holding that, in due process context, "some *minimal* procedural safeguards apply to clemency proceedings") (emphasis in original). Neither decision referenced the political question doctrine or suggested that federal courts lacked competence to consider federal constitutional violations concerning rights restoration or clemency.

---

[7] Disenfranchisement is the only disability collateral to a felony conviction that Plaintiff's suit implicates. No clemency decisions like pardons or commutations nor any other disabilities like the right to serve on a jury or run for political office are implicated.

Finally, having admitted that they are not bound by *any* time limits, Defendants now complain that it would be impossible for this Court to set a "reasonable time" for granting or denying voting rights restoration applications, citing *Bowens v. Quinn*, 561 F.3d 671 (7th Cir. 2009). ECF No. 61 at 21. Once again, Plaintiff actually requests that this Court order *Defendants* to set a reasonable, definite time limit. If Defendants fail to do so, the Court may then intervene and impose such a limit, but the Court need not impose any such limit in the first instance. In any event, Defendants' reliance on *Bowens* is misplaced. *Bowens* is a Fourteenth Amendment due process case in which the plaintiffs sought an injunction requiring the governor to decide whether to grant pardons within a reasonable time. 561 F.3d at 673–74. *Bowens* is not a voting rights restoration case, which the Seventh Circuit expressly distinguished:

> [Plaintiffs] do not claim to be seeking pardons in order to remove statutory disabilities, either, such as the right to vote or to hold public office; anyway most statutory disabilities resulting from a felony conviction are restored automatically upon the completion of the defendant's sentence . . . and others can be restored by administrative fiat.

*Id*. at 675. By contrast, Plaintiff's second claim asserting that Defendants must decide voting rights restoration applications within a reasonable, definite time limit is entirely consistent with First Amendment licensing jurisprudence. *FW/PBS, Inc.*, 493 U.S. at 226. *Bowens* is simply inapposite.

Accordingly, this Court should squarely reject Defendants' argument that this case presents a nonjusticiable political question.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

Dated: February 28, 2024

Respectfully submitted,

/s/      *Terry C. Frank*
Terry C. Frank, Esq. (VSB No. 74890)
TERRY FRANK LAW
6722 Patterson Ave., Ste. B
Richmond, VA 23226
P: 804.899.8090
F: 804.899.8229
terry@terryfranklaw.com

Fair Elections Center
1825 K St. NW, Suite 701
Washington, DC 20006
P: (202) 331-0114

Jonathan Lee Sherman, Esq.
(D.C. State Bar No. 998271)
jsherman@fairelectionscenter.org
*Admitted pro hac vice*

Michelle Elizabeth Kanter Cohen, Esq.
(D.C. State Bar No. 989164)
mkantercohen@fairelectionscenter.org
*Admitted pro hac vice*

Beauregard William Patterson, Esq.
(WI State Bar No. 1102842)
bpatterson@fairelectionscenter.org
*Admitted pro hac vice*

Nina G. Beck, Esq.
(WI State Bar No. 1079460)
nbeck@fairelectionscenter.org
*Admitted pro hac vice*

*Counsel for Plaintiff George Hawkins*

## CERTIFICATE OF SERVICE

I certify that on February 28, 2024, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a "Notice of Electronic Filing" to the following CM/ECF participants:

Andrew N. Ferguson (VSB #86583)
   *Solicitor General*

Jason S. Miyares
   *Attorney General*

Steven G. Popps (VSB #80817)
   *Deputy Attorney General*

Erika L. Maley (VSB #97533)
   *Principal Deputy Solicitor General*

Kevin M. Gallagher (VSB #87548)
   *Deputy Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
AFerguson@oag.state.va.us

Charles J. Cooper (*Pro Hac Vice*)
Haley N. Proctor (VSB #84272)
Joseph O. Masterman (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com
hproctor@cooperkirk.com
jmasterman@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Defendants Glenn Youngkin and
Kelly Gee*

*/s/ Terry C. Frank*
Terry C. Frank, Esq. (VSB No. 74890)
Terry Frank Law
6722 Patterson Ave., Ste. B
Richmond, VA 23226
P: 804.899.8090
F: 804.899.8229
terry@terryfranklaw.com