**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| GEORGE HAWKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-232-JAG |
| | ) | |
| GLENN YOUNGKIN, Governor of Virginia, | ) | |
| in his official capacity, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

Jason S. Miyares
*Attorney General*

Andrew N. Ferguson (VSB #86583)
*Solicitor General*

Charles J. Cooper (*Pro Hac Vice*)
Haley N. Proctor (VSB #84272)
Joseph O. Masterman (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

Steven G. Popps (VSB #80817)
*Deputy Attorney General*

Erika L. Maley (VSB #97533)
*Principal Deputy Solicitor General*

Kevin M. Gallagher (VSB #87548)
*Deputy Solicitor General*

*Counsel for Defendants Glenn Youngkin and Kelly Gee*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
AFerguson@oag.state.va.us

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT ............................................................................................................................ 2

    I.    The Governor's Clemency Power To Restore Felons' Voting Rights Is Not Subject To The First Amendment's Unfettered Discretion Doctrine ........................................... 2

    II.   Hawkins's Requested Remedy Underscores The Flaws In His Argument .................. 12

CONCLUSION ........................................................................................................................ 18

CERTIFICATE OF SERVICE ................................................................................................. 19

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*,
  570 U.S. 205 (2013)..................................................................................................5

*Aleman v. Beshear*,
  No. 23-590, 2024 WL 674760 (U.S. Feb. 20, 2024) ...............................................9

*Beacham v. Braterman*,
  300 F. Supp. 182 (S.D. Fla.), *aff'd*, 396 U.S. 12 (1969)......................................2, 3

*Bone v. University of N.C. Health Care Sys.*,
  No. 1:18-cv-994, 2023 WL 4144277 (M.D.N.C. June 22, 2023)......................13, 14

*Bowens v. Quinn*,
  561 F.3d 671 (7th Cir. 2009) ................................................................................14

*City of Austin, Tex. v. Reagan Nat'l Advertising of Austin, LLC*,
  596 U.S. 61 (2022)................................................................................................12

*City of Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1988).....................................................................................5, 6, 13

*Connecticut Bd. of Pardons v. Dumschat*,
  452 U.S. 458 (1981)............................................................................................2, 3

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990)..............................................................................................15

*Gallagher v. Commonwealth*,
  284 Va. 444 (2012) .................................................................................................8

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999)..............................................................................................15

*Hand v. Scott*,
  888 F.3d 1206 (11th Cir. 2018) ...................................................................*passim*

*Hope v. Warden York Cnty. Prison*,
  972 F.3d 310 (3d Cir. 2020)..................................................................................14

*Houston Cmty. Coll. Sys. v. Wilson*,
  595 U.S. 468 (2022)...........................................................................................9, 12

*Howard v. Gilmore*,
  205 F.3d 1333, 2000 WL 203984 (4th Cir. Feb. 23, 2000) ..................................2, 6

*Howell v. McAuliffe*,
  292 Va. 320 (2016) ...............................................................................16, 17, 18

*Hunter v. Underwood*,
  471 U.S. 222 (1985)...................................................................................6

*Irby v. Virginia State Bd. of Elections*,
  889 F.2d 1352 (4th Cir. 1989) ...................................................................2, 4

*Lostutter v. Kentucky*,
  No. 22-5703, 2023 WL 4636868 (6th Cir. July 20, 2023)................................ *passim*

*Matal v. Tam*,
  582 U.S. 218 (2017).....................................................................................5

*Ohio Adult Parole Auth. v. Woodard*,
  523 U.S. 272 (1998)...............................................................................2, 3, 8

*Pashby v. Delia*,
  709 F.3d 307 (4th Cir. 2013) ........................................................................13

*Republican Party of N.C. v. Martin*,
  980 F.2d 943 (4th Cir. 1992) ......................................................................2, 4

*Reynolds v. Sims*,
  377 U.S. 533 (1964)....................................................................................15

*Richardson v. Ramirez*,
  418 U.S. 24 (1974)......................................................................................11

*Rucho v. Common Cause*,
  139 S. Ct. 2484 (2019)...........................................................................12, 14

*Schmidt v. Lessard*,
  414 U.S. 473 (1974)....................................................................................13

*United States v. Lanier*,
  520 U.S. 259 (1997)......................................................................................4

*Variety Stores, Inc. v. Wal-Mart Stores, Inc.*,
  888 F.3d 651 (4th Cir. 2018) ..........................................................................3

*Washington v. Finlay*,
  664 F.2d 913 (4th Cir. 1981) ......................................................................2, 4

*Williams v. City of Columbia*,
    906 F.2d 994 (4th Cir. 1990) ................................................................4

*Wise v. Lipscomb*,
    437 U.S. 535 (1978)..........................................................................15

**Other Authorities**

A.E. Dick Howard & William Antholis, *The Virginia Constitution of 1971*, 129
    Virg. Mag. of Hist. & Bio. 346 (2021) ..................................................6

A.E. Dick Howard, *Who Belongs: The Constitution of Virginia and the Political
    Community*, 37 J. L. & Politics 99 (2022) ..............................................6

