IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

GEORGE HAWKINS,
          Plaintiff,

v.                                        Civil Action No. 3:23cv232

GLENN YOUNGKIN, in his official
Capacity as Governor of Virginia
& KELLY GEE, in her official
capacity as Secretary of the
Commonwealth of Virginia,
          Defendants.

**OPINION**

Virginia's Constitution vests the Governor with discretion to restore felons' voting rights. The plaintiff, George Hawkins, has launched a facial First Amendment challenge to the system that Governor Glenn Youngkin uses to assess felons' voting rights restoration applications. But his suit has a fatal flaw: the First Amendment's unfettered discretion doctrine does not apply to Governor Youngkin's rights restoration system. For the reasons discussed below, the Court will deny Hawkins's motion for summary judgment, (ECF No. 56), and grant the motion for summary judgment filed by the defendants, Governor Youngkin and Secretary of the Commonwealth Kelly Gee, (ECF No. 60).

**I. UNDISPUTED MATERIAL FACTS[1]**

Hawkins was convicted of a felony in 2010. (ECF No. 59 ¶ 1.) He served a thirteen-year term of incarceration and was released on May 3, 2023. (*Id.* ¶¶ 2–3.) On June 18, 2023, Hawkins submitted a voting rights restoration application. (*Id.* ¶ 4.) On August 17, 2023, Governor

---

[1] The parties jointly stipulate to the following undisputed facts. (*See* ECF No. 59.)

Youngkin deemed Hawkins "ineligible [to have his voting rights restored] at this time" and denied his application. (*Id.* ¶ 5.)

By the time Hawkins had submitted his application, Governor Youngkin had "fully implemented" his system to assess voting rights restoration applications. (*See id.* ¶ 7.) Under this system, an individual is eligible to apply for a restoration of his civil rights only if he has "finished any term of incarceration as a result of a felony conviction." (*Id.* ¶ 11 (quoting https://www.restore.virginia.gov/frequently-asked-questions/).) The current application asks for the following information:

> (a) full legal name; (b) full name when convicted; (c) Social Security Number; (d) date of birth; (e) gender (male/female); (f) street address; (g) phone number; (h) email address; (i) court of conviction (Virginia Circuit Court, Out of State Circuit Court, Military Court, Federal Court); (j) citizenship status; (k) whether the applicant has been convicted of a violent crime, and if so, the crime and date of conviction; (l) whether the applicant has completed serving all terms of incarceration; (m) whether the applicant is currently on probation, parole, or other state supervision, and if so, the expected end date; and (n) checkbox requiring applicant to indicate either that they have "paid all fines, fees, and restitution" or that they are "currently paying my fines, fees, and restitution" with a receipt or payment plan from the court attached.

(*Id.* ¶ 12.) "Apart from an applicant's death or citizenship status," these factors are not "dispositive [to] the outcome of a voting rights restoration application." (*Id.* ¶ 13.) Once an individual applies to have their rights restored, staff members of the Restoration of Rights Division within the Office of the Secretary of the Commonwealth (the "Restoration of Rights Division") review the application and seek additional information about the applicant by contacting state agencies, including the Virginia Department of Elections, Virginia Department of Behavioral Health and Development Services, Virginia Department of Corrections, and Virginia Compensation Board. (*Id.* ¶ 21.) "[A]n application is complete if . . . the applicant has filled out all required fields on the current application . . . and . . . responded to all inquiries from the Governor's office, the

Secretary of the Commonwealth's office, or any other Virginia agency that has submitted an inquiry to the applicant regarding" the application. (*Id.* ¶ 29.) Completed applications then go to the Governor for final consideration, unless the applicant does not satisfy other voting qualifications (such as age and residency requirements), is still incarcerated, subject to a pending felony charge, or on supervised release for an out-of-state or federal conviction. (*Id.* ¶ 28.)

