```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
                  Richmond Division




      GEORGE HAWKINS,

                        plaintiff,

              versus                    3:23CV232

      GLENN YOUNGKIN, et al,

                        defendants,




         Before:  HONORABLE JOHN A. GIBNEY, JR.
            Senior United States District Judge




                   April 23, 2024

                  Richmond, Virginia




             GILBERT F. HALASZ
            Official Court Reporter
              U. S. Courthouse
            701 East Broad Street
             Richmond, VA 23219
```

APPEARANCES


FAIR ELECTIONS CENTER

by:  Jonathan Sherman, Esq.

**VICTOR MICHAEL GLASBERG & ASSOCIATES**

**by:  Victor M. Glasberg, Esq.**

for the plaintiff



OFFICE OF THE ATTORNEY GENERAL

by:  Steven G. Popps, Esq.

Erika L. Maley, Esq.

**Assistant Attorneys General**

**COOPER & KIRK, PLLC**

**by:  John Duross Ramer, Esq.**

**for the defendants**

1          THE CLERK:  Case number 3:23 CV 232.

2          George Hawkins versus Glenn Younkin, et al.

3          The plaintiff is represented by Jonathan Sherman

4     and Victor Glasberg.

5          On the AT&T line for the plaintiff is Nina Beck.

6          The defendants are represented by Erika Maley,

7     Steven Popps and John Ramer.

8          Are counsel ready to proceed?

9          MR.POPPS:  Yes, Madam Clerk.

10         MR. SHERMAN:  Yes.

11         THE COURT:  I didn't hear you.

12         MR. SHERMAN:  Yes, Your Honor.

13         THE COURT:  Still can't hear you.

14         MR. SHERMAN:  Sorry.

15         Yes, Your Honor.  My apology.

16         THE COURT:  Mr. Popps.  Nice suit.  All right.

17    Thank you all for a coming today.  We are here today on

18    the cross motions for summary judgment in this case.

19         So, who wants -- have you all discussed who is

20    going first?

21         Who filed it?

22         MR.POPPS:  We filed simultaneously, Your Honor.

23    We have not discussed the order of operations.

24         THE COURT:  I will tell you what.  Why don't you

25    go ahead, Mr. Popps.  Always good to have you here.

```
 1          MR.POPPS:  Thank you, Your Honor.  Always a
 2    pleasure to be before The Court.
 3          May it please The Court.
 4          Your Honor, as you know, we are here on cross
 5    motions for summary judgment on this case brought by
 6    Mr. Hawkins.  The defendants, Governor Glenn Youngkin,
 7    and Secretary of the Commonwealth, Kelly Gee,
 8    respectfully request that The Court grant our motion
 9    for summary judgment and deny the plaintiffs' motion
10    for the following reasons:
11          First, and foremost, Your Honor, the unfettered
12    discretion doctrine, or the speech licensing doctrine
13    that the plaintiffs advance is simply not applicable to
14    this case.
15          Secondly, Your Honor, there are multiple appellate
16    courts who have considered this theory and have
17    rejected it.  Most notably --
18          THE COURT:  There are two.
19          MR.POPPS:  There may be three, Your Honor.  There
20    is a Fourth Circuit case which I would think is of
21    particular relevance to us.  It is Howard versus
22    Gilmore.  It was a shorter opinion, to be frank.  But
23    if we are being technical, there were three.
24          The Sixth Circuit in Losfetter, the Eleventh
25    Circuit in Hand, and then the Fourth Circuit in Howard
```

1    versus Gilmore.

2        So all three of those appellate courts have

3    considered the exact same theory advanced by the

4    plaintiffs here, Your Honor, and those courts have

5    ultimately rejected that theory.

6        Third, Your Honor, there are decades --

7        THE COURT:  That's the license theory.

8        MR.POPPS:  I'm sorry?

9        THE COURT:  That is their license theory.

10       MR.POPPS:  Yes, Your Honor, the applicability of

11   the first amendment licensing, speech licensing theory

12   to the restoration of voting.

13       There are also, Your Honor, decades of Supreme

14   Court precedent, and there is long-standing historical

15   practice in the Commonwealth that demonstrates that the

16   clemency powers accorded to the governor are rarely, if

17   ever, reviewed by courts.