Fed. R. Civ. P. 56..........................................................................................3

Va. Const. art. V, § 12 ..................................................................................8

# INTRODUCTION

Hawkins asks this Court to transform the Governor's *discretionary* clemency power to restore voting rights into those of a filing clerk, mechanistically reviewing re-enfranchisement applications to confirm that the applicant has checked all the boxes. Hawkins says this is what the United States Constitution commands, citing precedent that no court has ever applied in this context. Defendants have repeatedly explained the numerous flaws in his argument. Supreme Court precedent holds that the clemency power is committed to executive discretion and is rarely, if ever, subject to judicial review. Fourth Circuit precedent holds that there is no First Amendment right to voting restoration. And both courts of appeals to have addressed Hawkins's theory have rightly rejected it.

Despite countless opportunities in the many briefs he has filed over the last half year, Hawkins has failed to marshal a response to this overwhelming authority. He provides no case holding that an individual even has a First Amendment claim (as opposed to a Fourteenth or Fifteenth Amendment claim) with respect to voting rights. He provides no case even hinting that felon re-enfranchisement implicates the First Amendment. He provides no case suggesting that felon re-enfranchisement procedures are subject to the First Amendment's "unfettered discretion" doctrine. And he provides no case demonstrating that federal courts' equitable authority includes the power to order a state executive to exercise his clemency power in a particular way on a particular timeline. This Court should not be the first to adopt all these propositions.

Separately, Hawkins studiously avoids articulating the precise remedy he seeks. The only plausible explanation for this maneuver is that doing so would reveal that his claims raise a classic political question regarding when and how a State's chief executive should exercise his clemency power. But Hawkins's deliberate ambiguity creates the separate issue of whether his requested injunction would violate Federal Rule 65. And given the vagueness left by Hawkins's refusal to

specify a remedy, it is unclear how this Court's injunction would coexist with the Virginia Constitution's requirement of individualized consideration for all applicants. Hawkins's claims fail as a matter of law, and the Court should grant Defendants' motion for summary judgment.

## ARGUMENT

### I. The Governor's Clemency Power To Restore Felons' Voting Rights Is Not Subject To The First Amendment's Unfettered Discretion Doctrine

Every court of appeals to have encountered Hawkins's theory has rejected it—and for good reason. As Supreme Court precedent makes clear, a Governor's exercise of his clemency power is rarely, if ever, subject to judicial review. See *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981); *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 284–85 (1998) (plurality). And the Supreme Court has both summarily affirmed and favorably cited prior precedent rejecting a constitutional challenge to a discretionary voting-restoration process. See *Beacham v. Braterman*, 300 F. Supp. 182 (S.D. Fla.), *aff'd*, 396 U.S. 12 (1969). In addition, the Fourth Circuit has held several times that the First Amendment provides no greater protection to voting rights than the Fourteenth Amendment, and Hawkins concedes Virginia's voting-restoration process satisfies the Fourteenth Amendment's requirements. See *Republican Party of N.C. v. Martin*, 980 F.2d 943, 959 n.28 (4th Cir. 1992); *Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352, 1359 (4th Cir. 1989); *Washington v. Finlay*, 664 F.2d 913, 927 (4th Cir. 1981). Even more directly, the Fourth Circuit has stated in an unpublished decision that the "First Amendment creates no private right of action for seeking reinstatement of previously canceled voting rights." *Howard v. Gilmore*, 205 F.3d 1333 (Table), 2000 WL 203984, at *1 (4th Cir. Feb. 23, 2000). Finally, as the Sixth and Eleventh Circuits have held, the unfettered-discretion doctrine simply has nothing to do with the exercise of the Governor's clemency power to restore voting rights. See *Lostutter v. Kentucky*, No. 22-5703, 2023 WL 4636868 (6th Cir. July 20, 2023); *Hand v. Scott*, 888 F.3d 1206 (11th Cir. 2018).

Hawkins's response to this caselaw is meritless. First, he has no answer to the Supreme Court's precedent foreclosing his claim. See Memo. in Opp. to Defs.' Mot. for Summ. J. (Pl.'s MSJ Opp.) at 16–17 (ECF No. 65).[1] He primarily attempts to cabin *Beacham*, *Dumschat*, and *Woodard* as merely Due Process or Equal Protection Clause cases, but he ignores *why* those decisions rejected the constitutional challenges before them. In *Beacham*, for example, the Court summarily affirmed the rejection of a challenge to the state executive's power "to restore discretionarily the right to vote to some felons and not to others"—the precise power at issue here. See 300 F. Supp. at 183. And the decision the Court affirmed had rejected the challenge because the power to restore felons' voting rights was "an act of executive clemency *not subject to judicial control*." *Id.* at 184 (emphasis added). Similarly, *Dumschat* and *Woodard* rejected challenges to clemency procedures because clemency decisions "'have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review.'" *Woodard*, 523 U.S. at 276 (quoting *Dumschat*, 452 U.S. at 464). The reasoning of *Beacham*, *Dumschat*, and *Woodard* did not turn on specifics regarding the Due Process or Equal Protection Clauses but rather on the fact that *clemency*—including the discretionary power to restore voting rights—was "not subject to judicial control." 300 F. Supp. at 184. That Hawkins styles his challenge as a First Amendment claim does not suddenly make the clemency process a proper subject for judicial review.