"'Using research and information provided by the applicant, [Central Criminal Records Exchange,] and other state agencies,' the Secretary of the Commonwealth makes a recommendation to the Governor as to the disposition of the application." (*Id.* ¶ 27 (quoting Sherman Decl. ¶ 10, Ex. I).) The factors listed on the application "do not 'limit' or 'constrain' the Governor's discretion in deciding whether to grant or deny any . . . application.'" (*Id.* ¶ 14 (quoting Sherman Decl. ¶ 3, Ex. B at Response to Interrog. Nos. 1 and 2).) And "[t]here is no time limit by which the Governor must grant or deny an application." (*Id.* ¶ 34.)

## II. DISCUSSION[2]

No one would suggest that Governor Youngkin's "fully implemented" system is transparent, or that it gives the appearance of fairness. Much like a monarch, the Governor receives petitions for relief, may or may not rule upon them, and, when he does rule, need not explain his reasons. But transparency and the appearance of fairness are not the issues in this case.

---

[2] Under Federal Rule of Civil Procedure 56, a party may move for summary judgment on a claim, defense, or part of a claim or defense. The Rule directs courts to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment may succeed by establishing the absence of a genuine issue of material fact or showing that the other party cannot produce admissible evidence to support their claim: "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When reviewing cross-motions for summary judgment, "the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011).

Rather, this case turns on whether Governor Youngkin's rights restoration system is an administrative licensing scheme subject to the First Amendment's unfettered discretion doctrine. "[I]n the area of free expression[,] a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). Plaintiffs may facially challenge administrative licensing schemes that "allegedly vest[] unbridled discretion in a government official over whether to permit or deny expressive activity." *Id.* at 755. The parties dispute whether the First Amendment's unfettered discretion doctrine applies to Governor Youngkin's rights restoration system. Citing *Lakewood* and its progeny, Hawkins asserts that the discretionary system Governor Youngkin uses to assess rights restoration applications functions as a licensing scheme. The defendants reject this notion and explain that, in asking Governor Youngkin to restore his voting rights, Hawkins has not applied for a license.

The defendants' argument wins the day. Because Governor Youngkin's rights restoration system is not a licensing scheme subject to the unfettered discretion doctrine, the Court will grant the defendants' motion for summary judgment and deny Hawkins's motion for summary judgment.

### A. Courts Can Review Executive Clemency Regimes in Limited Circumstances

The defendants contend that "discretionary clemency regimes, like Virginia's voting-restoration process, are not typically subject to judicial review" because "the 'heart of executive clemency' is 'to grant clemency as a matter of grace, thus allowing the executive to consider a wide range of factors not comprehended by earlier judicial proceedings and sentencing determinations.'" (ECF No. 61, at 11–12 (quoting *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 280–81 (1998) (plurality)).) In Virginia, a felony conviction automatically results in a

4

person's loss of the right to vote. Va. Const. art. II, § 1. Article V, section 12—the "Executive clemency" section—of Virginia's Constitution grants the Governor power

> to remit fines and penalties under such rules and regulations as may be prescribed by law; to grant reprieves and pardons after conviction except when the prosecution has been carried on by the House of Delegates; *to remove political disabilities consequent upon conviction for offenses committed prior or subsequent to the adoption of this Constitution*; and to commute capital punishment.
>
> He shall communicate to the General Assembly, at each regular session, particulars of every case of fine or penalty remitted, of reprieve or pardon granted, and of punishment commuted, with his reasons for remitting, granting, or commuting the same.

Va. Const. art. V, § 12 (emphasis added).[3] Thus, in Virginia, felons may not vote unless and until their "civil rights have been restored by the Governor or other appropriate authority." Va. Const. art. II, § 1. "[T]he power to remove [a] felon's political disabilities remains vested solely in the Governor, who may grant or deny any request without explanation, and there is no right of appeal from the Governor's decision." *In re Phillips*, 265 Va. 81, 87–88, 574 S.E.2d 270, 273 (2003).[4]