18       So, Your Honor, for those reasons we ask that The

19   Court grant our motion for summary judgment, and I look

20   forward to questions from The Court.

21       THE COURT:  All right.  Thank you.

22       Let's hear from the plaintiff.

23       Well, let me -- before we get to that let me just

24   ask.  Here is something that I have puzzled over.

25   Suppose the Governor used his clemency power in some

1    invidious way?  Like he only restored voting rights of

2    white people, or whatever.  Is there any remedy for

3    that?  Other than voting him out of office?

4         MR.POPPS:  There is a legal remedy, Your Honor,

5    and it is the protections accorded by the 14th

6    amendment.

7         THE COURT:  Okay.  So he would have to bring a

8    14th amendment, not first amendment?

9         MR.POPPS:  That's right.  But it is important to

10   remember in this case Your Honor, there is no evidence

11   of that.

12        THE COURT:  I understand that.

13        MR.POPPS:  Okay.

14        THE COURT:  I am just sort of --

15        MR.POPPS:  Not even an allegation.

16        THE COURT:  -- trying to figure out whether there

17   is a remedy in an appropriate case.

18        MR.POPPS:  There absolutely is.  The 14th

19   amendment --

20        THE COURT:  Does this sort of executive privilege

21   argument that you are making, does that apply to lower

22   level executives?  Could the mayor of Ashland, for

23   instance, or mayor of Richmond, claim that?

24        MR.POPPS:  I think it would depend on what exactly

25   the power of the authority that that executive, that

1    subordinate executive is claiming, Your Honor.  In this

2    instance we have perhaps the highest and most important

3    level of clemency, which is re-enfranchisement.  And

4    that is specifically accorded to the governor by the

5    constitution of Virginia and by statute.

6        So I think it would depend on what clemency

7    powers, if any, a subordinate executive at the county

8    level may have.

9        THE COURT:  Well, okay.

10        I am fairly familiar with some local government

11    stuff.  Suppose the executive of, you know, the head of

12    a local government were to grant somebody a conditional

13    use permit for their property.  Is that something that

14    they could be sued over?  Or they would be immune from

15    suit under this doctrine that you are discussing with

16    us?

17        MR.POPPS:  I think it would depend on what type of

18    right is being exercised, but from what I understand

19    The Court's hypothetical to be positing --

20        THE COURT:  Land use permit.

21        MR.POPPS:  -- so property rights, yes, sir.

22        So in that case I think it would be a form perhaps

23    of speech or of use of your property.  And so in that

24    case you may have a licensing scheme that would be

25    subject to review.  But, again, the difference here is

1     that in those cases a potential plaintiff is seeking

2     permission to exercise a right that he or she already

3     has and is constitutionally guaranteed.

4         THE COURT:  Well, it may not.  I mean when you get

5     a license you don't have the right.

6         MR.POPPS:  I think in that, in the hypothetical we

7     would be talking about -- well, for instance in the

8     speech cases, Your Honor, we are talking about a first

9     amendment right of speech.  That is guaranteed by the

10    constitution.  And an applicant is asking the

11    government for permission to prospectively exercise

12    that right that is already guaranteed.

13        In this instance we have rights that have been

14    stripped by the constitution, both the Virginia

15    constitution and authorized by the U.S. constitution,

16    and now there is no underlying right to be

17    re-enfranchised.  So I think it is apples and oranges.

18        THE COURT:  But you have no general right to have

19    a parade or a demonstration.

20        MR.POPPS:  But you do have a right --

21        THE COURT:  You have a right to speak freely.

22        MR.POPPS:  Yes, sir.

23        THE COURT:  So in order to exercise that right you

24    need to -- you need to get the permits, the parade

25    permit is what I will call it.

1           MR.POPPS:  Yes, sir.

2           THE COURT:  And here in order to exercise the

3      right to vote you need to get the governor's approval,

4      right?  Or clemency, that is a form of clemency.

5           MR.POPPS:  Yes, Your Honor.

6           THE COURT:  So, I am a little -- so, does your

7      argument require me to conclude that voting is not

8      protected by the first amendment?