Indeed, under Fourth Circuit precedent, Hawkins *may not* bring a First Amendment claim seeking restoration of his voting rights. See Defs.' Memo. in Supp. of Mot. for Summ. J. (Defs.' MSJ Mem.) at 11–12 (ECF No. 61). Hawkins again has no answer to this precedent. His primary

---

[1] Hawkins purports to dispute several indisputable facts, Pl.'s MSJ Opp. at 3–4, but resolution of the disputes he raises would not "affect the outcome of the suit under the governing law," *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (quotation marks omitted). The Court may therefore grant Defendants' motion for summary judgment without resolving them. See Fed. R. Civ. P. 56(a).

contention is that *Washington* is limited to "vote dilution" claims, but he then immediately acknowledges that the Fourth Circuit has cited *Washington*'s general rule in a case that did not involve a vote-dilution claim. See Pl.'s MSJ Opp. at 20 (citing *Irby*, 889 F.2d at 1359). As *Irby* stated: "In *voting rights cases*, the protections of the First and Thirteenth Amendments 'do not in any event extend beyond those more directly, and perhaps only, provided by the fourteenth and fifteenth amendments.'" 889 F.2d at 1359 (quoting *Washington*, 664 F.2d at 927) (emphasis added). *Martin* also spoke in categorical terms: "This court has held that *in voting rights cases*, no viable First Amendment claim exists in the absence of a Fourteenth Amendment claim." 980 F.2d at 959 n.28 (emphasis added). Hawkins suggests that *Irby* and *Martin* somehow mischaracterized the general principle from *Washington*. Pl.'s MSJ Opp. at 20. But rather than speculate how multiple decisions of the Fourth Circuit got it wrong, the obvious answer is that the Fourth Circuit held precisely what it said it held—there is no standalone First Amendment claim for voting rights.[2]

Hawkins suggests that Defendants have "abandoned this argument." See Pl.'s MSJ Opp. at 20.[3] They have not; Defendants have simply noted that there is no need for this Court to reach the

---

[2] The Fourth Circuit's cases are consistent with the ordinary principle of constitutional interpretation that where one provision specifically addresses a subject, its doctrine controls over those of more general provisions that might otherwise be thought to apply. See, *e.g.*, *Hand*, 888 F.3d at 1212 (for felon re-enfranchisement claim, "the specific language of the Fourteenth Amendment controls over the First Amendment's more general terms"). Plaintiff cannot bootstrap his way into a more exacting constitutional review by ignoring the directly applicable constitutional provision. See, *e.g.*, *Williams v. City of Columbia*, 906 F.2d 994, 999 (4th Cir. 1990) (when an "ordinance is a content-neutral time, place and manner restriction, [it] therefore is not an unconstitutional infringement of the right to free speech" under the Equal Protection Clause); *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision[.]").

[3] At several points, Hawkins erroneously asserts that Defendants have "abandoned" arguments that Defendants have either never made, see, *e.g.*, Pl.'s MSJ Opp. at 21 (invidious discrimination is required for an unfettered-discretion claim), or instead continue to make, see, *e.g.*, Pl.'s MSJ Opp. at 1 (the First Amendment does not separately protect voting as expressive conduct).

broader question whether the First Amendment covers the right to vote because Hawkins's claims fail regardless. Hawkins concedes that the First Amendment does not confer a right for *felons* to vote, see Pl.'s MSJ Opp. at 13, and there is also no First Amendment right of felons to be re-enfranchised, see Defs.' Memo. in Support of Mot. to Dismiss Second Am. Compl. (Defs.' MTD Mem.) at 25–26 (ECF No. 27). Thus, regardless whether the First Amendment applies to the right to vote, Hawkins himself has no First Amendment right to vote. His claims therefore still fail.

Hawkins also asserts that Defendants must agree that felons have voting rights under the First Amendment because they have acknowledged that a felon might be able to bring an as-applied challenge based on intentional viewpoint discrimination. But such a challenge would not be vindicating *voting rights*; it would vindicate the right to be free from *viewpoint discrimination*. The Constitution protects citizens from discrimination on the basis of, or retaliation against, their protected speech, even where they have no First Amendment interest in the government benefit or process at issue. See, *e.g.*, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("[T]he Government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." (cleaned up)); *Matal v. Tam*, 582 U.S. 218, 240–41 (2017). The government may not, for example, deny a citizen access to a small-business-development program *because of* the content of his speech, even though he does not have a constitutional right to participate in the program itself.