Because Governor Youngkin's ability to restore felons' voting rights—and create a system by which to do so—stems from his clemency power, the defendants assert that Governor Youngkin's decision to grant or deny rights restoration applications involves a nonjusticiable political question. They contend that "clemency decisions are not typically subject to judicial review and 'might' warrant judicial review only in extreme circumstances such as 'a scheme

---

[3] Virginia's 1776 Constitution established the Governor's clemency power, and "[i]n the constitutional revision of 1870, the Governor was given the additional power to 'remove political disabilities consequent to conviction of offenses.'" *Gallagher v. Commonwealth*, 284 Va. 444, 451, 732 S.E.2d 22, 25 (2012) (quoting 2 A.E. Dick Howard, Commentaries on the Constitution of Virginia, 641–42 (1974)).

[4] The "loss of the right to vote" is a political disability. *See Howell v. McAuliffe*, 292 Va. 320, 328 n.1, 788 S.E.2d 706, 710 n.1 (2016).

5

whereby a state official flipped a coin to determine whether to grant clemency' or 'arbitrarily denied a prisoner any access to its clemency process.'" (ECF No. 61, at 12–13 (quoting *Woodard*, 523 U.S. at 289 (O'Connor, J., concurring)).)

Although clemency regimes traditionally do not fall within the "business of courts," some courts have addressed plaintiffs' claims that discretionary rights restoration systems had run afoul of the First Amendment. *Woodard*, 523 at 285 (plurality); *see, e.g., Hand v. Scott*, 888 F.3d 1206 (11th Cir. 2018); *Lostutter v. Kentucky*, No. 22-5703, 2023 WL 4636868, at *4 (6th Cir. July 20, 2023), *cert. denied sub nom. Aleman v. Beshear*, 144 S. Ct. 809 (2024).[5] The Court will therefore review Governor Youngkin's rights restoration system to determine whether it is a licensing scheme subject to the First Amendment's unfettered discretion doctrine.

### B. Licensing Schemes Are Subject to the Unfettered Discretion Doctrine

Before turning to the merits of the specific question at issue here, the Court will review the most relevant Supreme Court cases on which Hawkins relies. Hawkins cautions that "the 'clemency' label is no shield against [his] First Amendment claims" and argues that Governor Youngkin's rights restoration system functions as an administrative licensing scheme. (ECF No. 62, at 22.) Courts must invalidate licensing schemes that vest administrative officials with unbridled discretion to grant or deny an applicant's license to engage in protected expressive conduct. *Lakewood*, 486 U.S. at 757, 763–64. "If the permit scheme 'involves appraisal of facts, the exercise of judgment, and the formation of an opinion[]' by the licensing authority, 'the danger of censorship and of abridgment of our precious First Amendment freedoms is too great' to be permitted." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (first quoting

---

[5] *But see Beacham v. Braterman*, 300 F. Supp. 182 (S.D. Fla. 1969), *aff'd* 396 U.S. 12 (1969) ("The restoration of civil rights is part of the pardon power and as such is an act of executive clemency not subject to judicial control.").

6

*Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940); and then quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)). Similarly, the United States Supreme Court has struck down such schemes that did not set time limits by which administrators must render decisions. *E.g.*, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225–29 (1990); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 803 (1988).

Each of these cases addressed administrative licensing schemes that burdened applicants' First Amendment rights to free speech. In *Lakewood*, the Supreme Court struck down an ordinance that gave a "mayor the authority to grant or deny applications for annual newsrack permits." 486 U.S. at 755, 772. The Court allowed the plaintiff newspaper to bring a facial challenge to the licensing ordinance because "without standards to fetter the licensor's discretion, the difficulties of proof and the case-by-case nature of 'as applied' challenges render the licensor's action in large measure effectively unreviewable." *Id.* at 758–59. And in *Forsyth County*, the Supreme Court reviewed an ordinance that conferred unlimited authority upon administrative officials to regulate "public speaking, parades, or assemblies in 'the archetype of a traditional public forum.'" 505 U.S. at 130 (quoting *Frisby v. Schultz*, 487 U.S. 474, 480 (1988)). There, the Court explained that a plaintiff may successfully launch a facial First Amendment attack on a licensing scheme if it grants a licensor leeway to arbitrarily "exercise[] his discretion in a content-based manner." *Id.* at 133 n.10. In *FW/PBS*, the Supreme Court reviewed an ordinance "regulat[ing] sexually oriented businesses through a scheme incorporating zoning, licensing, and inspections" that "fail[ed] to set a time limit within which the licensing authority must issue a license, and, therefore create[d] the likelihood of arbitrary denials and the concomitant suppression of speech." 493 U.S. at 220–221, 223. Finally, in *Riley*, the Supreme Court struck down a licensing scheme that governed the