9           MR.POPPS:  I don't think so, Your Honor.  I think

10     my argument only requires The Court to conclude that a

11     doctrine in Lakewood and Forsyth County and those lines

12     of cases from the Supreme Court apply just as the

13     Supreme Court has said, which is only to speech

14     licensing cases.  In Lakewood it was seeking permission

15     to put a newspaper vending machine.  In Forsyth County

16     it was permission to hold a particular parade at a

17     particular time and place.  That is clearly speech, and

18     regulating speech, and a license for speech.  This case

19     does not regulate speech.  This case involves the

20     re-enfranchisement power, which is --

21          THE COURT:  So then you are saying that in order

22     to distinguish this case from Lakewood and Forsyth I

23     have to conclude that voting is not a form of

24     expression?

25          MR.POPPS:  That is my argument, Your Honor, but I

1    don't think The Court even needs to go that far.  I

2    think The Court simply would need to rule that speech

3    licensing cases are limited, as the Supreme Court has

4    said, to speech licensing issues.  And this is a

5    re-enfranchisement issue.  And that doctrine has no

6    applicability here.

7        THE COURT:  Okay.

8        And is your sort of executive immunity argument

9    part of the political question doctrine that you have

10   raised?

11       MR.POPPS:  I would resist The Court's label that

12   it is an immunity doctrine.

13       THE COURT:  Well, whatever it is, the thing he

14   can't sued about.

15       MR.POPPS:  Just simply under this doctrine, Your

16   Honor -- and I want to be make clear that, as we

17   discussed earlier, that there are remedies, not the

18   case right now, but if there was invidious

19   discrimination, unlawful discrimination happening in a

20   restoration of voting rights system there are remedies

21   for that.  It is just not a speech licensing doctrine

22   that is the remedy.

23       THE COURT:  Okay.  But you said that there is a --

24   that there is a doctrine that says that this is

25   entrusted to the discretion of the governor and

1    therefore there should not be litigation to compel him

2    to exercise his discretion one way or the other.

3         MR.POPPS:  Yes, Your Honor.

4         THE COURT:  Is that a branch of the political

5    question doctrine?

6         MR.POPPS:  I think partially, yes, Your Honor.  I

7    think it is also a branch of the doctrine in the line

8    of cases.  Willard, excuse me, Woodward and Dumschat

9    where the Supreme Court has said, albeit in the parting

10   context, that the clemency powers accorded to a chief

11   executive are rarely if ever reviewed; and, yes, Your

12   Honor, in part because of the political question

13   doctrine.

14        THE COURT:  Well, this is a form of clemency.

15        MR.POPPS:  It is, yes, Your Honor.

16        THE COURT:  It is not complete clemency, but a

17   form of it.

18        MR.POPPS:  Correct.

19        THE COURT:  Okay.

20        I just find the whole political question doctrine

21   to be sort of a troublesome area.  Courts used to use

22   it to get out cases they don't want to decide.

23        Okay.  All right.

24        Anything else you want you to add?

25        MR.POPPS:  No, Your Honor.  Thank you.

```
 1           THE COURT:  Thank you.

 2           Let's hear from Mr. Sherman.

 3           MR. SHERMAN:  Yes, Your Honor.

 4           THE COURT:  Your client is here today?

 5           MR. SHERMAN:  Good morning, Your Honor.

 6           Yes, George Hawkins is with us today, plaintiff.

 7           THE COURT:  Mr. Hawkins, good to see you, sir.

 8      Thank you for coming.

 9           AUDIENCE MEMBER:  Yes, sir.

10           MR. SHERMAN:  Good morning, Your Honor.  Thank

11      you.

12           All one has to do to see the first amendment

13      violation in this case is to say defendants go out

14      loud.  Governor Youngkin is here fighting for the right

15      to retain the power to selectively decide who may be

16      given the right to vote after a felony conviction has

17      stripped them of it.  And the governor refers to this

18      as a quote, predictive determination, as to who will

19      quote, live as a responsible citizen.

20           The governor's predictions as to who will live as

21      a quote-unquote, responsible citizen do not satisfy the

22      Supreme Court standards under Everson, Shuttlesworth.

23      In 1965 the Supreme Court decides in Shuttlesworth that

24      when first amendment political expression or expressive

25      conduct is on the line the standards governing that
```

 1   need to be narrow, quote, narrow, objective and

 2   definite.

 3        THE COURT:  Is there a Supreme Court case that

 4   says that voting is an exercise of first amendment

 5   rights?