By contrast, the *Lakewood* "unfettered discretion" doctrine that Hawkins seeks to invoke is a special prophylactic rule that applies only where government officials have "unbridled discretion *directly to license speech*, or conduct commonly associated with speech." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 767 (1988) (emphasis added). Indeed, *Lakewood* was careful to note that it was not holding "that the press or a speaker may challenge as

censorship any law involving discretion to which it is subject." *Id.* at 759. Rather, *Lakewood* and its progeny apply only where the plaintiff must obtain a license before "attempting to exercise his or her First Amendment right to freedom of speech." *Lostutter*, 2023 WL 4636868, at *4. A "felon can invoke no comparable right" when applying for re-enfranchisement, because the felon has no underlying First Amendment right to vote. *Ibid.* Hawkins's argument concerning the Supreme Court's decision in *Hunter v. Underwood*, 471 U.S. 222 (1985), suffers from the same flaw. Hawkins invokes *Hunter* as proof that "the disenfranchised" have an "interest in voting." See Pl.'s MSJ Opp. at 15 n.5. But *Hunter* is a case about the Fourteenth Amendment right to be free from *racial discrimination*; it held that a felon-disenfranchisement provision was unconstitutional *because* it was intended to discriminate on the basis of race. *Hunter*, 471 U.S. at 225. It did not hold that a felon was entitled to a particular re-enfranchisement process, or any process at all. And Hawkins does not bring a race-discrimination claim, nor could he. Virginia's 1971 Constitution was intended to rid Virginia's laws of any trace vestiges of racial discrimination. See, *e.g.*, A.E. Dick Howard, *Who Belongs: The Constitution of Virginia and the Political Community*, 37 J. L. & Politics 99, 113 (2022) ("Both by mandates and aspirations, today's Virginia Constitution seeks to define the political community to make fairness, justice, and inclusiveness signposts on the path to achieving a government 'for the common benefit.'"); A.E. Dick Howard & William Antholis, *The Virginia Constitution of 1971*, 129 Virg. Mag. of Hist. & Bio. 346, 356 (2021) (The 1971 Constitution's "aim was to put . . . opposition to civil rights behind us as Virginians.").

In a final attempt to warp Fourth Circuit caselaw, Hawkins suggests that *Howard* has nothing to do with voting restoration. Pl.'s MSJ Opp. at 13. This would be news to the panel, which plainly stated that "[t]he First Amendment creates no private right of action for seeking *reinstatement of previously canceled voting rights*." *Howard*, 2000 WL 203984, at *1 (emphasis

added). Hawkins's claims are thus foreclosed by numerous Fourth Circuit decisions.

Next, Hawkins fails to distinguish the Eleventh Circuit's decision in *Hand* and the Sixth Circuit's decision in *Lostutter*. With respect to *Hand*, Hawkins says almost nothing at all. Instead, he merely states that, after the Eleventh Circuit issued its stay opinion, the preliminary-injunction appeal was mooted by a state constitutional amendment. See Pl.'s MSJ Opp. at 2. But that procedural posture does not diminish the persuasive force of *Hand*'s analysis. See, *e.g.*, *Lostutter*, 2023 WL 4636868, at *5 (relying on *Hand* as "Eleventh Circuit precedent").

Hawkins's attempt to distinguish *Lostutter* fares no better. First, he says *Lostutter* is distinguishable because "that case was dismissed for lack of standing." Pl.'s MSJ Opp. at 2. But he again fails to explain *why* it was dismissed for lack of standing—because "Kentucky's voting-rights restoration process" was *not* "an administrative licensing or permitting scheme" under the unfettered-discretion doctrine. *Lostutter*, 2023 WL 4636868, at *1.[4]

Next, despite his insistence elsewhere that the Court use a "functional analysis," Hawkins asks this Court to distinguish *Lostutter* on the ground that the opinion used the label "pardon" to describe voting restoration in Kentucky. See Pl.'s MSJ Opp. at 11. Specifically, Hawkins notes that *Lostutter* referred to the Kentucky Governor's decision to restore voting rights as a "partial pardon" and that, in Virginia, "voting rights restoration" is not "a pardon." *Ibid.* Hawkins then says Defendants have "abandoned th[e] characterization" that felon re-enfranchisement "is a type of 'partial executive pardon.'" *Ibid.* (some quotation marks omitted). It is not entirely clear what Hawkins means by this. Defendants' point—as it has been all along—is that the Governor's power to restore voting rights is part of his *clemency power*, just as it was in *Lostutter* with respect to the

---

[4] If this Court would prefer to follow the Sixth Circuit directly, it could hold that Hawkins's claims fail for lack of standing because the unfettered-discretion doctrine and its corresponding permission to bring a facial challenge does not apply here.