solicitation of charitable contributions because it "fail[ed] to provide for definite limitations on the time within which the licensor must issue the license." *Id.* (citing *Riley*, 487 U.S. at 802).

In summary, the speech-licensing cases that Hawkins cites assess schemes that regulate individuals' ability to exercise their rights to free speech. Notably, none of these cases address the kind of system at issue here. And in similar challenges to states' rights restoration systems, two federal courts of appeals have declined to apply the First Amendment's unfettered discretion doctrine. *Lostutter*, 2023 WL 4636868, at *6 ("[T]he district court correctly held that a partial executive pardon restoring the right to vote is not a permit or license to vote, and thus the unfettered-discretion doctrine does not apply. The *City of Lakewood* line of cases is therefore inapplicable and dismissal for lack of standing was proper."); *Hand*, 888 F.3d at 1212 ("[T]he First Amendment cases cited by the appellees appear inapposite to a reenfranchisement case.") With these cases in mind, the Court turns to address Governor Youngkin's rights restoration system.

### C. Governor Youngkin's Rights Restoration System Is Not a Licensing Scheme

Hawkins argues that, "[f]unctionally, there is no material difference between Virginia's voting rights system and a licensing scheme." (ECF No. 65, at 17.) He hones in on the process itself, explaining that, first, a disenfranchised person applies to a government office to regain the right to vote. Governor Youngkin then has unbridled discretion to assess the individual's rights restoration application. Finally, Governor Youngkin has the sole authority to grant or deny that application, and without Governor Youngkin's approval, an applicant may not lawfully vote.

Hawkins, however, refuses to confront the fundamental differences between administrative licensing schemes and the rights restoration system at issue here. True, the licensing schemes in the cases above have similar steps to those of Governor Youngkin's rights restoration system. But the former functioned to regulate an existing right, and the latter exists to aid Governor Youngkin

8

in assessing whether a candidate deserves restoration of a right he has lost. In the cases above, at the first step, applicants asked government officials for licenses to exercise their right to free speech. Here, Hawkins has no similar underlying right. In assessing Kentucky's rights restoration system, the Sixth Circuit highlighted this critical difference: "[w]hile a person applying for a newspaper rack or parade permit is attempting to exercise his or her First Amendment right to freedom of speech, a felon can invoke no comparable right . . . because the felon was constitutionally stripped of the First Amendment right to vote." *Lostutter*, 2023 WL 4636868, at *4.

The decision stage of Governor Youngkin's rights restoration system also differs from that in the speech-licensing cases. If Governor Youngkin grants a rights restoration application, the disenfranchised felon regains his previously lost right. But in the speech-licensing cases, administrators who granted applicants' licenses confirmed how, when, and where those applicants could engage in their right to free speech. In short, the speech-licensing cases describe systems that function to regulate how a person can exercises an existing right. Governor Youngkin's rights restoration system, however, has a different function: it determines who can reenter the franchise. The Court therefore concludes that, in applying for rights restoration, Hawkins is not subject to a licensing scheme governed by the unfettered discretion doctrine.

## III. CONCLUSION

For the reasons discussed above, the Court will deny Hawkins's motion for summary judgment, (ECF No. 56), and grant the defendants' motion for summary judgment, (ECF No. 60).

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

/s/
John A. Gibney, Jr.
Senior United States District Judge

Date: 7 August 2024
Richmond, VA