 6        MR. SHERMAN:  Is there a case that says that?

 7        THE COURT:  Yes.

 8        MR. SHERMAN:  There are cases that do refer to,

 9   like Norman V Reed from 1992 that refer to voters'

10   right to express themselves at the ballot.  They are

11   speaking of the right to select candidates, the right

12   to chose political parties.  There is also, you know,

13   going back as far as 1965, there is Illinois Socialist

14   Workers Party.  A variety of Supreme Court cases that

15   refer to it.  They are usually in ballot access cases

16   that are talking about the right of political parties

17   and candidates to get on the ballot.  But in those

18   cases, as we have said in our briefs, they are also

19   speaking of the other side of the coin where voters

20   have the right to chose their candidates and chose

21   political parties as well.

22        THE COURT:  Go ahead.

23        MR. SHERMAN:  So since that decision in

24   Shuttlesworth there has been a long-standing precedent

25   for nearly 60 years that the standard governing rights

```
 1    restoration needs to be narrow, objective and definite.

 2    And the Responsible Citizen test clearly -- that

 3    Governor Youngkin has been employing -- clearly fails

 4    that standard.  They don't even --

 5         THE COURT:  They have no idea what Governor

 6    Youngkin uses to decide these cases.  He announces at

 7    the end that somebody is a responsible citizen or not,

 8    but how he gets there is anybody's guess.

 9         MR. SHERMAN:  Well, Your Honor --

10         THE COURT:  He has a bunch of information, but

11    how --

12         MR. SHERMAN:  Right.

13         THE COURT:  -- you know, if this was, if this was

14    Google we would say we take all that information and

15    put it in an algorithm that leads to responsible

16    citizen.  But we don't have that algorithm.  We don't

17    have any way to know how it is Governor Youngkin does

18    it.

19         MR. SHERMAN:  Correct, Your Honor.

20         But in response to the interrogatories and

21    requests for admission that plaintiff served on

22    defendants they did say that, however vague it is, and

23    subjective, their standard is they look at this, the

24    objective information they have collected and then

25    Governor Youngkin makes an assessment as to whether or
```

1    not the person, quote, in the future -- he makes a

2    prediction as to whether they will, quote, live as a

3    responsible citizen.

4        But, we, our position is that is hopelessly vague

5    and subjective, and they could have mooted this case by

6    converting that standard into a set of objective rules

7    and criteria.  If they mean law abiding, they could

8    have set a requirement that says, no convictions within

9    three years.  They could reconstruct that very vague

10   and subjective standard and make it objective.  But

11   they have refused to do so.

12       They don't make any argument, though, in their

13   briefs that this standard complies with the first

14   amendment rules that we have been discussing in this

15   case.  And along with the key admissions about the lack

16   of rules and criteria, and Governor Youngkin has

17   admitted that he is free to ignore any of those

18   purported, quote-unquote, factors, he is free to ignore

19   them entirely, that is essentially the ball game on

20   liability.

21       THE COURT:  Well, they say, opponents say, that we

22   have to classify this as a license.

23       MR. SHERMAN:  It is functionally a licensing

24   system.

25       THE COURT:  Functionally, but it is not a license.

1          MR. SHERMAN:  It is not formally --

2          THE COURT:  I think of a license, I think of what

3     somebody gets to drive a car, or to, in other states,

4     have a liquor store or whatever.  But this is different

5     from that.

6          MR. SHERMAN:  Formally it is different, but

7     someone applies to a government office for permission

8     to engage in first amendment protected expressive

9     conduct.  That government official reviews their

10    application.  And then in their discretion, their

11    unfettered discretion, decides whether or not to grant

12    or deny permission to engage in that expressive

13    conduct.

14         In that respect it is functionally no different

15    from applying for a parade permit or a newspaper rack

16    permit, or any of the other permit or licensing schemes

17    considered in the Supreme Court's prior decisions in

18    these areas.

19         It is as prospective, it is not purely

20    retrospective, it is prospective, someone can vote in

21    the future.  It is not simply a quote, a one-time act

22    of clemency.  If you are denied you have to keep

23    re-applying in order to one day hopefully regain your

24    right to vote.  Many of those purported distinctions

25    sort of crumble upon a closer inspection,

1   dysfunctionally this is operating like a license

2   scheme.