Kentucky Governor. Indeed, Virginia's Constitution has included the power "to remove political disabilities consequent upon conviction for offenses" as part of the Governor's "Executive clemency" power, alongside his power to grant pardons, for over 150 years. See *Gallagher v. Commonwealth*, 284 Va. 444, 451 (2012); Va. Const. art. V, § 12.[5] Thus, the point is not that felon re-enfranchisement is a "pardon." It is not: a pardon removes penal consequences, while re-enfranchisement removes a non-penal political disability. The point is instead that—just as in *Lostutter*—re-enfranchisement is a form of *clemency*, because it is an exercise of executive grace to remove a political disability resulting from a criminal conviction. *Woodard*, 523 U.S. at 280–81 ("[T]he heart of executive clemency . . . is to grant clemency as a matter of grace[.]"). Both precedent and tradition demonstrate that "the Governor's *executive clemency power*" is "rarely subjected to judicial review." *Lostutter*, 2023 WL 4636868, at *4 (emphasis added).

Hawkins continues his focus on labels to contend that "voting rights restoration is not even intrinsically or necessarily a species of clemency." Pl.'s MSJ Opp. at 12. Hawkins leaves unexplained the Platonic version of "clemency," what it "intrinsically or necessarily" entails, or what the various "species of clemency" are. Rather than propose a taxonomy of clemency, he seems to suggest that other States do it differently than Virginia. See *id.* at 12 n.3. What this proves is also left unexplained, and it is certainly not self-evident. What matters is the undisputed fact that for a century and a half the Governor of Virginia's "clemency power"—as defined by Virginia's Constitution—has included the power to restore convicted felons' voting rights. See *Gallagher*, 284 Va. at 451; Va. Const. art. V, § 12.

---

[5] Hawkins inexplicably states that the constitutional provision granting the Governor the power to remove political disabilities does not "reference the Governor's pardon power." Pl.'s MSJ Opp. at 11. Hawkins is flatly wrong as the text of Article V, § 12—entitled "Executive clemency"— demonstrates. Va. Const. art. V, § 12 ("The Governor shall have power to … grant reprieves and pardons after conviction … [and] to remove political disabilities consequence upon conviction.").

Moreover, even the States Hawkins cites as examples would seemingly violate his theory. For example, Hawkins repeatedly stresses that he is *not* challenging a Governor's discretionary power to pardon a felon or commute his sentence. See, *e.g.*, Pl.'s MSJ Opp. at 29 n.7. But at the same time, Hawkins champions States where voting restoration is tied solely to a felon's "release from incarceration" or "completion of parole and probation." See *id.* at 12 n.3. If the Governor has discretion to pardon a felon or commute his sentence, and thus to release the felon from incarceration and other restraints, then the voting restoration power in these States is *still* subject to the Executive's "unfettered discretion" that Hawkins says is unconstitutional. And Hawkins offers no reason why his theory does not also extend to those restoration schemes.

Apparently cognizant that his efforts to distinguish *Lostutter* and *Hand* do not work, Hawkins pivots to arguing that the Sixth and Eleventh Circuits are wrong. But the Supreme Court recently denied the petition for certiorari arising from the Sixth Circuit's rejection of the very theory Hawkins raises here—and not a single Justice noted his or her dissent. See *Aleman v. Beshear*, No. 23-590, 2024 WL 674760 (U.S. Feb. 20, 2024). Undeterred, Hawkins argues that the Sixth Circuit erred by using "a formalistic approach" while First Amendment doctrine requires "a functional analysis." Pl.'s MSJ Opp. at 5. Hawkins then spends several pages providing a paean to the use of a "functional analysis" in judicial interpretation. *Id.* at 5–10. But text, history, and precedent are all more relevant to judicial interpretation of novel constitutional claims. See *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022).

In any event, the Sixth Circuit also undertook a functional analysis, and Hawkins's theory still failed. The Sixth Circuit walked through numerous reasons why, as a functional matter, a discretionary clemency regime is "fundamentally different from obtaining an administrative license or permit." *Lostutter*, 2023 WL 4636868, at *3. First, clemency regimes "are retrospective

in the sense that they look backwards and excuse—indeed, nullify the consequences of—past misconduct," while a license "is usually prospective in that it looks forward and grants permission to engage in some future conduct." *Id.* at *4. Second, a pardon or the restoration of voting rights "is a one-time act of clemency, while a typical licensing or permitting scheme is ongoing—that is, the license or permit must be renewed periodically." *Ibid.* Third, felon re-enfranchisement "derives from the Governor's executive clemency power, which the Supreme Court has rarely subjected to judicial review" while "a licensing scheme regulating First Amendment-related conduct is typically grounded in the State's authority to promote public safety and well-being." *Ibid.* As the Sixth Circuit saw it, "the core thesis" of both the district court's opinion and its own is that a discretionary vote-restoration regime "in general *functions* differently than an administrative license or permit." *Id.* at *5 (emphasis added). Therefore, if Hawkins desires a functional analysis, that is precisely what the Sixth Circuit's opinion provided.