3       It is curious that they balk at applying objective

4   rules and criteria when all of the information they are

5   ingesting from the application from the applicant is

6   objective.  So what is the hesitation for applying a

7   system of objective rules and criteria when all of the

8   information they are reviewing is objective.  They are

9   not holding a hearing, they are not getting an essay.

10  It doesn't make sense other than that Governor Youngkin

11  wants the right to second guess what the courts have

12  already done in imposing a sentence.

13      THE COURT:  So if we were to take the word

14  "license" out of this case, because, I don't know, it

15  doesn't seem like a licensing, what your argument is

16  that when the governor makes a discretionary decision

17  that affects someone's first amendment rights, he has

18  to use objective criteria.

19      MR. SHERMAN:  Correct.  We believe Shuttlesworth

20  requires that.  The word "license" is not important.

21  What is happening is what is important.  And

22  functionally the governor is selecting who may and who

23  may not regain the right to vote.

24      THE COURT:  Does that include that the right to

25  vote is a form of protected speech?

1        MR. SHERMAN:  Expressive conduct, yes, Your Honor.

2    So, yes, absolutely.  For the fist amendment for

3    unfettered discretion doctrine to apply we have to, we

4    believe we have established that, you know, every form

5    of conduct and expression surrounding the right to vote

6    in the electoral context is already protected by the

7    right to vote.  Electioneering outside of a polling

8    place, campaign contributions, campaign expenditures,

9    even of a yard sign, City of Ladue v Gilleo, a yard

10   sign on the lawn.  That is first amendment.

11       THE COURT:  What is the message that is

12   communicated by a vote?

13       MR. SHERMAN:  What is the message communicated?

14       THE COURT:  What is the expression?

15       MR. SHERMAN:  Voters, even though it is anonymous,

16   voters show up at the ballot box and express their

17   support for candidates, political parties, when they

18   are voting on ballot initiatives or Constitutional

19   amendments, they are voting for a particular causes or

20   changes in the law.  All of this speaks in the

21   aggregate.  We don't know what any individual voter

22   says, but this country, of course, has a long history

23   of protecting anonymous speech, going all the way back

24   to Common Sense and Thomas Payne, which was published

25   under a pseudonym.  The Federalist Papers were

1    published under a pseudonym.  MacIntyre V Ohio Election

2    Commission from the '90s, in the case decided by the

3    Supreme Court, protected, struck down a ban on

4    anonymous pamphlets.  So the anonymity of voting

5    doesn't cancel out the expressive content of what

6    voters are doing.

7        I also want to address head on the argument that

8    there is no first amendment protection here because

9    disenfranchised people with felony convictions don't

10   currently have a right to vote under state law.  Their

11   position essentially is the first amendment unfettered

12   discretion doctrine only applies when the person in

13   question currently has a right to speak, a right to

14   publish, a right to vote.  But that just can't be.

15   They are fixated on where the applicant begins, that

16   default position, but not where they end up.  Where

17   they end up is people are granted the right to engage

18   in expressive conduct.  Whether we call that a license

19   or something else, doesn't really matter.  The Governor

20   is selectively authorizing people to engage in that

21   right, which is protected by the first amendment as

22   expressive conduct.

23       I think it is telling that over all the time we

24   have been briefing this case and debating this, the

25   defendants, defendants have not come with a coherent

1    response to our hypothetical about 16 and 17 year olds,

2    and non citizens being selectively enfranchised.  The

3    most they say in the reply brief is that the prefix

4    "re" in re-enfranchisement is doing a lot of work

5    because the people at issue in this case once had but

6    lost the right to vote because they quote, committed a

7    serious crime.  But that is a moral argument, not a

8    legal one.  For purposes of the first amendment all

9    three groups of people are ineligible as a matter of

10    state law, and selectively, arbitrarily enfranchising

11    or re-enfranchising them is a violation of the first

12    amendment unfettered discretion doctrine.

13         Otherwise it would just turn on the semantics, you

14    know, this doctrine application would just turn on the

15    semantics of state law.  And any state legislature

16    could frustrate the application of this federal

17    constitutional rule.

18         Beyond that argument there are essentially two

19    broad arguments that defendants make in this case,

20    clemency and tradition.  They argue that because

21    Virginia law defines voting rights restoration as a

22    form of clemency that federal courts have no business

23    whatsoever reviewing this under -- on first amendment

24    grounds.