Hawkins nevertheless disputes the conclusions that followed from that functional analysis. But Hawkins, like the plaintiffs in *Lostutter*, "merely conclude[s]" that a discretionary vote-restoration regime is governed by the speech-licensing cases; he "never persuasively explain[s] *why* voting restoration is more similar to a licensing scheme" than to a clemency regime. *Id.* at *5 (emphasis in original). Indeed, a permit to hold a parade is simply a different matter than felon re-enfranchisement. And Hawkins, just like the plaintiffs in the Sixth Circuit, "fail[s] to provide a single case in which a court interpreted a restored right to vote as a license or permit to vote." *Ibid.*

Even setting aside all the precedent that forecloses Hawkins's claims, his "functional" arguments fare no better on their own. To begin, Hawkins has not offered a single case holding that the franchise itself is a First Amendment right at all. Perhaps recognizing this problem, Hawkins tries to dodge it by insisting that Defendants "no longer contend that the First Amendment

does not protect voting as expressive conduct." Pl.'s MSJ Opp. at 1. That is wrong, and Defendants do not know on what he bases this claim. See, *e.g.*, Defs.' Memo. in Opp. to Pl.'s Mot. for Summ. J. at 7 (ECF No. 66) (citing Defendants' prior argumentation on this issue). Although this question is ultimately irrelevant to the resolution of this case, it is undisputable that no case has *ever* held that the First Amendment, and its corresponding doctrines such as the "unfettered discretion doctrine," governs the right to vote. Hawkins does not even attempt to argue otherwise.

Relatedly, Hawkins equates felon re-enfranchisement with allowing minors and non-citizens to vote. Pl.'s MSJ Opp. at 14. If a State may not "selectively grant or deny the right to vote to 16 and 17-year-olds or legal permanent residents," the argument goes, then it may not "selectively grant or deny" re-enfranchisement to felons. *Ibid.* To do otherwise, Hawkins says, is to make an argument "simply based on the prefix 're.'" *Ibid.* But "the prefix 're'" reveals something important: The individual seeking to have his vote restored *previously held and lost that right* because he committed a serious crime. As a matter of constitutional text, precedent, and history, convicted felons occupy a dispositively different position with respect to voting rights than people who are not convicted felons. See *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974). Most relevant here, convicted felons may be permanently stripped of their right to vote; adult citizens who are not convicted felons may not. See *ibid.* The Fourteenth Amendment itself enshrines that distinction, centuries of history confirm it, and every case addressing the issue supports it. See *ibid.*; Defs.' MTD Mem. at 18–19. Thus, Hawkins's attempt to equate convicted felons with other classes of individuals who are *not* convicted felons fails.

In sum, Hawkins's arguments are foreclosed by centuries of judicial and historical precedent. Throughout the last 150 years, there has been no indication of any First Amendment concern regarding Virginia's discretionary vote-restoration regime. Both "history and tradition of

regulation" are "relevant when considering the scope of the First Amendment." *City of Austin, Tex. v. Reagan Nat'l Advertising of Austin, LLC*, 596 U.S. 61, 75 (2022) (quotation marks omitted). And "[w]hen faced with a dispute about the Constitution's meaning or application, long settled and established practice is a consideration of great weight." *Wilson*, 595 U.S. at 474 (brackets and quotation marks omitted). Hawkins has failed to offer *a single case* holding that a discretionary vote-restoration regime violates the First Amendment. To the contrary, "every First Amendment challenge to a discretionary vote-restoration regime" that Defendants are aware of "has been summarily rebuffed." *Hand*, 888 F.3d at 1212. "The unbroken tradition" of discretionary vote-restoration regimes forecloses "the adoption of [Hawkins's] novel rule." *City of Austin*, 596 U.S. at 75. In short, Hawkins's First Amendment challenge to Virginia's discretionary vote-restoration process fails as a matter of law.

## II.    Hawkins's Requested Remedy Underscores The Flaws In His Argument

Hawkins's refusal to specify precisely what remedy he seeks shows that his claims fail as a matter of law. As Defendants previously explained, see Defs.' MSJ Mem. at 16–17, determining what "criteria," "rules," or "time limits" should govern a state executive's exercise of the clemency power is a quintessential political question because "the Constitution provides no basis whatever to guide the exercise of judicial discretion" in this endeavor, *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019). To avoid this obvious conclusion, Hawkins has now clarified that he does not actually ask the Court to specify what "rules and criteria" or "time limits" are necessary to make a voting restoration process constitutional. See Pl.'s MSJ Opp. at 22. He thus steadfastly refuses to explain what a constitutional voting restoration process looks like; he just asserts that *this one* is unconstitutional. At most, then, the remedy for Hawkins's claims would be an injunction prohibiting administration of the current restoration process; in other words, the remedy that would redress Hawkins's claims would be to halt voting restoration entirely. Indeed, that remedy—an

injunction barring a speech-permitting scheme—is precisely what is awarded in the speech-licensing cases he cites. See, *e.g.*, *Lakewood*, 486 U.S. at 752–53 (noting that the government was appealing the judgment "enjoining enforcement of its local ordinance regulating the placement of newsracks"); see also Pl.'s MSJ Opp. at 26 (acknowledging that the proper remedy is to "invalidate" the licensing scheme).