25         One of the great ironies I think of this case is

1    that defendants are invoking a vestige of the English

2    monarchy as a shield against the claim under the first

3    amendment which, of course, was originally designed to

4    get at or to prevent the exercise of arbitrary power

5    that subjects of the English monarchy had experienced.

6         They make this argument even though we are not

7    arguing for system of like judicial review of the

8    denial.  We are not asking for review of George

9    Hawkins' denial.  We are not asking for a system of

10   judicial review of the individual restoration

11   decisions.  What we are arguing for is systemic change

12   to a non-arbitrary system.  And Woodward v Dumschat,

13   really those due process cases only speak to review of

14   individual denials of individual clemency in individual

15   clemency cases.

16        Tradition is a much weaker argument.  I won't

17   spend a great deal of time on this, but suffice it to

18   say --

19        THE COURT:  Pause for a second here.

20        Suppose someone who is, you know, of the caliber

21   of Mother Teresa and applies to vote and meets all the

22   -- let's just assume for a second that the Governor

23   were to adopt -- I don't know -- sort of a policy

24   manual or a set of rules that governs.  And if Mother

25   Teresa is deemed ineligible even though she meets all

1    the criteria, and is clearly a good citizen, could she

2    then sue the governor to grant her or to compel him to

3    grant her clemency?

4         MR. SHERMAN:  So, I think this would be a mater of

5    state law following this case.  Let's presume --

6         THE COURT:  But it is still a -- it is still --

7    she would still be denied first amendment rights,

8    according to you.

9         MR. SHERMAN:  Correct, Your Honor.  But our view

10   of it is that she wouldn't be able to bring a

11   federal -- it wouldn't be a federal constitutional

12   issue if there were a non-arbitrary systems.  So if

13   Mother Teresa is applying, and there is a non-arbitrary

14   system, we don't believe that she can invoke the

15   federal constitutional doctrine at issue in this case.

16   If plaintiff were to prevail here, if defendants were

17   to replace the current system with a set of objective

18   rules and criteria, that is now Virginia policy or law.

19   And if it is not being followed, then I think Mother

20   Teresa might have an action in state court if

21   reasonable time limits, for instance, were not being

22   followed, or if an obvious -- if the basis for the

23   denial was something that she had obviously satisfied,

24   that might be a question of state law to be adjudicated

25   in state court, but, no, I don't think every individual

1    applicant can run to federal court and say, you know,

2    this non-arbitrary system wasn't applied correctly in

3    my case.  That, I don't think --

4        THE COURT:  They could come in and say, well, I

5    still am not being able to exercise my first amendment

6    right because the Governor didn't apply the rule

7    correctly.

8        MR. SHERMAN:  Correct.  I think that is correct.

9    Right.  Once there is a system of objective rules and

10   criteria, no one has standing at that point to bring a

11   claim under the first amendment unfettered discretion

12   doctrine.

13       THE COURT:  Okay.  Well, but are there other first

14   amendment doctrines that they could rely on?  Other

15   than the unfettered discretion doctrine?

16       MR. SHERMAN:  There is a doctrine under the first

17   and 14th amendment, the Anderson Burdick test, which

18   Your Honor, may be familiar with, which sort of argues

19   that a certain scheme is an undue burden on the right

20   to vote.  Traditionally this has been thought to only

21   apply to people who have the present existing right to

22   vote, not people who were disenfranchised.  But I don't

23   think that would have -- I don't think a plaintiff

24   invoking that would have much traction.  But it is

25   possible that someone would try to sue, but I don't

1    know how far they would get.

2         THE COURT:  Okay.

3         MR. SHERMAN:  I did want to add on the clemency

4    point before moving on that defendant's counsel said

5    clemency is a part of the political question doctrine,

6    I have never seen any case linking the two before there

7    is clemency on the one hand and political question

8    doctrine, whatever it is, whether it is jurisdictional

9    or justiciability, I have never seen the two overlap.