But Hawkins obviously does not desire the cessation of voting restoration entirely. That result would restore the default—which Hawkins acknowledges is constitutional—that no felon may vote. So instead, he says he seeks an injunction that "order[s] Defendants to replace" the current restoration process "with objective and uniformly applied rules and criteria that satisfy the First Amendment"—leaving to Defendants to determine which "rules and criteria" would "satisfy the First Amendment." Pl.'s MSJ Opp. at 22. In other words, he asks this Court for an order not only *enjoining* the enforcement of the current process but also *mandating* that Defendants "replace" the process with "rules" and "criteria" that Hawkins refuses to describe.

Not only would a judicial order *requiring* an Executive to exercise his clemency power in a particular way be unprecedented, but such a vague injunction would violate the Federal Rules of Civil Procedure. Specifically, Rule 65(d) "requires courts granting injunctions to 'describe in reasonable detail the act or acts restrained or required.'" *Pashby v. Delia*, 709 F.3d 307, 331 (4th Cir. 2013) (ellipses omitted). "The Supreme Court has explained that Rule 65(d) 'was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.'" *Ibid.* (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). Here, an injunction ordering Defendants to implement "criteria" or "reasonable" time limits that "satisfy the First Amendment" would violate Rule 65. See, *e.g.*, *Bone v. University of N.C. Health Care Sys.*, No. 1:18-cv-994, 2023 WL

4144277, at \*32 (M.D.N.C. June 22, 2023) ("obey-the-law injunctions run afoul of the traditional equitable principle" that is "codified in Federal Rule of Civil Procedure 65(d)"). For example, the Third Circuit held that an injunction violated Rule 65 when it permitted "the Government to impose 'reasonable nonconfinement terms of supervision'" for individuals released from incarceration due to Covid because the term "'reasonable' is capacious enough to provoke disagreement between" the parties. See *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 322 (3d Cir. 2020). Yet Hawkins expressly asks this Court to order Defendants to implement "reasonable" time limits without clarifying what those time limits should be. See Pl.'s MSJ Opp. at 30 ("If Defendants fail to" set a "reasonable" time limit, "the Court may then intervene and impose such a limit."). And Defendants would be choosing time limits with the hope that the Court would deem them "reasonable" if the parties' dispute ever reached a contempt proceeding.

Hawkins presumably refuses to specify his requested remedy with any more particularity because it would reveal that he is asking this Court to make "an unmoored determination" that is "characteristic of a political question beyond the competence of the federal courts." *Rucho*, 139 S. Ct. at 2500 (quotation marks omitted). Indeed, the Seventh Circuit has said it has "no idea what a 'reasonable' time for deciding a clemency petition would be." *Bowens v. Quinn*, 561 F.3d 671, 676 (7th Cir. 2009). And the court thus "balk[ed] at the idea of federal judges' setting timetables for action on clemency petitions by state governors." *Ibid.*[6]

---

[6] As with other cases, Hawkins tries to cabin *Bowens* as "a Fourteenth Amendment due process case," Pl.'s MSJ Opp. at 30, while ignoring *the reason* the court held that the challenge failed—because clemency "is a classic example of unreviewable executive discretion," *Bowens*, 561 F.3d at 676. And Hawkins, returning to labels, says *Bowens* is not a "voting rights restoration case." Pl.'s MSJ Opp. at 30. True enough, but *Bowens* is a *clemency* case; and although voting rights were restored automatically in Illinois and thus not subject to the Governor's clemency power, restoring voting rights in Virginia *is* part of the Governor's clemency power. Thus, *Bowens*'s clemency analysis is equally applicable here.

14

Hawkins suggests that this type of injunction—ordering a state executive affirmatively to implement a new policy—is "commonplace." Pl.'s MSJ Opp. at 22. But then he offers remedial examples from only one context—redrawing electoral maps for redistricting cases. *Id.* at 22–23. Redistricting raises unique remedial issues, however, given the practical reality that States *must* hold elections so *some map* will have to be created and approved before the election. See *Reynolds v. Sims*, 377 U.S. 533, 585–86 (1964) (noting the unique remedial issues associated with redistricting). And if the State fails to produce a remedial map, or produces one that fails to cure the constitutional violation, the court must step in to redistrict the jurisdiction itself. See *id.* at 586; *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978). Here, in contrast, there is no constitutional obligation for States to operate a voting-restoration process. It is telling that Hawkins provides no other examples of injunctions ordering state defendants to "replace" policies deemed unconstitutional, as opposed to merely enjoining the unconstitutional policy. The exception for redistricting thus effectively proves the rule. Apart from the unique redistricting context, Hawkins provides no historical basis for a court sitting in equity to issue the remedy he seeks here. See *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999).

Next, Hawkins deems it "absurd" to think it is unclear how the contours of the speech-licensing cases apply to a clemency process. See Pl.'s MSJ Opp. at 26. But the lack of clarity is Hawkins's own doing. For example, the "procedural safeguards" in speech-licensing cases are the following: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained"; "(2) expeditious judicial review of that decision must be available"; and "(3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227 (1990). Hawkins mentions none of this, let alone explains how it would apply here.