10        On defendant's tradition argument.  Tradition, of

11   course, doesn't trump the constitution.  Many

12   Constitutional rules --

13        THE COURT:  We have had a few traditions in

14   Virginia that were unconstitutional.

15        MR. SHERMAN:  Correct, Your Honor.  Yes, there

16   were no Miranda warnings for much of the U.S. history,

17   segregation, there was a long tradition of segregation

18   in this country.  There was no right to counsel for

19   indigent criminal defendants.  Many constitutional

20   rights that have been established for the first time,

21   or applied in a new context, as this one, we are suing

22   under an 86-year-old, long-standing precedent decided

23   by the Supreme Court.  So, if anything, there is long

24   standing tradition in this country of protecting the

25   political expressive conduct from arbitrary licensing.

1          I did want to also address defendant's argument in

2     their brief that if we were to prevail in this case

3     then other suits, other legal actions are coming for

4     pardons and commutations, and other forms of clemency.

5     We just don't see that as the case.  Courts can draw a

6     bright line rule and say voting rights restoration,

7     that is directly influencing, directly controlling

8     whether someone can exercise the right to vote, but the

9     other forms of clemency just have an indirect effect at

10    best.  That is a bright line rule.

11         THE COURT:  Can somebody bring a second amendment

12    suit because the governor hasn't restored their right

13    to possess a firearm?

14         MR. SHERMAN:  People have tried to apply the

15    unfettered discretion doctrine in the second amendment

16    case, context.  So far they have been losing.  There is

17    a case Fisher, forgetting the defendant's name, out of

18    the ninth circuit.  So far they have all been

19    unsuccessful, because the origins, the original

20    understanding of the first amendment and the second

21    amendment are completely different.  There are reasons

22    that we have this prophylactic doctrine in the context

23    of speech and other expression, other political

24    expression, and don't have that in the context of the

25    right to firearms, which is treated just very

1    differently because of the public safety concerns.

2         A quick word on, before, getting off the merits to

3    the remedy arguments of the defendants make, I did want

4    to say a word on the evidence.  Defendants of course

5    make no argument here that their restoration scheme

6    satisfies the first amendment.  We think that the

7    evidence though does corroborate they have admitted to

8    in the interrogatories and in the request for

9    admission, the main purpose here is just to demonstrate

10   that it is not the case that Governor Youngkin just

11   doesn't want told what to do, but has magically landed

12   upon a system of objective rules and criteria that

13   treats applicants in a uniform consistent coherent

14   manner.  It is quite the opposite.  Any permutation of,

15   quote-unquote, factors -- that is their term -- any

16   permutation results in inconsistent treatment of

17   applicants.  And we demonstrate that in the brief, our

18   opening brief.

19        So, quickly on the remedy.  We don't think that

20   the political question doctrine has any application

21   here whatsoever.  Primarily because even if the

22   plaintiff prevails The Court doesn't need to implement

23   and impose a specific set of objective rules and

24   criteria.  Doesn't need to implement and impose a

25   specific reasonable definite time limit.  That can be

1    for the defendants to come up with.  There are numerous

2    cases throughout the country, numerous federal

3    constitutional cases, in which defendants proposed a

4    remedial scheme in the first instance.  Redistricting

5    is one line of cases where this occurs, the remedial

6    plan is first a proposal by the state legislature

7    before the court steps in if they can't come up with

8    one that complies with the constitution or the voting

9    rights act.  There are also cases under, in prison

10   reform cases, there are also cases under the first

11   amendment unfettered discretion doctrine.  We cited to

12   this Court Child Evangelism Fellowship of South

13   Carolina where the Fourth Circuit said it is not

14   incumbent upon defendants to impose any particular set

15   of objective, neutral, rules and criteria, they just

16   need to pick some.  Sentinel Communications, another

17   first amendment case out of the Eleventh Circuit.

18   There are lots of instances around the country.  Swann,

19   even going back to the desegregation cases from the

20   '60s and '70s, Swann v Charlotte-Mecklenburg.  The

21   remedial plan was first for the defendants to propose,

22   and then for The Court to review for compliance.  So

23   the political question doctrine doesn't have any

24   application where the court is imposing and selecting

25   specific -- a specific remedy.  All the court needs to

1    do is review whether that proposed remedy complies with

2    the first amendment requirements.  Not unique to this

3    case.

4          Lastly --

5          THE COURT:  What do you have to do comply with

6    that?

7          MR. SHERMAN:  Sorry?  I didn't hear.

8          THE COURT:  What do you have to do to comply with

9    that?