Thus, it is far from "absurd" to wonder how these requirements map onto the vote restoration process. For example, what happens if the Governor fails to act within a "reasonable" time on a voting-restoration application? Does the "restraint" (*i.e.*, disenfranchisement) simply vanish? In other words, is the applicant deemed re-enfranchised as a matter of remedial decree? Or would a state court review the failure to address the petition—exercising jurisdiction that Virginia's laws do not confer? Hawkins does not say, yet he suggests it should be patently obvious to everyone.

Finally, Hawkins offers shrugging indifference for the concern that this Court's injunction would be difficult to reconcile with the Virginia Supreme Court's requirements in *Howell v. McAuliffe*, 292 Va. 320 (2016). *Howell* interpreted the Virginia Constitution to require the Governor to exercise his re-enfranchisement power "on an individualized case-by-case basis taking into account the specific circumstances of each." *Id.* at 341. In other words, the Virginia Constitution contemplates a Governor exercising executive discretion based on individualized circumstances, not functioning as a box-checking automaton. It seems that Hawkins fails to comprehend the consequences of such a potential conflict. He says that, "even assuming such a conflict emerged, Defendants ignore that the Supreme Court of Virginia's interpretation of the Virginia Constitution must yield to the dictates of the U.S. Constitution." Pl.'s MSJ Opp. at 23–24. But this response misses the point. Because *Howell* stands for the proposition that Virginia's Constitution permits the Governor to exercise the power *only* in a way that Hawkins argues federal law *forbids*, then in granting Hawkins relief this Court would be forbidding the Governor from restoring *any* voting rights until Virginia's Constitution is amended.

Hawkins offers some conclusory assertions for why his preferred restoration scheme would not contradict *Howell*, but none obviously solves the problem. Hawkins says "individualized" consideration can still be made with "objective criteria." See Pl.'s MSJ Opp. at 24. But this much

does not follow. For example, if the Governor issued "objective and uniformly applied rules," *id.* at 22, that said *every* convicted felon who has completed his incarceration and supervised release will have his voting rights restored, Hawkins does not explain how the Governor would be "taking into account the specific circumstances of each" applicant "on an individualized case-by-case basis." *Howell*, 292 Va. at 341. After all, the restoration process that *Howell* deemed unconstitutional restored the voting rights to all felons "who had completed their sentences of incarceration and any periods of supervised release, including probation and parole." *Id.* at 327–28. But that type of system seems to be precisely what Hawkins seeks here. Hawkins also suggests that Governor McAuliffe's post-*Howell* restoration process provides an example of a permissible restoration process—but that process merely said that individuals who "are no longer incarcerated or under active supervision" "*may meet* the Governor's standards for restoration." Ex. B to Declaration of Nina Beck (ECF No. 65-1) (emphasis added). Thus, these criteria did not operate as "rules" in the sense Hawkins suggests.[7]

In sum, Hawkins studiously avoids articulating precisely what remedy he seeks. The only plausible explanation for this maneuver is to avoid exposing that his claims raise a classic non-justiciable political question regarding when and how a state executive should exercise his clemency power. But Hawkins's deliberate ambiguity creates the separate issue that the unprecedented injunction he seeks would violate Rule 65. And given the vagueness left by Hawkins's refusal to specify a remedy, it is unclear precisely how this Court's injunction would

---

[7] Hawkins also holds up Governor Northam's restoration policy from spring of 2021, but Governor Northam himself said his policy "*automatically* restore[d] voting rights to individuals upon completion of their sentence of incarceration." Ex. C to Declaration of Nina Beck (ECF No. 65-1). Defendants do not concede that Governor Northam's policy satisfied the requirements of *Howell*.

coexist with the holding of *Howell*. These flaws all underscore that Hawkins's claims fail as a matter of law.

## CONCLUSION

For these reasons, the Court should hold that Hawkins's claims fail as a matter of law, grant summary judgment for Defendants, dismiss this action with prejudice, and award Defendants any further such relief the Court deems necessary and appropriate.

Dated: March 5, 2024

Respectfully submitted,

GLENN YOUNGKIN
KELLY GEE

By:  */s/ Andrew N. Ferguson*
    Andrew N. Ferguson (VSB #86583)
     *Solicitor General*

    Jason S. Miyares
     *Attorney General*

    Steven G. Popps (VSB #80817)
     *Deputy Attorney General*

Charles J. Cooper (*Pro Hac Vice*)
Haley N. Proctor (VSB #84272)
Joseph O. Masterman (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants Glenn Youngkin and Kelly Gee*

    Erika L. Maley (VSB #97533)
     *Principal Deputy Solicitor General*

    Kevin M. Gallagher (VSB #87548)
     *Deputy Solicitor General*

    Office of the Attorney General
    202 North Ninth Street
    Richmond, Virginia 23219
    (804) 786-2071 – Telephone
    (804) 786-1991 – Facsimile
    AFerguson@oag.state.va.us

**CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on March 5, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all parties of record.

*Andrew N. Ferguson*
Andrew N. Ferguson (VSB #86583)
*Solicitor General*