10         MR. SHERMAN:  To comply with the first amendment

11   they need a set of objective neutral rules and criteria

12   and a reasonable definite time limit.  They have made

13   the case themselves that three months is a workable

14   time limit.  They make some arguments about how do we

15   know, you know, in certain cases they are waiting for

16   information from state agencies or the client.  They

17   could set a reasonable definite time limit of two

18   months from the completion.  Two months from the

19   completion of the application.  That would be a

20   reasonable definite time limit for the governor to make

21   his decision once an application is complete.  So that

22   it doesn't linger for months and months.  They could

23   also set a reasonable definite time limit for the

24   application process to be initiated.  Sometimes they

25   have waited months just to initiate the request from

1    the applicant or initiate the request from other state

2    agencies.

3         Lastly, I do want to address defendants' claim

4    that the proposed remedy would conflict with Howell v

5    McAuliffe and the Supreme Court of Virginia's

6    interpretation of the Virgina Constitution.  To the

7    extent they are arguing that Howe v McAuliffe requires

8    a purely discretionary restoration system, that would

9    conflict with the federal court order saying that kind

10   of system violates the first amendment and the federal

11   court's injunction would trump any state court decision

12   to the contrary.  But to the extent they are arguing

13   that Howe versus McAuliffe requires individualized

14   review, there is a way, an easy way, to reconcile the

15   two.  Individualized doesn't mean arbitrary.  And any

16   application that demonstrates whether the individual

17   factors and facts of this person's case, the crime they

18   have committed, whether they are paying off their legal

19   financial obligations, et cetera, those are the

20   individualized facts of that case, and they -- a

21   remedial scheme can simply reconcile the two saying it

22   is non discretionary, it is not arbitrary, but it also

23   has to be based on an application and individualized

24   consideration of those facts.

25        So we don't see any conflict there.  And I think

1    they are just conflating these two in an attempt to

2    deter The Court from ruling in plaintiff's favor.

3        Without -- with that, if The Court has any other

4    questions from me, Your Honor.

5        THE COURT:  Thank you.

6        MR. SHERMAN:  Thank you, Your Honor.

7        THE COURT:  Mr. Popps, do you have anything to say

8    in response to that?

9        MR.POPPS:  Your Honor, the defendants don't have

10   anything to add unless The Court has questions.

11       THE COURT:  All right.

12       I have in front of me a motion requesting judicial

13   notice -- why is this here?  I already decided that.

14       Okay.  Why is this here?  In case I need to look

15   at it?  All right.

16       Tell me this.  What if this case goes forward?  I

17   take it both of you think that this is a case in which

18   there really aren't any factual disputes and it is ripe

19   for summary judgment.  Is that fair to say?

20       MR. SHERMAN:  Yes, Your Honor.

21       MR.POPPS:  Yes, Your Honor.

22       THE COURT:  So there are no pending discovery

23   matters or anything like that that need to be addressed

24   by me or on-going between the two sides?

25       MR. SHERMAN:  No, Your Honor.

```
 1        MR.POPPS:  No, Your Honor, no discovery issues at
 2   all.
 3        THE COURT:  All right.
 4        Well, okay.  I have got to say that this case
 5   raises difficult questions.  I have a hard time seeing
 6   re-enfranchisement as a form a license.  But I
 7   understand it a little better when I call it the
 8   unfettered discretion doctrine that affects someone's
 9   first amendment rights.
10        But I think it is a difficult case.  So I am going
11   to, to the extent anything is threatening to be on
12   going in this case I will stay the case until I decide
13   the summary judgment motion.  And I will have a
14   decision on this relatively quickly.
15        So, Mr. Popps, you don't want to -- you don't want
16   to respond to the accusation you are reaching back to
17   the English monarchy?  I realize that you are a fan of
18   all things English.
19        MR.POPPS:  Particularly King William and Queen
20   Mary, Your Honor.
21        THE COURT:  There you go.
22        MR.POPPS:  We are not reaching back to the
23   monarchy in the sense --
24        THE COURT:  I don't think you are.
25        MR.POPPS:  Okay.  Thank you, Your Honor.
```

1          THE COURT:  All right.  Thank all very much.

2      And I will be catching up with you soon.

3      Thank you.

4                      HEARING ADJOURNED.

5

6      THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

7

8                    GILBERT FRANK HALASZ

9                   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25